**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

_____

In Re:                                                )
                                                           )
ANGEL MEDICAL SYSTEMS, INC.,    )                Chapter 11
a Delaware corporation,                        )                Case No. 18-12903 (    )
                                                           )
          Debtor.[1]                                   )
_____)


**AMENDED DISCLOSURE STATEMENT OF ANGEL MEDICAL SYSTEMS, INC.**


HONIGMAN MILLER SCHWARTZ                    MORRIS JAMES LLP
AND COHN LLP                                              Jeffrey R. Waxman, Esquire
Joseph R. Sgroi, Esquire                               500 Delaware Avenue, Suite 1500
Glenn S. Walter, Esquire                              Wilmington, DE  19801-1494
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226-3506


Proposed Counsel to the Debtor


Dated:  December 26, 2018

---

[1] The Debtor's address is 40 Christopher Way, Suite 201, Eatontown, NJ 07724.  Its EIN is 52-2360129.

Angel Medical Systems, Inc. (the *"Debtor"*) is sending you this disclosure statement (the *"Disclosure Statement"*) because you may be a creditor entitled to vote on the Prepackaged Plan of Reorganization of Angel Medical Systems, Inc. (the *"Plan"*). This solicitation (the *"Solicitation"*) of votes is being conducted to obtain sufficient acceptances of the Plan *prior* to the filing of a voluntary case under Chapter 11 of Title 11 of the United States Code (the *"Bankruptcy Code"*). If sufficient votes to obtain confirmation of the Plan are received and certain other conditions are met, the Debtor intends to file its voluntary case under Chapter 11 of the Bankruptcy Code to implement the Plan. Because no Chapter 11 case has yet been commenced, this Disclosure Statement has not been approved by any Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. Following the commencement of its Chapter 11 case, the Debtor expects to seek promptly an order of the Bankruptcy Court (1) approving (a) this Disclosure Statement as having contained "adequate information" and (b) the Solicitation as having been in compliance with Section 1125(b) of the Bankruptcy Code, and (2) confirming the Plan described herein.

**AMENDED DISCLOSURE STATEMENT**

**DATED DECEMBER 26, 2018**

**PREPETITION SOLICITATION OF VOTES**
**WITH RESPECT TO PREPACKAGED PLAN OF REORGANIZATION**

**OF**

**ANGEL MEDICAL SYSTEMS, INC.**

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

Neither this Disclosure Statement nor the Plan has been filed with or reviewed by any Bankruptcy Court, and the securities to be issued on or after the Effective Date (as defined below) are not the subject of a registration statement filed with the United States Securities and Exchange Commission (the *"SEC"*) under the United States Securities Act of 1933, as amended (the *"Securities Act"*), or any securities regulatory authority of any state under any state securities law (*"Blue Sky Law"*). The Debtor is relying on section 4(2) of the Securities Act and similar provisions of state securities law, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of new securities in connection with the Solicitation and the Plan.

Each holder of 2012 Notes, 2014 Notes, and 2016 Notes (each a *"Noteholder"*) or authorized signatory for the beneficial owner of a 2012 Note, 2014 Note or 2016 Note (collectively, the *"Notes"*) will be required to certify on its Ballot whether such holder or beneficial owner is an Accredited Investor, as that term is defined by Rule 501 of Regulation D of the Securities Act.

The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell, or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement and the information set forth herein are confidential. This Disclosure Statement contains material non-public information concerning the Debtor and its respective securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended (the *"Securities Exchange Act"*), and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any person, under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION OF ANGEL MEDICAL SYSTEMS, INC. IS 5:00 P.M. PREVAILING EASTERN TIME ON JANUARY 14, 2019, UNLESS EXTENDED BY THE DEBTOR (THE *"VOTING DEADLINE"*). THE RECORD DATE FOR DETERMINING WHETHER A HOLDER OF AN IMPAIRED CLAIM IS ENTITLED TO VOTE ON THE PLAN IS, DECEMBER 14, 2018 (THE *"VOTING RECORD DATE"*).

THE DEBTOR IS FURNISHING THIS DISCLOSURE STATEMENT TO EACH MEMBER OF AN IMPAIRED CLASS UNDER THE PREPACKAGED PLAN OF REORGANIZATION OF ANGEL MEDICAL SYSTEMS, INC. THIS DISCLOSURE STATEMENT IS TO BE USED BY EACH RECIPIENT SOLELY IN CONNECTION WITH HIS, HER, OR ITS EVALUATION OF THE PLAN, AND USE OF THIS

**DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. WITHOUT THE PRIOR WRITTEN CONSENT OF THE DEBTOR, THIS DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO OTHERS (OTHER THAN THOSE ADVISORS OF ANY RECIPIENT OF THIS DISCLOSURE STATEMENT WHO MAY REVIEW THE INFORMATION CONTAINED HEREIN TO ASSIST SUCH RECIPIENT IN HIS, HER, OR ITS EVALUATION OF THE PLAN).**

Prepared by:

Joseph R. Sgroi
Glenn S. Walter
Honigman Miller Schwartz & Cohn LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI  48226-3506
(313) 465-7997

Proposed Counsel for Debtor

Jeffrey R. Waxman
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
(302) 888-5842

29644614.2

# INTRODUCTION AND DISCLAIMER

Angel Medical Systems, Inc. (*"Debtor"*) submits this Amended Disclosure Statement to certain holders of claims against and interests in the Debtor in connection with the Solicitation of acceptances of the proposed Prepackaged Plan of Reorganization of Angel Medical Systems, Inc., dated as of December 26, 2018 (a copy of which is annexed hereto as Appendix A). This Disclosure Statement amends and restates the Disclosure Statement of Angel Medical Systems dated December 17, 2018. The Debtor is soliciting such acceptances from holders of 2012 Notes, 2014 Notes, and 2016 Notes.[1]

Under the Plan, the Debtor proposes to restructure its financial affairs, including the obligations owed under the 2012, 2014, and 2016 Notes. To effectuate the restructuring of such obligations, assuming the requisite votes are obtained on the Plan, the Debtor will file for bankruptcy relief (and will concurrently or shortly thereafter file the Plan) and will seek the necessary relief from the Bankruptcy Court to continue to operate in the ordinary course of business.

In furtherance of its restructuring, the Debtor will be entering into the Transaction Documents, collectively, the Amended and Restated Certificate of Incorporation, the New Series A Preferred Stock Purchase Documents, the New Equity Interests, and any agreement, contract, instrument, and other agreement or document executed or delivered in connection with the foregoing. Together, the Plan and the Transaction Documents provide, inter alia, (i) for existing equity in the Debtor to be cancelled; (ii) the conversion of the 2012 Notes and 2014 Notes into New Common Stock; (iii) the conversion of 2016 Notes into New Series A preferred stock; and (iv) a new capital infusion under a rights offering of New Series A Preferred Stock.

The Debtor is furnishing this Disclosure Statement to all holders of Claims in Class 3 (2012 Notes), Class 4 (2014 Notes), and Class 5 (2016 Notes) to enable such claimholders to vote to accept or reject the Plan. This Disclosure Statement is to be used by holders of Class 3 (2012 Notes), Class 4 (2014 Notes), and Class 5 (2016 Notes) solely in connection with their evaluation of the Plan. Use of this Disclosure Statement for any other purpose is not authorized. This Disclosure Statement may not be reproduced or provided to anyone other than advisors to the recipient without the prior written consent of the Debtor.

The Debtor intends to use any and all Ballots accepting the Plan that were received pursuant to the Solicitation and not subsequently withdrawn prior to the Voting Deadline to seek confirmation of the Plan. Votes in favor of the Plan may also be used by the Debtor as acceptances to any modifications to the Plan provided such modifications do not materially and adversely affect the treatment of Claims. *See* **Section VIII – "Consequences of the Plan**."

---

[1]    All capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

This Disclosure Statement describes certain aspects of the Plan, the Debtor's operations, the restructuring of the Debtor's financial affairs, the disposition of the Debtor's obligations with respect to the 2012, 2014, and 2016 Notes, the Debtor's post-restructuring management and other related matters.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE APPENDICES AND EXHIBITS THERETO IN THEIR ENTIRETY.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

**THE DEBTOR HAS NOT COMMENCED A CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME.**  BECAUSE NO BANKRUPTCY CASE HAS BEEN COMMENCED, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  NONETHELESS, IF A CHAPTER 11 CASE IS SUBSEQUENTLY COMMENCED, THE DEBTOR INTENDS TO SEEK PROMPTLY AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND DETERMINING THAT THE SOLICITATION OF VOTES ON THE PLAN BY MEANS OF THIS DISCLOSURE STATEMENT COMPLIED WITH SECTION 1126(b) OF THE BANKRUPTCY CODE.

THE DEBTOR INTENDS TO CONTINUE OPERATING ITS BUSINESS IN CHAPTER 11 IN THE ORDINARY COURSE AND TO SEEK THE NECESSARY RELIEF FROM THE BANKRUPTCY COURT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO THE SATISFACTION OR WAIVER OF MATERIAL CONDITIONS PRECEDENT, INCLUDING ALL CONDITIONS PRECEDENT TO ENTERING INTO THE NEW SERIES A NOTE PURCHASE AGREEMENT DOCUMENTS.  THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS PRECEDENT WILL BE SATISFIED.

THE DEBTOR CURRENTLY INTENDS TO SEEK TO EFFECTUATE THE PLAN PROMPTLY AFTER CONFIRMATION OF THE PLAN.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR.  PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT (A) THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS IN CERTAIN CLASSES AND (B) THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS ARE DESCRIBED IN **SECTION V — "SUMMARY OF THE PLAN OF REORGANIZATION."**

IF THE PLAN IS NOT CONFIRMED AND/OR EFFECTUATED, THEN THE DEBTOR WILL HAVE TO CONSIDER ALL OF ITS OPTIONS AS A DEBTOR IN BANKRUPTCY.  *SEE* **SECTION IX — "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN."**

ii

NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE APPENDICES ATTACHED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN.  IF SUCH INFORMATION OR REPRESENTATION IS GIVEN OR MADE, IT MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ANY CREDITOR OR INTEREST HOLDER DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE DEBTOR'S HISTORY, BUSINESS, AND OPERATIONS, IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS THAT MAY BE PENDING AS OF THE FILING OF THE DEBTOR'S CHAPTER 11 CASE OR COMMENCED AFTER THE FILING OF THE DEBTOR'S CHAPTER 11 CASE, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN, AND NOTHING STATED HEREIN CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF IMPAIRED CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING SECTION VI — "RISK FACTORS TO BE CONSIDERED," BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

EXCEPT WITH RESPECT TO THE "FINANCIAL PROJECTIONS" ATTACHED HERETO AS APPENDIX C AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN (INCLUDING WITH RESPECT TO THE PLEADINGS THE DEBTOR EXPECTS TO FILE IN THE CHAPTER 11 CASE), THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT,

UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, ALL INFORMATION CONTAINED HEREIN HAS BEEN PROVIDED BY THE DEBTOR.

UNLESS SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM.

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS:** This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, among others, those summarized herein. *See* **Section VI — "Risk Factors To Be Considered."** When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtor believes that its plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtor or persons acting on its behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtor expressly disclaims any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

### NOTICES REGARDING THIRD PARTY RELEASES

**PLEASE TAKE NOTICE THAT THE PLAN CONTAINS THIRD-PARTY RELEASE PROVISIONS. SUBJECT TO ANY FINAL ORDER OF THE BANKRUPTCY COURT TO THE CONTRARY, UNLESS YOU TIMELY MAKE AN ELECTION TO OPT OUT OF THE RELEASE PROVISIONS IN ARTICLE X OF THE PLAN BY (I) INDICATING YOUR ELECTION TO OPT OUT OF RELEASES ON THE BALLOT OR OTHER NOTICE PROVIDED TO YOU AND TIMELY DELIVERED SUCH DOCUMENT IN ACCORDANCE WITH THE INSTRUCTION SET FORTH THEREIN OR (II) FILE WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASE AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE X OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION, YOU WILL BE DEEMED TO CONSENT TO THE THIRD-PARTY RELEASES SET FORTH IN ARTICLE X OF THE PLAN WILL BE BINDING ON YOU.**

iv

# TABLE OF CONTENTS

INTRODUCTION AND DISCLAIMER ....................................................................... i

I.   OVERVIEW OF THE DEBTOR ...............................................................1

    A.  Identifying Information...............................................................................1

    B.  Overview Of Business Operations.............................................................1

    C.  Capital Structure .......................................................................................1

    D.  Officers and Directors...............................................................................2

        1.  David R. Fischell Ph.D., Co-Founder and Chief Executive Officer.......................3

        2.  David L. Keenan, Chief Operating Officer.............................3

        3.  Steve Johnson, Consultant .......................................................4

        4.  Andrew Taylor, Consultant.......................................................4

    E.  Transactions with Abbott Laboratories (successor in interest to St. Jude)...................5

    F.  Events Leading to Chapter 11 Cases .........................................................5

    G.  The Proposed Plan ....................................................................................6

    H.  Transaction Documents .............................................................................7

        1.  Amended and Restated Certificate of Incorporation ...............7

        2.  Rights Offering .........................................................................8

        3.  New Common Stock ..................................................................8

II.  SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ................................................................................................9

III. PLAN VOTING INSTRUCTIONS AND PROCEDURES ............................10

    A.  Notice To Holders Of Claims ..................................................................10

    B.  Solicitation Package..................................................................................11

    C.  Voting Procedures And Ballots And Voting Deadline ..............................11

    D.  Confirmation Hearing And Deadline For Objections To Confirmation......................12

IV. THE ANTICIPATED CHAPTER 11 CASE ............................................................12

    A. Motions To Be Filed On The Petition Date ............................................13

        1. Motion To Approve Combined Disclosure Statement And Confirmation Hearing...........................................................................................13

        2. Motion To Use Cash Collateral And Obtain DIP Financing ................13

        3. Motion For Authority To Pay Prepetition Employee Compensation And Associated Benefits........................................................................14

    B. Anticipated Timetable For The Chapter 11 Cases ......................................14

V. SUMMARY OF THE PLAN OF REORGANIZATION ...................................14

    A. Overview Of Chapter 11 ...........................................................................15

    B. Overall Structure Of The Plan ..................................................................15

    C. Classification And Treatment Of Claims And Interests .............................15

        1. Treatment Of Unclassified Claims...................................................16

        2. Classification And Treatment Of Claims And Interests ....................17

        3. Acceptance Or Rejection Of The Plan..............................................21

        4. Means For Implementation Of The Plan ...........................................21

    D. Allowance and Restitution of Claims. .......................................................24

        1. Allowed Claims and Interests .........................................................24

        2. Full Satisfaction .............................................................................24

        3. Interest And Penalties On Claims ....................................................25

        4. Post Confirmation Claim and Asset Resolution ...............................25

        5. Deadline to Object to Claims...........................................................25

    E. Provisions Governing Distributions...........................................................25

        1. Delivery of Distributions ................................................................25

        2. Distributions Relating to Allowed Insured Claims.............................25

        3. Defenses; Setoff .............................................................................26

29644614.2

4.   Distributions for Claims Allowed as of the Effective Date ...................................26

5.   Means Of Cash Payment ........................................................................................26

6.   Withholding And Reporting Requirements ............................................................26

F.  Treatment Of Executory Contracts And Unexpired Leases .........................................27

1.   Assumption/Rejection of Executory Contracts and Unexpired Leases .................27

2.   Cure Amounts ........................................................................................................28

3.   Compensation and Benefit Programs.....................................................................28

4.   Employment Contracts...........................................................................................29

5.   Indemnification ......................................................................................................29

6.   Right of First Refusal.............................................................................................29

G.  Confirmation And Consummation Of The Plan .........................................................29

1.   Condition To Entry Of The Confirmation Order ...................................................29

2.   Conditions To Effective Date ................................................................................29

3.   Waiver Of Conditions ............................................................................................30

4.   Notice of Effective Date ........................................................................................30

H.  Effect Of Plan Confirmation .......................................................................................30

1.   Binding Effect ........................................................................................................30

2.   Revesting Of Assets ..............................................................................................31

3.   Releases And Related Matters ...............................................................................31

4.   Discharge Of The Debtor .......................................................................................32

5.   Injunction ...............................................................................................................33

6.   Exculpation And Limitation Of Liability ..............................................................33

7.   Term Of Bankruptcy Injunction Or Stays.............................................................34

8.   Post-Effective Date Retention Of Professionals ...................................................34

I.   Retention Of Jurisdiction .............................................................................................34

29644614.2

J.   Failure of Bankruptcy Court to Exercise Jurisdiction....................................................36

K.   Miscellaneous Provisions...........................................................................................36

    1.   Effectuating Documents And Further Transactions ...............................................36

    2.   Company Action ...................................................................................................36

    3.   Indemnification Of Directors And Officers ...........................................................36

    4.   Payment Of Statutory Fees ...................................................................................36

    5.   Amendment Or Modification Of The Plan .............................................................36

    6.   Severability Of Plan Provisions ...........................................................................37

    7.   Successors And Assigns .......................................................................................37

    8.   Revocation, Withdrawal, Or Non-Consummation..................................................37

    9.   Governing Law ....................................................................................................38

    10.  Tax Reporting and Compliance ............................................................................38

    11.  Conflicts..............................................................................................................38

VI. RISK FACTORS TO BE CONSIDERED.............................................................................38

A.   Failure to Confirm the Plan.......................................................................................38

B.   Potential Adverse Effects of Chapter 11 ....................................................................39

C.   Dependence on Key Personnel ..................................................................................39

D.   Business Risks ..........................................................................................................39

    1.   Operating Losses and No Assurance Of Future Profitability ..................................39

    2.   Limited Operating History.....................................................................................39

    3.   Single Product Company ......................................................................................40

    4.   Inherent Uncertainty Of Debtor's Financial Projections........................................40

    5.   Lack of Audited and Recent Financial Reports .....................................................40

E.   Methods of Solicitation..............................................................................................40

F.   Classification And Treatment Of Claims And Equity Interests....................................41

VII.    applicability of federal and other securities laws ........................................................42

    A.  Plan Securities ...........................................................................................................42

    B.  Issuance and Resale of Plan Securities Under the Plan .............................................42

        1.  Exemption From Registration ...............................................................................42

        2.  Resales Of Plan Securities; Definition Of Underwriter ........................................43

    C.  Rights Offering ..........................................................................................................44

VIII.   TAX CONSEQUENCES OF THE PLAN .................................................................44

    A.  Introduction Federal Tax Consequences ...................................................................44

    B.  Certain U.S. Federal Income Tax Consequences to the Debtor .................................46

        1.  COD Income .........................................................................................................46

        2.  Net Operating Losses – Section 382 .....................................................................46

    C.  Certain U.S. Federal Income Tax Consequences to U.S. Holders ..............................48

        1.  Certain U.S. Holders of Claims and Interests .......................................................48

        2.  Accrued but Unpaid Interest .................................................................................49

        3.  Information Reporting and Backup Withholding ...................................................49

IX. FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS. ................50

    A.  Feasibility of the Plan ...............................................................................................50

    B.  Acceptance Of The Plan ...........................................................................................51

    C.  Best Interests Test .....................................................................................................51

    D.  Confirmation Without Acceptance Of All Impaired Classes: 'Cramdown' ................52

X.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
    PLAN ...............................................................................................................................53

XI. THE SOLICITATION .....................................................................................................53

    A.  Parties In Interest Entitled To Vote .........................................................................53

    B.  Classes Impaired Under The Plan .............................................................................54

    C.  Revocation; Waivers Of Defects; Irregularities ........................................................54

ix

D.  Further Information; Additional Copies .......................................................................55

XII.    CONCLUSION AND RECOMMENDATION..........................................................56

# APPENDICES

APPENDIX A          Prepackaged Plan of Reorganization of Angel Medical Systems, Inc.

APPENDIX B          Liquidation Analysis

APPENDIX C          Use of Funds and Financial Projections

APPENDIX D          Independent Accountant's Compilation Report (Fiscal years ending, December 2016 and December 2017)

APPENDIX E          Unaudited Financial Statement Q3 2018

APPENDIX F          Rights Offering - Indication of Interest and Summary Terms

# I.    OVERVIEW OF THE DEBTOR

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan.  Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

## A.    Identifying Information

The Debtor incorporated in Delaware on November 29, 2001.

The Debtor's executive offices are located at 40 Christopher Way, Eatontown, NJ 07799.  The Debtor's internet address is www.angel-med.com.  Attached hereto as Appendices D and E, respectively, is the independent accountant's compilation report of the Debtor's financial statement for the fiscal years ending December 31, 2016 and December 31, 2017, and unaudited consolidated financial statements for the third quarter of 2018 (collectively, the *"Financial Statements"*).

## B.    Overview Of Business Operations

The Debtor is a privately held pre-commercial medical device company with approximately fifty issued patents.  The Debtor has developed the AngelMed Guardian System, which is an implantable cardiac monitoring and alerting system that is designed to warn cardiac patients of potentially life-threatening acute coronary syndromes (*"ACS"*), including heart attacks.  It is well known that getting early treatment for heart attacks is extremely beneficial and potentially life-saving.  In a five year clinical study, the AngelMed Guardian System demonstrated that the warning provided by it provides a more accurate and earlier indication of ACS than a patient relying on symptoms alone and can materially shorten the time between the commencement of an incident to Emergency Room arrival.  On April 9, 2018, the Food and Drug Administration approved the Debtor's Pre-Market Approval submission and approved the commercialization of the AngelMed Guardian System.  The FDA approved indication for use (IFU) allow the Guardian to be prescribed for patients with a prior ACS event at high risk for another one.  More than two million Americans would qualify today based in this IFU.  The FDA in its summary of safety and efficacy states "An important consideration is that the device fills an unmet medical need by providing more effective diagnosis of a life-threatening condition compared to relying on patient symptoms alone."  Other than for liquidity constraints arising from the pending debt maturities discussed below, the Debtor believes that it is poised to successfully launch into the commercial stage of its operations in 2019.

## C.    Capital Structure

The Debtor has been funded by the issuance of both debt and equity.  In addition to stock based compensation, the Debtor issued six series of Preferred Stock. As of the Petition Date, the paid-in capital reflected on the Debtor's balance sheet is approximately $67,000,000.  All old equity in the Debtor will be cancelled under the proposed Plan.

In addition to equity financing, the Debtor issued three tranches of secured debt. Pursuant to a Note Purchase and Security Agreement dated as of December 5, 2012 (as amended) by and among the Debtor, as the borrower, Bioinfo Accelerator Fund, LLC, as agent,

and the noteholders party thereto, the Debtor issues secured notes (i.e., the **"2012 Notes"**).  As of the Petition Date, $20,646,000 in aggregate unpaid principal amount, plus interest, fees and other expenses, are outstanding under the 2012 Notes.

Pursuant to a Note Purchase and Security Agreement dated as of November 25, 2014 (as amended) by and among the Debtor, as the borrower, Bioinfo Accelerator Fund, LLC, as agent, and the noteholders party thereto, the Debtor issued an additional series of secured notes (i.e., the **"2014 Notes"**).  As of the Petition Date, $20,430,000 in aggregate unpaid principal amount, plus interest, fees and other expenses, are outstanding under the 2014 Notes.

Pursuant to a Note Purchase and Security Agreement dated as of September 20, 2016 (as amended) by and among the Debtor, as the borrower, Bioinfo Accelerator Fund, LLC, as agent, and the noteholders party thereto, the Debtor issued a third series of secured notes (i.e., the **"2016 Notes,"** and together with the 2012 Notes and 2014 Notes, the **"Notes"**).  As of the Petition Date, $1,956,442 in aggregate unpaid principal amount, plus interest, fees and other expenses, are outstanding under the 2016 Notes.

Each series of Notes is secured by substantially all of the assets of AngelMed, excluding intellectual property.  The Notes mature on December 31, 2018 (the **"Maturity Date"**).  Under the terms of an Intercreditor Agreement dated as of September 20, 2016 (the **"2016 Intercreditor Agreement"**), the 2016 Notes are senior in both right to payment and lien priority to the 2012 Notes and 2014 Notes.  Under an intercreditor agreement dated as of November 25, 2014, the 2012 Notes and 2014 Notes are of equal rank and priority of payment.  Because the Debtor is in the pre-revenue stage of its life cycle and has not started to commercialize the AngelMed Guardian System, the vast majority of the Debtor's asset value is attributable to its intellectual property, which is unencumbered.

The Debtor believes that the value of all of its assets (excluding intellectual property) is less than the amount owed under the 2016 Notes.  Therefore, the Debtor believes that claims arising under the 2012 Notes and the 2014 Notes are entirely unsecured.  As common in start-up entities, there is a material overlap in the holders of Notes and equity interests, including by insiders.

As the Debtor is pre-commercialization, the Debtor does not have a substantial amount of trade debt or operational debt.  Excluding wages (which the Debtor will seek Bankruptcy Court authority to satisfy) and some unpaid professional fees, the Debtor believes that the amount of trade payables outstanding will be less than $500,000.

## D.    Officers and Directors

Under the Amended and Restated Articles of Incorporation, the board of directors of the Reorganized Debtor will consist of five (5) individuals.  Unless otherwise stated in the Plan, the initial board will be (i) David Fischell, (ii) Andrew Taylor, (iii) the member designated by a holders of the Common Stock and the Series A Preferred, (iv) Victor Whitman and (v) one director designated by the Holders of New Series A Preferred Stock.  The Plan Supplement will include the biographical information of the directors to be appointed on the Effective Date.

The current management team is comprised of highly capable and seasoned professionals with extensive experience in the biomedical device industry. Under the Plan, existing management will continue to serve in their existing capacities after the Effective Date. The below contains a brief background description of the Debtor's senior officers.

### 1.    *David R. Fischell Ph.D., Co-Founder and Chief Executive Officer*

David Fischell is a serial entrepreneur who has founded nine biomedical device companies in the last fifteen years, including the Debtor. He is also a Director of eight biomedical technology companies (including five of those he founded) and was the primary designer of the BX Velocity™ and Cypher™ coronary stents for Cordis, a Johnson & Johnson Company.

Mr. Fischell is chairman of the Cornell University Biomedical Engineering Advisory Board, and a Fellow of the American Institute for Medical and Biological Engineering. Other companies founded by Mr. Fischell include Neuralieve, Inc (2002) a developer of transcranial magnetic stimulation systems for migraine headaches; and NeuroPace, Inc. (1997) a developer of implantable brain pacemakers to treat epilepsy.

After earning his Ph.D. in Applied Physics from Cornell University, Mr. Fischell joined Bell Laboratories in 1979 where, for 11 years, he performed and directed a wide range of research and development projects. He left Bell Labs in 1991 to work full time on medical devices. He currently holds 85 issued U.S. patents, and has published numerous papers in the fields of telecommunications, cardiology, radiobiology, and radiation dosimetry. Dr. Fischell's current compensation from the Debtor is approximately $247,000 per annum.

The Debtor and Cathco, Inc. are parties to an exclusive licensing agreement whereby the Debtor licenses certain technology from Cathco. Cathco is the patent holding S-corporation that held the original intellectual property from the Fischells at the time of the Debtor's incorporation, and is owned and controlled by members of the Fischell family. Additionally, the Debtor and Robert Fischell, David Fischell, Scott Fischell and Tim Fischell are parties to a technology assignment agreement whereby certain intellectual property was assigned to the Debtor. These agreements are royalty bearing and will be assumed under the Plan.

### 2.    *David L. Keenan, Chief Operating Officer*

Mr. Keenan has over 16 years of experience in the development and deployment of complex active cardiovascular implants. He was actively involved in the development of the AngelMed Guardian system from the start and participated in the first in man implant in Brazil, and the first implants in the US and Germany. Mr. Keenan took over responsibility for the ALERTS Clinical Study in 2012 and then oversaw the analysis and reporting of efficacy and safety results for the PMA submission, including the amendment that led to FDA approval. Mr. Keenan has a dozen patents related to medical devices and computer networking technologies.

Prior to working for Debtor, Mr. Keenan was a Director at Corente, Inc. (formally OpenReach), a leader in managed secure networks. At OpenReach, Mr. Keenan managed the provisioning and support of networks in 40 countries. Before joining Corente, Mr. Keenan spent 15 years at AT&T Bell Laboratories. During that time, Mr. Keenan worked within the R&D

team that created Ethernet over twisted pair wire.  Mr. Keenan traveled to over 44 countries during this period to support and troubleshoot network problems for AT&T and NCR. Prior to AT&T, Mr. Keenan worked in R&D for Perkin Elmer Corporation on some of the world's first 32-bit minicomputers, used to power state of the art military simulators.  Mr. Keenan's first job after graduating from The Catholic University of America was in the Inhalation Toxicology Labs of Hazleton Laboratories in Reston, Virginia.  This lab was the setting for the best seller "The Hot Zone" which chronicled the early discoveries associated with the ebola virus.  Mr. Keenan's current compensation from the Debtor is approximately $218,000 per annum.

3.      *Steve Johnson, Consultant*

Steve Johnson has over 30 years' experience in designing and implementing solutions to real-world problems.  Mr. Johnson is a senior consultant for the Debtor and was previously its Vice President of Research and Development for the Debtor, Mr. Johnson is responsible for the organizations that design, develop, and deliver Debtor's products as well as carry on research for future innovations.

Before joining the Debtor, Mr. Johnson was Director of Technical Marketing for Phaethon Communications where he provided systems level expertise to a leading edge optical component supplier.  Prior to Phaethon, Mr. Johnson managed the Optical Transmission System R&D group at TerraWorx, where he played a key role in designing 10Gb/s ultra-long haul terrestrial fiber optic systems.  Before TerraWorx, Mr. Johnson started his career at AT&T Bell Labs, where he led the systems engineering effort of the design team responsible for developing several generations of high capacity, long haul digital fiber optic transmission systems.  Mr. Johnson has a Bachelor of Science in Engineering from Dartmouth College and earned his Master's in Electrical Engineering at the University of Illinois.  He holds a number of patents in optical transmission systems and cardiac-related algorithm design.  Mr. Johnson currently receives $7,500 per month under his consulting contract from the Debtor.

4.      *Andrew Taylor, Consultant*

Mr. Taylor has over 20 years of experience serving as a financial officer, operating executive and business advisor across start-ups, emerging growth and Fortune 500 companies in both the U.S. and abroad.

Mr. Taylor was formerly the President and Chief Financial Officer of the Debtor. Mr. Taylor consults on the financial planning and analysis activities, capital raising efforts, and implementation of capital and operating budgets for the Debtor.  Prior to his time at the Debtor, Mr. Taylor served as a Practice Leader for AC Lordi Consulting, a professional services firm, providing finance, accounting and strategy services.  Before joining AC Lordi, Mr. Taylor was the Chief Financial Officer and Corporate Director of Operations for Safe3w, Inc., a security software company, which was acquired by iPass (NASDAQ: IPAS) in 2004.

Mr. Taylor earned a high-honors MBA with a concentration in Accounting and Finance from Northeastern University and a BA in Political Science and Economics from McGill University.  Mr. Taylor receives $5,000 per month under his consulting contract.

**E.        Transactions with Abbott Laboratories (successor in interest to St. Jude)**

One of the early investors in the Debtor was Pacesetter Inc., d/b/a/ St Jude Medical Cardiac Rhythm Management Division, a Delaware corporation (including its affiliates, **"St. Jude"**). Specifically, in 2004 the parties entered into a Joint Development and Cross License Agreement, whereby certain of the Debtor's rights to patents and technical information are exclusively licensed to St. Jude for a limited field of use and by which certain of St. Jude's rights to patents and technical information are non-exclusively licensed to the Debtor for a different field of use. In non-technical terms, the Debtor has exclusive rights to the intellectual property related to the manufacture of standalone implantable cardiac monitoring and alerting system, and St. Jude has an exclusive right to use certain of the intellectual property in connection with the manufacturing of implantable pacemakers, ICDs and other implantable devices having a pacing of defibrillation function. The Joint Development and Cross License Agreement was modified several times and was amended and restated in 2012. To date, the Debtor has recognized $50 million in license fees from St. Jude constituting a fully paid up license with no future payments due. The Debtor intends to assume the Joint Development and Cross License Agreement under the Plan.

In addition to its equity investment, St Jude supported the Debtor by participating in the 2012 and 2014 financing rounds by acquiring 2012 Notes and 2014 Notes. In connection with the purchase of 2014 Notes the parties entered in a Right of First Refusal Agreement with St. Jude pursuant to which St. Jude has a right of first refusal to acquire the Debtor within 1 year of the date (April 9, 2018) that the Debtor received FDA approval for its stand-alone Guardian device. The Right of First Refusal Agreement will be rejected under the Plan.

Subsequent to these investments, St. Jude was acquired by Abbott Laboratories. Abbott remains a significant equity holder of the Debtor, holds a majority of the 2012 Notes and 2014 Notes, and has board observation rights.

**F.        Events Leading to Chapter 11 Cases**

The research and regulatory approval process for a new medical device is long and capital intensive. The first patents related to the Angel Guardian System were issued prior to the Debtor's formation and the Debtor has been focused on developing its life-saving technology since its founding. Commercialization was hampered by difficulty in obtaining final FDA approval. Specifically, a pivotal clinical trial (**"ALERTS"**) for this system was conducted in the U.S., and the completed Pre-Market Approval (PMA) application was submitted to the FDA for review in March 2016. The FDA Advisory Panel provided a negative recommendation for the Guardian System with respect to its Pre-Market Approval (PMA) application for the AngelMed Guardian System. Subsequently, the Debtor met with the FDA and discussed a re-submission plan that could correct the deficiencies noted in the "non-approvable" letter through a re-analysis and augmentation of its study data. The Debtor submitted the PMA Amendment to the FDA on May 5, 2017. The Debtor also received FDA agreement on a plan to exit patients from its study and close the trial sites. On April 9, 2018, the Debtor received a letter from the FDA stating that its Pre-Market Approval submission had been approved and that the AngelMed Guardian System could be commercialized.

5

Subsequent to getting FDA approval, the Debtor also secured reimbursement codes from government payers, which is an important step in commercialization. With FDA approval in hand, the Debtor was poised to raise additional funds through debt and/or equity in order to launch a commercial effort. Unfortunately, as discussed below, the Debtor was unable to receive the affirmative consent of a majority of the Noteholders to extend the Maturity Date of the Notes and to allow the Debtor's to incur bridge financing.

## G.    The Proposed Plan

In early September, 2018, the Debtor was informed by its largest Noteholder that the Noteholder would not consent to extend the Maturity Date of the Notes, and the Debtor began exploring all of its strategic alternatives to maximize value for all stakeholders.

The Debtor quickly realized that it would not be able to obtain a sufficient capital infusion to satisfy the Notes in full in cash on the Maturity Date. The Debtor further determined that the best way to maximize value for all stakeholders was to continue the Debtor's business operations, as a liquidation would result in little to no return for stakeholders.

In consultation with its advisors, the Debtor concluded that it was in the best interests of the Debtor and its stakeholders to pursue a plan of reorganization that would provide for a restructuring of its balance sheet and provide sufficient liquidity to allow the Debtor to bring its life-saving technology to market and reach profitability. In connection therewith, the Debtor commenced extensive fundraising efforts that included discussions with existing stakeholders and outside sources of capital.

In addition to existing stakeholders, the Debtor reached out to more than thirty sources of outside sources of capital. Eight outside entities executed non-disclosure agreements and conducted due diligence. One entity provided a letter of intent that would have dramatically diluted recoveries to stakeholders and the Debtor did not proceed to a term sheet. Another proposal presented a viable plan structure. The Debtor engaged in extensive negotiations with the potential investor to develop a framework whereby this potential investor would have served as lead investor and co-invest along with existing stakeholders and other outside investors to provide the Debtor sufficient equity financing upon emergence from bankruptcy to fund its business plan.

Although the negotiations were far advanced, this potential lead investor decided to not move forward with the transaction. However, these negotiations served as the framework whereby an existing Noteholder, MCM Angel Partners, LLC (the *"Lead Investor"*), agreed to serve as lead investor in a proposed $2,000,000 to $2,500,000 debtor-in-possession financing (the *"DIP Facility"*) (discussed in more detail below) and an offering for between $10,000,000 and $15,000,000 (inclusive of the DIP Facility) of preferred stock (the *"Series A Offering"*) of the Reorganized Debtor to be purchased by both existing stakeholders and outside investors on the effective date of the Plan. To provide additional liquidity to the reorganized Debtor, the lenders under the DIP Facility further agreed to convert the obligations under the DIP Facility into Series A Preferred Stock on the Effective Date. Additional existing and several new investors have now signed indication of interest letters of intent to participate in the DIP and

6

Series A Offering totaling more than $15,000,000 which amount is sufficient for the Debtor to exercise its business plan and reach profitability as shown in the plan included in Appendix C.

The Plan proposes the following balance sheet restructuring of the Debtor:

- All existing equity will be cancelled;

- The 2012 and 2014 Notes will be converted into 100% of the new common stock of the Reorganized Debtor, subject to dilution by a management stock option plan, representing 28% of the equity in the Reorganized Debtor on a fully diluted basis (assuming $10,000,000 minimum participation in the Rights Offering);

- The 2016 Notes will be converted into Series A Preferred Stock, representing 12.5% of the equity in the Reorganized Debtor on a fully diluted basis (assuming $10,000,000 minimum participation in the Rights Offering);

- General Unsecured Creditors will share pro rata in a pool of $500,000

- $2,000,000 of DIP Facility Claims will be converted into Series A Preferred Stock at a 22% discount to the Series A Offering purchase price with any DIP Facility Claims in excess of such amount paid back in cash with interest on the Effective Date; and

- $10,000,000 to $15,000,000 of new capital will be raised through the Series A Offering.

To ensure that the offering is fair and equitable to all stakeholders, all existing Noteholders and equity holders, that are accredited investors, will be provided an opportunity to purchase Series A Preferred Stock on the same terms as the Lead Investor pursuant to the Rights Offering.

**H.    Transaction Documents**

Set forth below are summaries of material terms and conditions of the Transaction Documents implementing the transactions contemplated by the Plan. To the extent of any conflict between the summaries set forth below and the underlying Transaction Document to which such summary relates, the respective Transaction Document controls. Capitalized terms not defined in this Disclosure Statement or in the summaries shall have the meaning ascribed to them in the respective Transaction Document.

1.    *Amended and Restated Certificate of Incorporation*

On the Effective Date, the Reorganized Debtor shall be deemed to have adopted the Amended and Restated Articles of Incorporation and the Debtor will continue to exist after the Effective Date as a Delaware corporation. The Amended and Restated Articles of

Incorporation shall include a provision to prohibit the Reorganized Debtor from issuing non-voting equity securities to the extent necessary to comply with section 1123(a) of the Bankruptcy Code.  Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estate shall revest in the Reorganized Debtor.

### 2.  *Rights Offering*

The Debtor will raise between $10 and $15 million pursuant to Rights Offering of New Series A Preferred Stock.  The Debtor currently has indications of interest aggregating $15 million of this targeted amount.

The Rights Offering will be implemented by the New Series A Preferred Stock Purchase Documents.   The New Series A Preferred Stock Purchase Documents include, collectively, the (i) New Series A Stock Purchase Agreement, (ii) New Investors' Rights Agreement, (iii) New Voting Agreement, and (iv) New Right of First Refusal and Co-Sale Agreement, each on the terms set forth on Appendix F hereto and substantially in the form contained in the Plan Supplement, pursuant to which the Reorganized Debtor will issue New Series A Preferred Stock.

**All existing holders of Notes or Old Equity Interest that are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act are eligible to participate in the Rights Offering.  A form indication of interest is attached hereto as Appendix F.  If you are an Eligible Participant entitled to vote on the Plan, a form indication of interest and instructions is included in the Solicitation Package.  Other Eligible Participants may receive an indication of interest by contacting Debtor's counsel.**

### 3.  *New Common Stock*

Holder of 2012 Notes and 2014 Notes shall receive 100% of the New Common stock in the Reorganized Debtor, subject to dilution by the Management Initiative Plan.  All shares of New Common Stock will have a par value of $.001 and will be issued by the Reorganized Debtor under the Amended and Restated Articles of Incorporation.  All shares of New Common Stock issued under the Plan shall be, upon issuance, fully paid and non-assessable, and the holders thereof shall have no preemptive or other rights to subscribe for additional shares, except for awards issued under the Management Incentive Plan.

The valuation of the equity securities to be issued under the Plan is uncertain.  Specifically, because the Debtor is pre-commercialization, there is no generally accepted standard of valuation.  Based on the Debtor's extensive marketing efforts, discussed above, the Debtor believes that the best indication of value is the value attributed to the Debtor by new-investors after arm's length negotiation. In other words, the purchase price of the New Series A Preferred Stock under the Rights Offering is the best indication of value.  Based on this valuation methodology, the Debtor believes that the pre-new money valuation of the Reorganized Debtor is approximately $8.6 million subject to exercise of option under the Management Incentive Plan.

## II.    SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

The table set forth below summarizes the classification and treatment of the prepetition Claims and Interests under the Plan.

The Debtor intends to pursue consummation of the Plan and to cause the Effective Date to occur immediately after all conditions to the Effective Date are satisfied or waived. There can be no assurance, however, as to when or whether the Effective Date will occur.  **See Section VI — "Risk Factors To Be Considered"** for a further discussion of certain factors that could delay or prevent the occurrence of the Effective Date.

The Debtor believes that the distributions contemplated by the Plan reflect an appropriate resolution of the Claims, taking into account the differing nature and priority of such Claims.

| Description And Amount Of Claims Or Interests | Summary Of Treatment |
| --- | --- |
| **Administrative Claims** <br><br> Estimated Recovery:  100% | Paid in full in cash. |
| **Priority Tax Claims** <br><br> Estimated Recovery:  100% | Paid in full in cash in accordance with provisions of Section 1129(a)(9)(c) of the Bankruptcy Code. |
| **Class 1** – **Non-Tax Priority Claims** <br><br> Estimated Recovery:  100% | Paid in full in cash. |
| **Class 2** – **Other Secured Claims** <br><br> Estimated Recovery:   100% | At the Debtor's option (a) paid in full in cash; (b) the holder of Claim will receive the collateral securing its Claim; or (c) the Claim will be Reinstated or otherwise treated in a manner to render it unimpaired. |
| **Class 3** – **2012 Secured Notes Claims** <br><br> Estimated Recovery:  12% | Each Holder will receive its pro rata share of the Junior Noteholder New Common Stock Allocation. |
| **Class 4** – **2014 Secured Notes** | Each Holder will receive its pro rata share of the Junior |

9

| Description And Amount Of Claims Or Interests | Summary Of Treatment |
|---|---|
| **Claims**<br><br>Estimated Recovery: 12% | Noteholder New Common Stock Allocation. |
| **Class 5** – **2016 Secured Notes Claims**<br><br>Estimated Recovery 100% | Each Holder will receive its pro rata share of the Senior Noteholder New Series A Preferred Stock Allocation. |
| **Class 6 – General Unsecured Claims**<br><br>Estimated Recovery: up to 100%, subject to dilution for unknown unliquidated, disputed, and contingent claims | Each Holder of an Allowed General Unsecured Claim shall receive its pro rata share of $500,000; provided, that, no Holder of a General Unsecured Claim shall be entitled to receive more than the amount of its Allowed Claim. |
| **Class 7 – Convenience Claims**<br><br>Estimated Recovery: 100% | Each Holder of an Allowed Convenience Claim shall be paid in full in Cash on the Effective Date up to $7,500. |
| **Class 8 – Old Equity Interests**<br><br>Estimated Recovery: 0% | On the Effective Date, all Old Equity Interests shall be cancelled and Holders of Old Equity Interests and Claims arising from or related to Old Equity Interests that are subject to subordination under section 510(b) of the Bankruptcy Code shall not receive or retain any property on account thereof. |

## III.    PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.    Notice To Holders Of Claims

This Disclosure Statement will be transmitted to Holders of Claims that are entitled under the Bankruptcy Code to vote on the Plan. Holders of Claims in Class 3, Class 4, and Class 5 are the only Holders of Claims that are entitled to vote on the Plan. The purpose of this Disclosure Statement is to provide adequate information to enable such Holders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan. With the exception of Class 6 General Unsecured Claims and Class 8

Old Equity Interests, all other Classes are Unimpaired under the Plan and the Holders of Claims and Interests in such classes are deemed to have accepted the Plan.

ALL HOLDERS OF CLAIMS IN CLASS 3, CLASS 4, AND CLASS 5 ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.  This Disclosure Statement contains important information about the Plan and important considerations pertinent to acceptance or rejection of the Plan.

THIS DISCLOSURE STATEMENT, THE PLAN, AND BALLOTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No person has been authorized to distribute any information concerning the Debtor relating to the Solicitation other than the information contained herein.

**B.      Solicitation Package**

In soliciting votes for the Plan pursuant to this Disclosure Statement from the Holders of Claims in Class 3, Class 4, and Class 5, the Debtor also will send copies of the Plan (attached hereto as <u>Appendix A</u>) and one or more Ballots to be used by Holders of Claims in such Classes to vote to accept or reject the Plan.

**C.      Voting Procedures And Ballots And Voting Deadline**

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot.  Please complete and sign your Ballot and return your Ballot to Morris James LLP at the address indicated below either by first class mail, or by hand delivery, or overnight courier to the address set forth below, so that it is received by the Voting Deadline.

THE VOTING DEADLINE IS 4:00 P.M. PREVAILING EASTERN TIME ON JANUARY 14, 2019 UNLESS EXTENDED BY THE DEBTOR.

**The Voting Record Date for determining whether a Holder of an Impaired Claim is entitled to vote on the Plan is December 14, 2018.**

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE VOTING AGENT BY FIRST CLASS MAIL, HAND DELIVERY, OR OVERNIGHT COURIER AT THE ADDRESS SET FORTH BELOW.

**Jeffrey R. Waxman**
**Morris James LLP**
**500 Delaware Avenue, Suite 1500**
**Wilmington, DE  19801-1494**
**DIRECT PHONE: (302) 888-5842**

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received or the amount of your Claim, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact Morris James LLP.

Except as provided below, unless the Ballot is timely submitted before the Voting Deadline or the Bankruptcy Court orders otherwise, the Debtor may, in its sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

In the event of a dispute with respect to any Impaired Claim, any vote to accept or reject the Plan cast with respect to such Claim will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION X — **"THE SOLICITATION."**

**D.      Confirmation Hearing And Deadline For Objections To Confirmation**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

If and when the Debtor files a petition for relief under Chapter 11 of the Bankruptcy Code, it will request that the Bankruptcy Court schedule a Confirmation Hearing to consider the adequacy of this Disclosure Statement and to confirm the Plan.  Notice of the Confirmation Hearing will be provided to Holders of Claims and Interests or their representatives (the **"Confirmation Hearing Notice"**) pursuant to an order of the Bankruptcy Court.  Objections to Confirmation must be filed with the Bankruptcy Court by the date designated in the Confirmation Hearing Notice and are governed by Bankruptcy Rules 3020(b) and 9014 and local rules of the Bankruptcy Court.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, SUCH OBJECTION TO CONFIRMATION MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING.

**IV.      THE ANTICIPATED CHAPTER 11 CASE**

If the Debtor receives the requisite acceptances in response to the Solicitation occurring pursuant to this Disclosure Statement, the Debtor intends promptly to commence the Chapter 11 Case.  From and after the Petition Date, the Debtor intends to continue operating its business and managing its property as Debtor-in-Possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Debtor does not expect the Chapter 11 Case to be protracted.  To ease its transition into Chapter 11 and to expedite its emergence from Chapter 11, the Debtor intends to seek from the Bankruptcy Court, among other things, the relief detailed below on the Petition Date.  If granted, this relief will facilitate the administration of the Chapter 11 Case.  There can be no assurance, however, that the Bankruptcy Court will grant the requested relief.  The Debtor may also seek various other forms of administrative and other relief in the early stages of the Chapter 11 Case.

## A.    Motions To Be Filed On The Petition Date

### 1.    *Motion To Approve Combined Disclosure Statement And Confirmation Hearing*

The Debtor expects to seek an order (i) scheduling a combined Confirmation Hearing and hearing on the adequacy of this Disclosure Statement on the earliest date which is convenient for the Bankruptcy Court (the *"Combined Hearing"*); (ii) approving the objection deadline and procedures with respect to the Combined Hearing; and (iii) approving the proposed notice of the Combined Hearing.  At the Combined Hearing, the Debtor would seek approval of this Disclosure Statement and confirmation of the Plan pursuant to sections 1125, 1128, and 1129 of the Bankruptcy Code.  At that time, the Debtor also expects to request the Bankruptcy Court to approve the prepetition solicitation of votes on the Plan.

### 2.    *Motion To Use Cash Collateral And Obtain DIP Financing*

The Debtor intends to seek authority to obtain secured debtor-in-possession financing (*"DIP Facility"*) on a superpriority priming basis in the amount of up to $2,500,000, at least $600,000 of which would be available on an interim basis pending a final hearing.   The DIP Facility is being made available by a group of existing Noteholders, and new investors and includes both insiders and non-insiders (collectively, the *"DIP Lenders"*).  The DIP Facility will serve as a bridge loan to ensure that the Debtor has sufficient liquidity to meet its financial obligations pending confirmation and consummation of the Plan.  As discussed above, under the Plan, up to $2,000,000 of the obligations outstanding under the DIP Facility will be converted into equity in the reorganized Debtor.

Without the proposed post-petition DIP Facility and continued access to cash collateral, the Debtor will have insufficient liquidity to operate its business, and it will be unable to fund ordinary course expenditures or pay expenses necessary to administer the bankruptcy case, the most significant of which are payroll expenses and payments to the vendors preparing to manufacture the Guardian for the Debtor. Simply put, without access to financing, the Debtor will be required to cease operations and liquidate, causing irreparable harm to the Debtor, its estate and all other stakeholders. Further, absent financing, the Debtor will not be able to bring to market a medical device that fills an unmet need for better diagnosis of a life-threatening condition as the know how and expertise that resides in the Debtor's people could be lost.

The Debtor has been actively seeking financing from both existing stakeholders and third parties.  The Debtor was unable to obtain alternative financing terms from other lenders that were more favorable than the proposed DIP Facility.  Further, the willingness of the DIP

Lenders to provide the DIP Facility is being provided in the context of a global restructuring plan, whereby the DIP Lenders will convert the obligations under the DIP Facility into equity in the Reorganized Debtor.  The Debtor, in its business judgment, has determined that the DIP Facility is the Debtor's best available option for financing.

> 3.  *Motion For Authority To Pay Prepetition Employee Compensation And Associated Benefits*

The Debtor has a valuable asset in its work force and believes that any delay in paying prepetition compensation or benefits to its employees would destroy its relationships with such employees and irreparably harm employee morale at a time when the continued dedication, confidence and cooperation of its employees is most critical.  Accordingly, the Debtor intends to seek authority to pay compensation and benefits that were accrued but unpaid as of the Petition Date up to the priority amount of $12,850, set forth in section 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

**B.    Anticipated Timetable For The Chapter 11 Cases**

Following the Petition Date, the Debtor expects the Chapter 11 Case to proceed as expeditiously as anticipated, subject to a timetable approved by the Bankruptcy Court.

The Debtor intends to request that a hearing to consider the adequacy of this Disclosure Statement and confirmation of the Plan will occur within 45 to 60 days after the Petition Date.  Assuming that the Plan is confirmed at that hearing, the Plan provides that the Effective Date will be the first Business Day on which all conditions to the Plan's effectiveness (as set forth in Article VIII of the Plan) have been satisfied or waived.  *See* **Section V.G.1 — "Summary Of The Plan Of Reorganization – Confirmation And Consummation Of The Plan – Condition To Entry of the Confirmation Order."**  Based upon information currently available, the Debtor believes that the Effective Date could occur shortly after the Confirmation Date.  There can be no assurance, however, that this projected timetable can be achieved.

**V.    SUMMARY OF THE PLAN OF REORGANIZATION**

The primary objectives of the Plan are to (i) deleverage the Debtor's balance sheet, (ii) settle, compromise, or otherwise dispose of certain Claims on terms that the Debtor believes to be fair and reasonable and in the best interests of its creditors and interest holders, (iii) consummate the transaction contemplated by the New Series A Preferred Stock Purchase Documents, and (iv) bring its lifesaving device to market.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or the documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtor under the Plan and will, upon the Effective Date, be

14

binding upon all Holders of Claims against and Interests in the Debtor and its Estate, the Reorganized Debtor, and other parties in interest.  In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative document are controlling.

## A.      Overview Of Chapter 11

Chapter 11 is the principal business reorganization Chapter of the Bankruptcy Code.  Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors, and its interest holders.  Another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization or liquidation is the principal objective of a Chapter 11 case.  The plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan by the Bankruptcy Court makes that plan binding upon the debtor and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) holds a claim or interest that is impaired under the plan; (ii) has voted to accept or reject the plan; or (iii) receives or retains any property under the plan.

## B.      Overall Structure Of The Plan

Under the Plan, Claims against and Interests in the Debtor are divided into different classes.  The Classes of Claims against and Interests in the Debtor created under the Plan, the treatment of those Classes under the Plan and distributions, if any, to be made under the Plan are described below.

## C.      Classification And Treatment Of Claims And Interests

The Plan classifies Claims and Interests separately and provides different treatment for different Classes of Claims and Interests in accordance with the Bankruptcy Code. As described more fully below, the Plan provides, separately for each Class, that Holders of Claims and Interests will receive types of consideration based on the different rights of the Holders of Claims or Interests in each Class.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

Procedures for the distributions pursuant to the Plan, including matters that are expected to affect the timing of the receipt of distributions by Holders of Claims, are described in

**Section V.E — "Summary Of The Plan Of Reorganization – Provisions Governing Distributions."**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified.

1.    *Treatment Of Unclassified Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

(a)    Administrative Claims.  On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.  Notwithstanding the foregoing, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and the Debtor or the Reorganized Debtor.

(b)    Priority Tax Claims.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the sole discretion of the Reorganized Debtor, (a) Cash equal to the unpaid portion of such Holder's Allowed Priority Tax Claim, (b) payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code over a period not ending later than five years from the Petition Date, or (c) such other treatment as to which the Debtor, Reorganized Debtor and such Holder shall have agreed upon in writing.

(c)    DIP Facility Claims.  On the Effective Date, the DIP Lenders shall convert $2,000,000 of their Allowed DIP Facility Claims into New Series A Preferred Stock at a 22% discount under the New Series A Preferred Stock Purchase Documents.  To the extent that the purchase price under the New Series A Preferred Stock Purchase Documents is less than the amount of Allowed DIP Facility Claims, the unconverted Allowed DIP Facility Claims shall be paid in full in Cash on the Effective Date.  To the extent that the purchase price under the New Series A Preferred Stock Purchase Documents is greater than the amount of Allowed DIP Facility Claims, the balance of the purchase price under the New Series A Preferred Stock Purchase Documents shall be paid in full in Cash by the DIP Lenders to the Reorganized Debtor on the Effective Date.

(d)    Professional Fee Claims. Professional Fee Claims shall be paid in full in Cash on, or as soon as reasonably practicable after, the allowance of such claims by Final

Order of the Bankruptcy Court.  Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Case prior to the Effective Date shall file with the Bankruptcy Court an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Case on or before the 45th day following the Effective Date.  Without limiting the foregoing, the Reorganized Debtor may pay the charges incurred by the Reorganized Debtor on and after the Effective Date for any Professional's fees, disbursements, expenses or related support services, without application to or approval by the Bankruptcy Court.

2.    *Classification And Treatment Of Claims And Interests*

(a)    Introduction

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtor.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims have not been classified, and the respective treatment of such Unclassified Claims is set forth in Article II of the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

(b)    Summary of Classes

| *Class* | *Impaired/Unimpaired; Entitlement To Vote* |
|---|---|
| Class 1 – Non-Tax Priority Claims | Unimpaired – Deemed to have accepted the Plan and not entitled to vote |
| Class 2 – Other Secured Claims | Unimpaired – Deemed to have accepted the Plan and not entitled to vote |
| Class 3 – 2012 Secured Notes Claims | Impaired – Entitled to vote |
| Class 4 – 2014 Secured Notes Claims | Impaired – Entitled to vote |
| Class 5 – 2016 Secured Notes Claims | Impaired – Entitled to vote |
| Class 6 – General Unsecured Claims | Impaired – Deemed to have rejected the Plan and not entitled to vote |
| Class 7 – Convenience Claims | Unimpaired – Deemed to have accepted the Plan and not entitled to vote |

| Class 8 – Old Equity Interests | Impaired – Deemed to have rejected the Plan and not entitled to vote |
|---|---|

(c)    Treatment Of Classes

(i)    Class 1 – Non-Tax Priority Claims

(A)    *Claims In Class:*  Class 1 consists of all Non-Tax Priority Claims against the Debtor.

(B)    *Treatment:*    Except to the extent that the Holder of an Allowed Non-Tax Priority Claim has agreed to a less favorable treatment of such Claim, on, or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, (c) the date on which such Allowed Non-Tax Priority Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between the Reorganized Debtor and the Holder of such Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim.

(ii)    Class 2 – Other Secured Claims

(A)    *Claims In Class:* Class 2 consists of all Other Secured Claims against the Debtor.  (Each Other Secured Claim shall constitute a separate Class numbered 2.1, 2.2, 2.3, etc.)

(B)    *Treatment:*  On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Class 2 Other Secured Claim shall, at the option of the Reorganized Debtor, in an exercise of its business judgment, and without need for further order of the Bankruptcy Court, be entitled to the treatment set forth below in option A, B, C, or D.  The Reorganized Debtor specifically reserves the right to challenge the validity, nature and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported Liens relating to the Other Secured Claims.

Option A:   Allowed Other Secured Claims with respect to which the applicable Debtor elects option A shall be Reinstated.  The failure of the Debtor to file an objection, prior to the Effective Date, with respect to any Other Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtor to contest or otherwise defend against such Claim in an appropriate forum when and if such Claim is sought to be enforced.  Any Cure amount that the Debtor may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such Reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes Allowed, or (c) such other date

as mutually may be agreed to by and between such Holder and the Debtor or Reorganized Debtor.

Option B:  Allowed Other Secured Claims with respect to which the Reorganized Debtor elects option B shall be paid in Cash, in full, including any amounts owed under section 506 of the Bankruptcy Code, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, (c) the date on which such Other Secured Claim is otherwise due and payable and (d) such other date as mutually may be agreed to by and between such Holder and the Reorganized Debtor.  The failure of the Debtor to file an objection, prior to the Effective Date, with respect to any Other Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtor to contest or otherwise defend against such Claim in an appropriate forum when and if such Claim is sought to be enforced.

Option C:  Allowed Other Secured Claims with respect to which the Reorganized Debtor elects option C shall be satisfied by the surrender to the Holder of the Claim of the collateral securing the applicable Other Secured Claim.

Option D:  Allowed Other Secured Claims with respect to which the Reorganized Debtor elects option D shall be satisfied in accordance with such other terms and conditions as may be agreed upon by the Reorganized Debtor and the Holder of such Allowed Secured Claim.

The Reorganized Debtor shall be deemed to have elected option A with respect to all Allowed Other Secured Claims except those with respect to which the applicable Debtor elects another option in writing prior to the Effective Date.

(iii)    Class 3 – 2012 Notes Claims

(A)  *Claims In Class:*  Class 3 consists of all 2012 Notes Claims.

(B)  *Treatment:*  On the Effective Date, each Holder of a 2012 Notes Claim will receive, in full and final satisfaction of its allowed 2012 Notes Claim, its pro rata share of the Junior Noteholder Allocation of New Common Stock based on the principal amount of the 2012 Notes.

(iv)    Class 4 – 2014 Notes Claims

(A)  *Claims In Class:*  Class 4 consists of all 2014 Notes Claims.

(B)  *Treatment:*  On the Effective Date, each Holder of a 2014 Notes Claim will receive, in full and final satisfaction of its allowed 2014 Notes Claims, its pro rata share of the Junior Noteholder Allocation of New Common Stock based on the principal amount of the 2014 Notes.

(v)    Class 5 – 2016 Notes Claims

(A)  *Claims In Class:*  Class 5 consists of all 2016 Notes Claims.

(B)  *Treatment:*  On the Effective Date, each holder of a 2016 Notes Claim will receive, in full and final satisfaction of its allowed 2016 Notes Claims, its pro rata share of the Senior Noteholder Allocation of Series A Preferred Stock based on the principal amount of the 2016 Notes.

(vi)    Class 6 – General Unsecured Claims

(A)  *Claims In Class:*  Class 6 consists of all General Unsecured Claims.

(B)  *Treatment:*  Each Holder of an Allowed General Unsecured Claim shall receive its pro rata share of $500,000; provided, that, no Holder of a General Unsecured Claim shall be entitled to receive more than the amount of its Allowed Claim.

(vii)    Class 7 – Convenience Claims

(A)  *Claims In Class:* Class 7 consists of all Convenience Claims.

(B)  *Treatment:*  Each holder of an Allowed Convenience Claim shall be paid in full in Cash on the Effective Date up to $7,500.

(viii)    Class 8 – Old Equity Interests

(A)  *Claims In Class:*  Class 8 consists of Old Equity Interests and all Claims arising from or related to Old Equity Interests that are subject to subordination under section 510(b) of the Bankruptcy Code.

(B)  *Treatment:*  On the Effective Date, all Old Equity Interest shall be cancelled and Holders of Old Equity Interests and Claims arising from or related to Old Equity Interests that are subject to subordination under section 510(b) of the Bankruptcy Code shall not receive or retain any property on account thereof.

(d)    Alternative Treatment.  Notwithstanding any provision in the Plan to the contrary, any Holder of an Allowed Claim or Interest may receive, instead of the distribution or treatment to which it is entitled under the Plan, any other distribution or treatment to which it and the Reorganized Debtor agree.

(e)    Special Provision Regarding Unimpaired Classes of Claims.  Except as otherwise provided in the Plan, nothing shall affect the Debtor's or the Reorganized Debtor's

rights and defenses, both legal and equitable, with respect to any Claims in Unimpaired Classes, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs against or recoupments of Claims in Unimpaired Classes.

3.    *Acceptance Or Rejection Of The Plan*

(a)    Classes Entitled To Vote.  Classes 3, 4 and 5 are entitled to vote to accept or reject the Plan.  By operation of law, Classes 1, 2 and 7 are deemed to have accepted the Plan and are not entitled to vote.  Classes 6 and 8 are deemed to have rejected the Plan and are not entitled to vote.

(b)    Acceptance By Impaired Classes.  An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

(c)    Elimination Of Classes.  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

(d)    Cramdown.  To the extent necessary, the Debtor shall request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

4.    *Means For Implementation Of The Plan*

(a)    Continued Legal Existence and Revesting of Assets.  On the Effective Date, the Reorganized Debtor shall be deemed to have adopted the Amended and Restated Articles of Incorporation and the Debtor will continue to exist after the Effective Date as a Delaware corporation.  The Amended and Restated Articles of Incorporation shall include a provision to prohibit the Reorganized Debtor from issuing non-voting equity securities to the extent necessary to comply with section 1123(a) of the Bankruptcy Code.  Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estate shall revest in the Reorganized Debtor.

(b)    Sources Of Cash For Distribution.  All Cash necessary for the Reorganized Debtor to make payments required by the Plan shall be obtained from (a) existing Cash balances, (b) the DIP Facility, and (c) sale and issuance of New Series A Preferred Stock under the New Series A Preferred Stock Purchase Documents.

(c)    Issuance of New Equity Interests.  On the Effective Date, upon the terms and subject to the conditions set forth in the Plan and the Amended and Restated Articles of Incorporation, the Reorganized Debtor shall issue, sell and deliver the New Common Stock to

holders of 2012 New Note Claims and 2014 Note Claims.  On the Effective Date, upon the terms and subject to the conditions set forth in the Plan and the Amended and Restated Articles of Incorporation, the Reorganized Debtor shall issue, sell and deliver the Senior Noteholder Allocation of Series A Preferred Stock to the holders of the 2016 Note Claims.  On the Effective Date, upon the terms and subject to the conditions set forth in the Plan, the Amended and Restated Articles of Incorporation, and the New Series A Preferred Stock Purchase Documents, the Reorganized Debtor shall issue, sell and deliver the Series A Preferred Stock to the investors party to the New Series A Preferred Stock Purchase Documents.  The New Equity Interest issued under the Plan shall be subject to dilution by the Management Incentive Plan.  All shares of New Equity Interests issued under the Plan shall be, upon issuance, fully paid and non-assessable, and the holders thereof shall have no preemptive or other rights to subscribe for additional shares, except for awards issued under the Management Incentive Plan.

(d)     Rights Offering.  Eligible Participants will be eligible to participate in the Rights Offering of New Series A Preferred Stock to be issued under the New Series A Preferred Stock Purchase Documents.

(e)     Section 1145 Exemption.  Pursuant to section 1145 of the Bankruptcy Code, the issuance of shares of the New Equity Interests to the holders of 2012 New Note Claims, 2014 Note Claims and 2016 Note Claims pursuant to the Plan shall be exempt from registration under the Securities Act of 1933 and any state or local law requiring registration for offer or sale of a security.

(f)     Company Action.  Each of the matters provided for under the Plan or the Transaction Documents involving the company structure of the Debtor or Reorganized Debtor or any company action to be taken by, or required of, the Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by directors, officers or shareholders of the Debtor or the Reorganized Debtor.

(g)     Preservation of Causes of Action.   In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor will retain and may (but is not required to) enforce all Retained Actions.  After the Effective Date, the Reorganized Debtor, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The Reorganized Debtor or any successors, in the exercise of its sole discretion, may pursue such Retained Actions so long as it is determined in the exercise of the Reorganized Debtor or any successors holding such rights of action to be in its best interest.  The failure of the Debtor to specifically list any claim, right of action, suit, proceeding, or other Retained Action in the Plan or this Disclosure Statement does not, and will not be deemed to, constitute a waiver or release by the Debtor or the Reorganized Debtor of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtor will retain the right to pursue such claims, rights of action, suits, proceedings, and other Retained Actions in its sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the Confirmation or consummation of the Plan.

22

(h)    Effectuating Documents; Further Transactions.    The Debtor and Reorganized Debtor, and their respective officers and designees, are authorized to execute, deliver, file, or record the Transaction Documents and such other contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable law.

(i)    Exemption from Certain Transfer Taxes and Recording Fees. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from the Debtor to the Reorganized Debtor or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtor's real or personal property, will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

(j)    Further Authorization.    The Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

(k)    Dissolution of Creditors' Committee.    The Creditors' Committee, if any, shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.    On the Effective Date, the Creditors' Committee, shall be dissolved and the Creditors' Committees members, in their capacity as such, shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Case or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order.

(l)    Cancellation of Existing Securities and Agreements.    Except as provided in the Plan or in the Confirmation Order or for the purpose of evidencing a right to distribution hereunder on the Effective Date, all notes, stock, instruments, certificates, agreements, side letters, fee letters and other documents evidencing or giving rise to Claims and Interests in the Debtor shall be canceled, and the obligations of the Debtor thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person.    The Holders of or parties to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents shall have no rights arising from or relating to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents or the cancellation thereof, except the rights provided pursuant to the Plan and the Confirmation Order.

(m)    Officers and Directors of Reorganized Debtor.    On the Effective Date, each of the members of the existing board of directors of the Debtor shall be deemed to have resigned in such capacity, and the members of the existing board of directors shall return all property of the Debtor in their possession to the Debtor or Reorganized Debtor on or before such date.  On the Effective Date under the Amended and Restated Articles of Incorporation, the Board will consist of five (5) individuals.  The holders of the New Series A Preferred, voting as a separate class, will be entitled to appoint two members of the board as designated by the holders of a majority in interest of the New Series A Preferred (each a *"Series A Director"*).  The holders of the New Common Stock and the New Series A Preferred, voting as a single class on an as converted to shares of the New Common Stock basis, will be entitled to elect the remaining members of the board, (i) one (1) of whom would be the Reorganized Debtor's CEO, (ii) one (1) of whom would be mutually acceptable to the other members of the Board who would initially be Andrew Taylor and (iii) one of (1) of whom is designated by a the holders of the Common Stock and the Series A Preferred, voting as a single class on an as converted to shares of the Common Stock basis.  Unless disclosed in the Plan Supplement to the contrary, the initial board will consist of (i) David Fischell, (ii) Andrew Taylor, (iii) the member designated by a the holders of the Common Stock and the Series A Preferred, (iv) Victor Whitman, and (v) the second Series A Director.  Such composition of the board would be prescribed by the New Voting Agreement entered into by and among the Reorganized Debtor and the holders of the Debtor's capital stock. The Reorganized Debtor shall pay all reasonable expenses of the board members, including costs relating to service on a Board committee. The Plan Supplement will include the biographical information of the directors to be appointed on the Effective Date.  It is anticipated that the Debtor's businesses will continue to be managed, as of the Effective Date, by existing management, subject to replacement by the new board of directors after the Effective Date.  On the Effective Date, the officers and directors of the Reorganized Debtor will be appointed automatically without any requirement of further action by the shareholders, officers or directors of the Debtor or the Reorganized Debtor.

## D.    Allowance and Resolution of Claims.

### 1.    *Allowed Claims and Interests*

Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor shall make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall only receive a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.  The Reorganized Debtor shall withhold distributions otherwise due hereunder to the holder of a Claim for a reasonable period of time to enable the Reorganized Debtor to determine whether to object to the Claim.  The presence of a Disputed Claim in any class will not be a cause to delay distribution to Allowed Claims in that Class or in other Classes.  A holder of a Convenience Claim that becomes an Allowed Claim after the Effective Date will receive its distribution as soon as practicable after Allowance.

### 2.    *Full Satisfaction*

The Reorganized Debtor shall make, and each holder of an Allowed Claim shall receive, the distributions provided for in the Plan in full satisfaction and discharge of the Claim.

3. *Interest And Penalties On Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable bankruptcy law, or necessary to render a Claim Unimpaired, postpetition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims, Non-Tax Priority Claims, and Convenience Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of the Plan.

4. *Post Confirmation Claim and Asset Resolution*

After the Effective Date, the Reorganized Debtor may defend, pursue or settle, without Bankruptcy Court approval, any Disputed Claim or Claim or Cause of Action of the Estate.

5. *Deadline to Object to Claims*

No later than 150 days after the Effective Date (the ***"Claims Objection Deadline"***) (unless extended by an order of the Bankruptcy Court upon motion of the Reorganized Debtor), the Reorganized Debtor may file objections to Claims with the Bankruptcy Court and serve such objections upon the holders of each of the Claims to which objections are made. Nothing contained herein, however, shall limit the Reorganized Debtor's right to object to Claims, if any, filed or amended after the Claims Objection Deadline and unless subsequently ordered for good cause the Reorganized Debtor shall continue to have the right to amend any objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed. Further, nothing herein shall require approval of the Bankruptcy Court for the settlement of any Claims.

E. **Provisions Governing Distributions**

1. *Delivery of Distributions*

Distributions shall be made by the Reorganized Debtor to each holder of an Allowed Claim (a) at the address shown on the list of creditors filed with the petitions commencing the Chapter 11 Case, (b) at the address listed in the Schedules if different from the address shown on the list creditors filed with the petitions commencing the Chapter 11 Case, or (c) if a proof of claim is filed, and the address is different from that listed in the Schedules, at the address set forth in the proof of claim.

2. *Distributions Relating to Allowed Insured Claims*

If any Claim otherwise payable under the Plan is covered by an insurance policy held by the Debtor or Reorganized Debtor, the Claim may be satisfied, in whole or in part, with the proceeds of the policy, if any.

3.   *Defenses; Setoff*

Any defenses, counterclaims, rights of set off or recoupment of the Debtor with respect to a claim shall vest in and inure to the benefit of the Reorganized Debtor.  To the extent permitted by law, the Reorganized Debtor may, but shall not be required to, set off against any claim, the payments or other distributions to be made in respect thereof, and claims of any nature whatsoever that the Debtor or Reorganized Debtor may have against the Claim's holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of a claim or Cause of Action of the Reorganized Debtor.

4.   *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made by the Reorganized Debtor on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  New Equity Interests shall not be certificated.  Equity Interests shall be evidenced by the official registry maintained by the Reorganized Debtor under the Amended and Restated Articles of Incorporation.

5.   *Distribution Reserve*

On the Effective Date, the Reorganized Debtor shall establish a distribution reserve ("Distribution Reserve,") on account of Disputed General Unsecured Claims.  The Distribution Reserve shall initially include Cash sufficient to distribute to each holder of a Disputed Claim in the full amount that it would receive hereunder if its Claim is ultimately allowed in its full face amount.  Any surplus remaining from the disallowance of all or part of a Disputed Claim shall be distributed to Holder of Allowed General Unsecured Claims under the terms of the Plan until all such Claims are paid in full.  In the event that all such Claims are paid in full, any amounts remaining after the satisfaction of all Allowed General Unsecured Claims shall revert to the Reorganized Debtor.

6.   *Means Of Cash Payment*

Payments of Cash made pursuant to the Plan shall be made, at the option and in the sole discretion of the Reorganized Debtor, by checks drawn on, or wire transfer from, a domestic bank selected by the Reorganized Debtor.  Cash payments to foreign creditors may be made, at the option of the Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

7.   *Withholding And Reporting Requirements*

In connection with the Plan and all distributions thereunder, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any

such withholding and reporting requirements.  The Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

## F.      Treatment Of Executory Contracts And Unexpired Leases

### 1.   *Assumption/Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, the Reorganized Debtor shall (a) assume the Executory Contracts and Leases on the Assumed Contract List and (b) reject the Executory Contracts and Leases on the Rejected Contract List.  The Debtor reserves the right to amend the Assumed Contract List and Rejected Contract List at any time prior to the Effective Date.  Any Executory Contract and Unexpired Lease not listed on either the Assumed Contract List or Rejected Contract List shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease:

> (a)   has been previously rejected by the Debtor by Final Order of the Bankruptcy Court;
>
> (b)   has been rejected by the Debtor by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order); or
>
> (c)   is the subject of a motion to reject filed by the Debtor under section 365 of the Bankruptcy Code pending as of the Effective Date.

An Executory Contract or Unexpired Lease that is assumed pursuant to the foregoing sentence shall be referred to as an *"Assumed Contract."*  An Executory Contract or Unexpired Lease that is rejected as described above shall be referred to as a *"Rejected Contract."*  Each non-debtor party to an Assumed Contract or Rejected Contract shall receive at least twenty–one days' notice of the deadline to object to assumption or rejection, as the case may be, of the identified Executory Contract or Unexpired Lease, which date will be the deadline set by the Bankruptcy Court to object to Confirmation of the Plan (the *"Executory Contract Objection Deadline"*).  If the Assumed Contract List or Rejected Contract List is modified less than twenty-one days prior to the Executory Contract Objection Deadline, the affected party will be provided at least twenty-one days' notice of the time to object to assumption or rejection of the identified Assumed Contract or Rejected Contract.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (a) the Reorganized Debtor has properly provided for adequate assurance of payment of the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code, (b) each assumption (or rejection, as the case may be) is in the best interest of the Debtor and its Estate and that each Assumed Contract is assumed as of the Effective Date and each Rejected Contract rejected as of the Effective Date or such other date identified in the Rejected Contract List, and (c) the requirements for assumption, or rejection, as the case may be, of any Executory Contract or Unexpired Lease to be assumed or rejected, as the case may be, have been satisfied.  No

provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtor based on the filing of the Chapter 11 Case or the financial condition of the Debtor or which would restrict the assumption of any Assumed Contract under a "change in control" prohibition or similar restriction shall be enforceable.

Unless otherwise provided by an order of the Bankruptcy Court, any asserted Claims arising from the rejection of an Executory Contract or Unexpired Lease must be filed by Holders of such Claims with the Bankruptcy Court and served on the parties entitled to notice under the Plan no later than sixty (60) days after the later of (1) the Effective Date or (2) the effective date of such rejection, subject to the Debtor's and Reorganized Debtor's right to object thereto.  In the event of such objection, the Debtor shall not be obligated to make any distribution in respect of such Claim until such dispute is resolved by Final Order of the Bankruptcy Court or the agreement of the parties.

2.    *Cure Amounts*

Any monetary amounts by which any Executory Contract and Unexpired Lease to be assumed under the Plan is in default shall be satisfied, under Section 365(b)(l) of the Bankruptcy Code, by Cure.  If the Assumed Contract List indicates a specific Cure amount for a contract or lease, the payment of the amount so specified shall be conclusively deemed to constitute Cure with respect to that contract or lease, and no other payment or performance on account of a prepetition default thereunder shall be required.  If the amount so specified is zero, no payment shall be required.  Notwithstanding the foregoing, if the other party to a contract or lease on the Assumed Contract List files, no later than the Executory Contract Objection Deadline, an objection disputing the Cure amount so specified with respect to its contract or lease, or otherwise raising an objection as to the nature or amount of any Cure, (a) except as provided in Section 7.1, any other matter relating to assumption, Cure shall occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption; if an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtor, in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

3.    *Compensation and Benefit Programs*

All of the Debtor's existing programs, plans, agreements, and arrangements relating to employee compensation and benefits (other than as set forth in or related to any Rejected Contract), including, without limitation, all medical, dental, pharmacy, vision, dental, and disability plans entered into before the Petition Date, as amended from time to time and to the extent and as in effect immediately prior to the Effective Date (***"Benefit Plans"***), will be deemed to be, and will be treated as executory contracts that are assumed under Section 7.1 of the Plan, and the Debtor's and Reorganized Debtor's obligations and rights under such programs, plans, agreements, and arrangements will survive Confirmation of the Plan, subject to the terms and conditions of such Benefit Plans.  The Debtor does not have any retiree plans (as defined in Section 1114 of the Bankruptcy Code).  Nothing contained herein shall be deemed to modify the existing terms of the Benefit Plans, including, without limitation, the Debtor's and the Reorganized Debtor's rights of termination and amendment thereunder.

4. *Employment Contracts*

Unless included in the Assumed Contract List, all employment and management consulting agreements with the Debtor, whether in writing or not, such employment or consulting agreement shall be deemed rejected as of the Effective Date. Subject to approval by the board of directors of the Reorganized Debtor without need for Bankruptcy Court approval, the Reorganized Debtor shall enter into new employment and/or consulting agreements with members of existing management that remain with the Reorganized Debtor after the Effective Date.

5. *Indemnification*

The Debtor's obligation to indemnify any former director or officer under its Articles of Incorporation, bylaws, employee indemnification policy, or any other agreement shall be deemed assumed as of the Effective Date.

6. *Right of First Refusal*

On the Effective Date, that certain Right of Refusal Agreement between St. Jude Medical, Inc. and the Debtor shall be rejected. If the Bankruptcy Court allows rejection damage claims with respect to such rejection, the Reorganized Debtor, in its sole option, may elect to assume such Executory Contract or Unexpired Lease in lieu of rejecting it.

## G.   Confirmation And Consummation Of The Plan

1. *Condition To Entry Of The Confirmation Order*

The following are conditions precedent to the entry of the Confirmation Order, each of which must be satisfied or waived by the Debtor in accordance with the terms hereof:

(a) The Plan and all schedules, documents, supplements and exhibits relating to the Plan shall have been filed in form and substance acceptable to the Debtor; and

(b) The proposed Confirmation Order shall be in form and substance acceptable to the Debtor.

2. *Conditions To Effective Date*

The Debtor shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtor in accordance with the terms hereof:

(a) The Confirmation Order, in form and substance satisfactory to the Debtor shall have been entered by the Bankruptcy Court and be in full force and effect and not subject to any stay and shall, among other things, provide that the Debtor and Reorganized Debtor are authorized without further board or member approval or consent to take all actions necessary

to enter into the Transaction Documents and other agreements or documents created in connection with the Plan.  Without limiting the foregoing, the board of directors, chief executive officer, or other appropriate officer of the Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Transaction Documents.

(b)     All Transaction Documents shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date).

(c)     All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

(d)     All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

(e)     The Debtor shall have sufficient Cash, whether on hand or from funds received under the New Series A Preferred Stock Purchase Documents to make all required payments to be made on the Effective Date.

3.  *Waiver Of Conditions*

The Debtor may waive, in its sole discretion, in whole or in part, the conditions to the occurrence of the Effective Date, without any notice to parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Effective Date shall preclude the occurrence of the Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The waiver of a condition to the occurrence of the Effective Date shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

4.  *Notice of Effective Date*

The Reorganized Debtor will file with the Bankruptcy Court a notice of the occurrence of Effective Date on the date thereof or as soon thereafter or is practicable, and such notice shall be served upon all known Holders of Claims and Interests.

## H.     Effect Of Plan Confirmation

1.  *Binding Effect*

The Plan shall be binding upon and inure to the benefit of the Debtor, its Estates, all current and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtor.

2.    *Revesting Of Assets*

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estate (including Retained Actions) shall revest in the Reorganized Debtor, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of the Effective Date, the Reorganized Debtor may operate its businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

3.    *Releases And Related Matters*

**(a)    Releases by the Debtor.  Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtor, the Reorganized Debtor, and its Estate, from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtor, Reorganized Debtor, or its Estate would have been legally entitled to assert in its own right or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's capital structure, the assertion or enforcement of rights and remedies against the Debtor, the Debtor's in- or out-of-court restructuring efforts, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, or filing of the Plan, this Disclosure Statement, the Plan, the Plan Supplement or any Transaction Documents, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Case, any preference, fraudulent transfer, or other Avoidance Action arising pursuant to Chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Person under the Plan, any Transaction Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**(b)    Releases by Holders of Claims and Interests.  Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtor, the Reorganized Debtor, the Debtor's Estate and each Releasing Party from any and all Causes**

of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtor, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's in- or out-of-court restructuring efforts, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, or filing of this Disclosure Statement, the Plan, the Plan Supplement or any Transaction Documents, contract, instrument, release, or other agreement or document relating to any of the foregoing, created or entered into before or during the Chapter 11 Case, any preference, fraudulent transfer, or other Avoidance Action arising pursuant to Chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Person under the Plan, any Transaction Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan.  For the avoidance of doubt, nothing in the Plan shall be deemed to be, or construed as, a release, waiver, or discharge of any Indemnification Obligation.

4.   *Discharge Of The Debtor*

(a)   Other than Claims arising from or related to the Transaction Documents and except as otherwise provided herein or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or Estate and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtor, the Estate, and Reorganized Debtor shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the holder of a Claim based upon such debt accepted the Plan.

(b)   As of the Effective Date, other than Claims arising from or related to the Transaction Documents and except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtor or the Reorganized Debtor, any other or further Claims, debts, rights, causes of action, claims for relief, or liabilities relating to the Debtor or any Interest in the Debtor  based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the

**Effective Date. In accordance with the foregoing, other than with respect to Claims arising from or related to the Transaction Documents and except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor, and the termination of all such Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or a terminated Interest.**

    5.   *Injunction*

    **(a)   Except as provided in the Plan or the Confirmation Order, from and after the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released, terminated, exculpated, or discharged under Article XV of the Plan, along with their respective current and former employees, agents, officers, directors, managers, principals, affiliates, shareholders, and members are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, the Released Parties and the Exculpated Parties, and their respective agents, officers, directors, managers, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns or any of their respective property on account of any such released, terminated or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or Interest: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (b) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of this the or the Confirmation Order.**

    6.   *Exculpation And Limitation Of Liability*

    **(a)   None of the Exculpated Parties shall have or incur any liability to any Person for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, Disclosure Statement and Plan, the transactions contemplated by or described in the Transaction Documents, the formulation, negotiation, or implementation of the Plan or the Transaction Documents, the pursuit of Confirmation of the Plan, the operation of the Debtor during the Chapter 11 Case, the Confirmation of the Plan, the consummation of the Plan or the Transaction Documents, or the administration of Chapter 11 Case or the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud, willful misconduct, or gross negligence; provided, however, that the foregoing exculpation and limitation of liability shall not apply to and shall not operate to waive, release, or exculpate any Claims or causes of action arising from or related to the rights and obligations under the Plan, the Transaction Documents, and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby. Without limiting the generality of the foregoing,**

**Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

7.   *Term Of Bankruptcy Injunction Or Stays*

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.**

8.   *Post-Effective Date Retention Of Professionals*

Upon the Effective Date, other than filing final applications for compensation in connection with work done prior to the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtor may employ and pay professionals in the ordinary course of business.

## I.   Retention Of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

1.   Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease with respect to which the Debtor or Reorganized Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

2.   Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving the Debtor that may be pending on the Effective Date;

3.   Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, this Disclosure Statement, or the Confirmation Order;

4.   Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any entity's rights arising from, or obligations incurred in connection with, the Plan or such documents (other than a dispute arising after the Effective Date under, or directly with respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

5.      Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement, or the Confirmation Order, or remedy any defect or omission, or reconcile any inconsistency, in any Bankruptcy Court order, the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

6.      Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b) and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date any fees and expenses of the Reorganized Debtor, including professional fees arising after the Effective Date, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

7.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of the Plan or the Confirmation Order;

8.      Adjudicate controversies arising out of the administration of the Estates or the implementation of the Plan;

9.      Recover all assets of the Debtor and property of the Estates, wherever located;

10.     Hear and determine causes of action by or on behalf of the Debtor or the Reorganized Debtor;

11.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason, or in any respect, modified, stayed, reversed, revoked, or vacated, or distributions pursuant to the Plan are enjoined or stayed;

12.     Determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement, or the Confirmation Order (other than a dispute arising after the Effective Date under, or directly with respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

13.     Hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

14.     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

15.     Hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or Title 28 of the United States Code; and

16.    Enter an order closing the Chapter 11 Case.

**J.    Failure of Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in Section 10.1 of the Plan, the provisions of Article X of the Plan will have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

**K.    Miscellaneous Provisions**

1.    *Effectuating Documents And Further Transactions*

The Debtor and the Reorganized Debtor shall be authorized to execute, deliver, file, or record the Transaction Documents and such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan.

2.    *Company Action*

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan or the Transaction Documents that would otherwise require approval of the shareholders or directors of the Debtor or the Reorganized Debtor shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) without any requirement of further action by the shareholders or directors of the Debtor or the Reorganized Debtor.

3.    *Indemnification Of Directors And Officers*

The Debtor's obligation to indemnify any former director or officer under its Articles of Incorporation, bylaws, employee indemnification policy, or any other agreement (*"Indemnification Obligation"*) shall be deemed assumed as of the Effective Date.

4.    *Payment Of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code (*"UST Fees"*), as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Reorganized Debtor shall pay any UST fees that become payable after the Effective Date.

5.    *Amendment Or Modification Of The Plan*

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtor reserves the right to alter, amend, or modify the Plan at any time prior to or after the Confirmation Date.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended

or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

### 6.   *Severability Of Plan Provisions*

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, upon the request of the Debtor to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 7.   *Successors And Assigns*

The Plan shall be binding upon and inure to the benefit of the Debtor, and its successors and assigns, including, without limitation, the Reorganized Debtor. The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

### 8.   *Revocation, Withdrawal, Or Non-Consummation*

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file a different plan of reorganization. If the Debtor revokes or withdraws the Plan, or if Confirmation or consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims or any release contemplated hereby), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (A) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Person, (B) prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor, or (C) constitute an admission of any sort by the Debtor or any other Person.

(a)   All notices, requests, and demands to or upon the Reorganized Debtor to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtor, to:

Joseph R. Sgroi, Esq.
Glenn S. Walter, Esq.

Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226-3506

and

Jeffrey R. Waxman, Esq.
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
Telephone: (302) 888-5842
Facsimile: (302) 504-3942
Email: jwaxman@morrisjames.com

9.   *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to the principles of conflicts of law of such jurisdiction.

10.   *Tax Reporting and Compliance*

The Reorganized Debtor is hereby authorized, on behalf of the Debtor, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor for all taxable periods ending after the Petition Date through, and including, the Effective Date.

11.   *Conflicts*

In the event that provisions of this Disclosure Statement and provisions of the Plan conflict, the terms of the Plan shall govern.

## VI.    RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.  This information, however, does not describe the only risks involved in connection with the Plan and its implementation.

## A.    Failure to Confirm the Plan

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to Chapter 7 liquidations.   The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion with

respect to the affairs of the Debtor during the Chapter 11 Case. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and requires, among other things, that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtor believes that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Furthermore, although the Debtor believes that the Effective Date will occur shortly after the Confirmation Date, there can be no assurance as to such timing. In addition, the Debtor could experience material adverse changes in their liquidity as a result of such delay.

## B.    Potential Adverse Effects of Chapter 11

Although the Debtor will seek to make its stay in Chapter 11 as brief as possible and to obtain relief from the Bankruptcy Court so as to minimize any potential disruption to their business operations, it is possible that the commencement of the Chapter 11 Case could materially adversely affect the relationship among the Debtor and its customers, employees, talent, vendors, and joint venture partners.

## C.    Dependence on Key Personnel

The success of the Reorganized Debtor's business is materially dependent upon the services of their key officers and employees. The loss of these key personnel due to death, disability or termination of employment could have a material adverse effect on the results of operations or financial conditions, or both, of the Reorganized Debtor.

## D.    Business Risks

### 1.    *Operating Losses and No Assurance Of Future Profitability*

The Debtor has never been profitable. The extent of the Debtor's future operating losses and the timing of profitability are highly uncertain, and the Debtor expects to continue incurring significant expenses and operating losses over the next several years. Any additional operating losses may have an adverse effect on the Debtor's equity, and the Debtor is not certain that it will ever be able to achieve profitability. Even if the Debtor achieves profitability, it may not be able to sustain or increase profitability on a quarterly or annual basis. The Debtor's failure to become and remain profitable would depress the value of the Debtor and could impair its ability to raise capital, expand its business, maintain its development efforts, obtain regulatory approvals or continue our operations.

### 2.    *Limited Operating History*

Although the Debtor was incorporated in Delaware on November 29, 2001, the Debtor's operations are subject to all of the risks inherent in the establishment of a new business enterprise, including but not limited to the absence of an operating history, and lack of fully-commercialized products.

Investors are subject to all the risks incident to the creation and development of a new business and each investor should be prepared to withstand a complete loss of his, her or its

investment.  The Debtor has not emerged from the development stage, and may be unable to raise further equity.

### 3.  *Single Product Company*

The Debtor is organized solely to develop and market the AngelMed Guardian System.  Accordingly, this limited focus may affect the eventual success or lack of success of the undertaking.  An inability to successfully manufacture and market the AngelMed Guardian System, or, if the Debtor successfully markets such technology, an inability to generate sufficient or sustainable revenue to achieve or sustain profitability, could cause the Debtor to cease operations and cause you to lose all of your investment.

### 4.  *Inherent Uncertainty Of Debtor's Financial Projections*

The Financial Projections attached hereto as <u>Appendix C</u> include projections covering the Reorganized Debtor's operations through 2023.  These projections are based on assumptions that are an integral part of the projections, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtor, industry performance, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtor and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Reorganized Debtor's operations.  These variations may be material and may adversely affect the value of the New Common Stock and New Series A Preferred Stock.  Because the actual results achieved may vary from projected results, perhaps significantly, the projections should not be relied upon as a guaranty or other assurance of the actual results that will occur.

Furthermore, the business plan was developed by the Debtor with the assistance of its advisors.  Any deviations from the Debtor's existing business plan would necessarily cause a deviation from the attached projections, and could result in materially different outcomes from those projected.

### 5.  *Lack of Audited and Recent Financial Reports*

Attached hereto as <u>Appendices D and E</u>, respectively, is the independent accountant's compilation report of the Debtor's financial statement for the fiscal years ending December, 2016 and December, 2017, and unaudited consolidated financial statements for the third quarter of 2018.  The Debtor has not undergone a complete financial audit of its financial statement for this period.  Until an audit is completed, there cannot be any assurances as to whether, how, or to what degree those results may be restated in the future.

## E.    Methods of Solicitation

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such

acceptance or rejection was in compliance with applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of "adequate information" (as defined by section 1125(a) of the Bankruptcy Code).

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.

The Debtor believes that its Solicitation of votes to accept or reject the Plan from the Holders of Impaired Claims is proper under applicable nonbankruptcy law, rules, and regulations, and that this Disclosure Statement contains "adequate information" as defined by section 1125(a) of the Bankruptcy Code. The Debtor also believes that they are not required to solicit any other class under the Bankruptcy Code or applicable nonbankruptcy law, rules, or regulations. The Debtor cannot be certain, however, that its Solicitation of acceptances or rejections will be approved by the Bankruptcy Court. There is also a risk that confirmation of the Plan could be denied by the Bankruptcy Court.

The Debtor believes that the Solicitation, including the use of this Disclosure Statement and the Ballots for the purpose of obtaining acceptances of the Plan complies with the Bankruptcy Code. The Bankruptcy Court may decide, however, that the Solicitation failed to meet the requirements of section 1126(b) of the Bankruptcy Code. If the Bankruptcy Court determines that the Solicitation did not comply with the requirements of section 1126(b) of the Bankruptcy Code, the Debtor may seek to resolicit acceptances, and, in that event, confirmation of the Plan could be delayed and possibly jeopardized.

## F.    Classification And Treatment Of Claims And Equity Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against and Interests in the Debtor. The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtor believes that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor would likely seek to (i) modify the Plan to provide for whatever classification might be required for confirmation and (ii) use the acceptances received from any creditor pursuant to the Solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification without requiring that the Debtor resolicit

votes.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to the Solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member.  The Debtor believes that, under the Bankruptcy Rules, the Debtor would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim of any creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtor believes that they have complied with this requirement.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan or the Debtor could be required to modify the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

## VII.   APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

### A.   Plan Securities

The Plan provides for the Debtor to issue New Common Stock and New Series A Preferred Stock to holders of the Notes (the ***"Plan Securities"***).

The Debtor believes that the Plan Securities constitutes "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable Blue Sky Law.  The Debtor further believes that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the Holders thereof that are not "underwriters," as defined in Section 2(a)(1) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

### B.   Issuance and Resale of Plan Securities Under the Plan

1.   *Exemption From Registration*

Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering.  By virtue of section 18 of the Securities Act, section 4(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale

occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

In reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any state Blue Sky Law.

The issuance of the Plan Securities is covered by section 1145 of the Bankruptcy Code. Accordingly, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

2.    *Resales Of Plan Securities; Definition Of Underwriter*

If the holder of the Plan Securities is an underwriter, the Plan Securities will be "restricted securities" and may not be resold under the Securities Act and applicable state Blue Sky Law absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and

policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Plan Securities by Persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Debtor does not presently intend to make publicly available the requisite current information regarding the Debtor, and as a result, Rule 144 will not be available for resales of Plan Securities by persons deemed to be underwriters. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtor expresses no view whether any Person would be deemed an "underwriter" with respect to the Plan Securities. In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Debtor makes no representations concerning the right of any Person to freely resell Plan Securities. Accordingly, the Debtor recommends that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.

## C.    Rights Offering

The New Series A Preferred Stock to be issued pursuant to the Rights Offering shall be issued under Section 4(2) of the Securities Act. This issuance will not be exempt under section 1145 of the Bankruptcy Code because these securities are not being issued in exchange for an existing claim against the Debtor. Therefore, the New Series A Preferred Stock will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act and may not be resold under the Securities Act and applicable state Blue Sky Law absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration.

## VIII.    TAX CONSEQUENCES OF THE PLAN

## A.    Introduction Federal Tax Consequences

Set forth below is a very general discussion of certain U.S. federal income tax consequences of the Plan to the Debtor and to certain Holders of Claims and Interests that are Impaired under the Plan. Unless otherwise noted, the following summary does not discuss the

U.S. federal income tax consequences to Holders whose Claims are entitled to payment in full in cash or are otherwise Unimpaired under the Plan.

This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the *"IRC"*), final, temporary or proposed Treasury regulations promulgated thereunder, judicial opinions, published positions of the Internal Revenue Service (the *"Service"*) and all other applicable authorities, as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect). Any such change could significantly affect the federal income tax consequences described below. The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. There can be no assurance that the Service will not take a contrary view. No ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected U.S. federal income tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes may or may not be retroactive and could affect the tax consequences to the Holders, the Debtor and the Reorganized Debtor. It cannot be predicted whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the Debtor, Reorganized Debtor, or Holders.

The following discussion assumes that a Holder of an Allowed Claim holds such Claim as a "capital asset" within the meaning of IRC Section 1221 (generally, property held for investment). It also assumes that Debtor's debt obligations constitute indebtedness for U.S. federal income tax purposes.

This discussion is for general information only and addresses only certain U.S. federal income tax consequences and does not address all of the tax consequences that may be relevant to a Holder, such as the potential application of the alternative minimum tax or any state, local or foreign tax. This discussion does not purport to address all U.S. federal income tax consequences or any facts or limitations applicable to any particular Holder in light of that Holder's particular circumstances or to any Holder subject to special rules under the U.S. federal income tax laws, such as financial institutions, banks, thrifts, mutual funds, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-qualified retirement plans, partnerships and other pass-through entities, investors in such pass-through entities, small business investment companies, regulated investment companies, real estate investment trusts, foreign corporations, foreign trusts, foreign estates, Holders who are not citizens or residents of the United States, Holders holding Claims or Interests as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, Holders who are citizens or residents of the United States with a "functional currency" other than the U.S. dollar, Holders that acquired Interests in connection with the performance of services, or tax-exempt organizations. All Holders should consult their tax advisors regarding the tax consequences to them of the Plan.

The potential U.S. federal income tax consequences with respect to the Plan to a Holder of a Claim will depend, among other things, upon the origin of the Holder's Claim, whether or not the Holder holds the Claim as a capital asset, whether the Holder reports income

using the accrual or cash method (or other method) of accounting, the manner in which the Holder acquired the Claim and its timing in acquiring the Claim, whether the Claim constitutes a "security" for U.S. federal income tax purposes, whether the Holder has taken a bad debt deduction or worthless security deduction, if applicable, with respect to such Claim (or portion of its Claim) in the current year or any prior year, the length of time the Claim has been held, whether the Claim was acquired at a discount, whether the Holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim, whether the Holder's Claim is modified such that it constitutes a "significant modification" or "retirement of debt" for U.S. federal income tax purposes, and whether the Claim is an installment obligation for U.S. federal income tax purposes.

**EACH HOLDER SHOULD CONSULT HIS, HER OR ITS OWN TAX ADVISER WITH RESPECT TO THE PARTICULAR TAX CONSEQUENCES TO IT UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS.**

**B.      Certain U.S. Federal Income Tax Consequences to the Debtor**

> 1.    *COD Income*

Under the cancellation of indebtedness rules of the IRC, debts discharged in the context of a bankruptcy proceeding will not result in taxable income, although they will cause the reduction in certain tax attributes of the Reorganized Debtor, including net operating losses (***"NOLs"***) and NOL carryforwards.

The Debtor estimates that it has approximately $116 million of NOL carryforwards for U.S. federal income tax purposes.  A substantial amount of such NOLs may be eliminated following implementation of the Plan as a result of the satisfaction of certain Claims at a discount, for which the Debtor will generally be required to reduce its NOLs and NOL carryforwards.  In addition, if the amount of cancellation of indebtedness (i.e., the excess of the amount of debt cancelled over the amount of any Cash, the issue price of any debt instruments and the fair market value of any other property given in cancellation of such debt) exceeds the amount of the Debtor's NOLs and NOL carryforwards, the excess will be applied to reduce the Debtor's tax basis in its assets (to the extent the tax basis exceeds the amount of the Debtor's liabilities following implementation of the Plan).

> 2.    *Net Operating Losses – Section 382*

With respect to any NOLs and NOL carryforwards of the Debtor remaining after confirmation of the Plan and any required attribute reduction, IRC Section 382 contains certain rules limiting the amount of such NOLs and NOL carryforwards a corporate taxpayer can utilize in each taxable year following an "ownership change" (the ***"Annual Section 382 Limitation"***). In general, an "ownership change" occurs whenever the percentage of the stock of a corporation owned, directly or indirectly, by "5-percent stockholders" (within the meaning of IRC Section 382) increases by more than fifty (50) percentage points over the lowest percentage of the stock of such corporation owned, directly or indirectly, by such 5-percent stockholders at any time

over the preceding three year period.  It is possible that the Debtor will undergo an ownership change on the Effective Date.

As a general rule, a loss corporation's Annual Section 382 Limitation equals the product of the value of the stock of the corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate," which is a rate published monthly by the Treasury Department.  Any unused portion of the Annual Section 382 Limitation generally is available for use in subsequent taxable years.  If a loss corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the corporation's Annual Section 382 Limitation is zero.  The Section 382 Annual Limitation will also apply to any net unrealized built in-losses (i.e., losses economically accrued but unrecognized as of the date of the ownership change in excess of a threshold amount), to the extent such losses are recognized during the five year period immediately after the ownership change.

IRC Section 382(l)(5) provides an exception to the application of the Annual Section 382 Limitation where a corporation is under the jurisdiction of a court in a Title 11 or similar case (the *"382(l)(5) Exception"*).  The 382(l)(5) Exception provides that where an ownership change occurs pursuant to a bankruptcy reorganization or similar proceedings, the Annual 382 Limitation will not apply if the pre-change shareholders and/or "qualified creditors" (as defined by applicable Treasury regulations) own at least fifty (50) percent of the stock of the reorganized corporation.  However, under the 382(l)(5) Exception, a corporation's pre-change NOLs and NOL carryforwards that may be carried over to a post-change year generally must be reduced to the extent attributable to any interest paid or accrued to qualified creditors during the three taxable years preceding the Effective Date of the Plan, and during the part of the current taxable year prior to and including the Effective Date.  If the 382(l)(5) Exception applies, a second ownership change of the corporation within a two year period following the Effective Date of the Plan will cause the corporation to forfeit all of its unused NOLs and NOL carryforwards that were incurred prior to the date of the second ownership change.

If a corporation in bankruptcy elects out of the rules under Section 382(l)(5), a special rule under IRC Section 382(l)(6) will apply in calculating the Annual Section 382 Limitation.  Under this special rule, the Annual Section 382 Limitation will be calculated by reference to the lesser of the value of the corporation's stock (with certain adjustments, including any increase in value resulting from any surrender or cancellation of any Claims in the bankruptcy) immediately after the ownership change (as opposed to immediately before the ownership change, as discussed above) or the value of the corporation's assets (determined without regard to liabilities) immediately before the ownership change. The Debtor is continuing to analyze whether the Section 382(l)(5) Exception is available and if it is advisable to avail itself of the 382(l)(5) Exception.  Finally, even if the benefits of IRC Section 382(l)(5) are available upon consummation of the Plan, such benefits will be lost if the Reorganized Debtor experiences another ownership change within the subsequent two (2) year period.  The Debtor makes no representations and gives no assurance that such an ownership change will not occur (as a result of redemptions or other transfers of the Reorganized Debtor's stock or otherwise).

**C.      Certain U.S. Federal Income Tax Consequences to U.S. Holders**

The following discussion applies to a Holder who (or that) is (i) an individual that is a citizen or resident of the United States, (ii) a corporation or other entity taxable as a corporation created or organized under the laws of the United States or a political subdivision thereof, (iii) an estate, the income of which is subject to U.S. federal income tax regardless of its source, or (iv) a trust, if a U.S. court can exercise primary supervision over the administration of the trust and one or more U.S. persons can control all substantial trust decisions or, if the trust was in existence on August 20, 1996, and it has elected to continue to be treated as a U.S. person. As noted above, this discussion is further limited to Holders of Impaired Claims that are not subject to special U.S. federal income tax rules. Accordingly, the discussion below does not address any U.S. federal income tax consequences to certain Holders of Claims.

1.      *Certain U.S. Holders of Claims and Interests*

(a)      Class 3 – 2012 Secured Notes Claims

Under the Plan, each Holder in Class 3 will receive its pro rata share of the Junior Noteholder New Common Stock Allocation.  Holders of Claims in Class 3 should consult their tax advisors as to the particular tax consequences resulting to them as a consequence of the Plan.

(b)      Class 4 – 2014 Secured Notes Claims

Under the Plan, each Holder in Class 4 will receive its pro rata share of the Junior Noteholder New Common Stock Allocation. Holders of Claims in Class 4 should consult their tax advisors as to the particular tax consequences resulting to them as a consequence of the Plan.

(c)      Class 5 – 2016 Secured Notes Claims

Under the Plan, each Holder in Class 5 will receive its pro rata share of the Senior Noteholder New Series A Preferred Stock Allocation. Holders of Claims in Class 5 should consult their tax advisors as to the particular tax consequences resulting to them as a consequence of the Plan.

(d)      Class 6 – General Unsecured Claims

Under the Plan, each Holder of an Allowed Claim in Class 6 will receive its pro rata share of $500,000; provided, that, no Holder of a General Unsecured Claim shall be entitled to receive more than the amount of its Allowed Claim.  The U.S. federal income tax consequences of the Plan to a Holder of an Allowed Claim in Class 6 will depend upon the factors mentioned above, including in particular the nature of the Claim held by such Holder. Holders of such Claims should therefore consult their tax advisors as to the particular tax consequences resulting to them as a consequence of the Plan

(e)      Class 8 – Old Equity Interests

Under the Plan, all Old Equity Interests shall be cancelled and Holders of Old Equity Interests and Claims arising from or related to Old Equity Interests that are subject to

subordination under section 510(b) of the Bankruptcy Code shall not receive or retain any property on account thereof.  Holders of such Old Equity Interests or Claims should consult their tax advisors as to the particular tax consequences resulting to them as a consequence of the Plan.

## 2.    *Accrued but Unpaid Interest*

A portion of the consideration received by a Holder of a Claim may be attributable to accrued but unpaid interest on account of such Claim. Such amount should be taxable to that Holder as interest income if such accrued but unpaid interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. The Service could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE DETERMINATION OF THE AMOUNT OF CONSIDERATION RECEIVED UNDER THE PLAN THAT IS ATTRIBUTABLE TO INTEREST.

## 3.    *Information Reporting and Backup Withholding*

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided, however,* that the required information is timely provided to the Service.

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

## IX.     FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS.

**A.     Feasibility of the Plan**

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor.  For purposes of showing that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of the Reorganized Debtor to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

To support their belief in the feasibility of the Plan, the Debtor has relied upon the Financial Projections attached hereto as <u>Appendix C</u>.  The Financial Projections show that the Reorganized Debtor should have sufficient cash to make payments required under the Plan and to execute the Debtor's business plan.  Accordingly, the Debtor believe the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS ARE BY THEIR NATURE FORWARD LOOKING, AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE INFORMATION SET FORTH THEREIN.  Readers of this Disclosure Statement are cautioned not to place undue reliance on the Financial Projections, and should carefully review **Section VI — "Risk Factors To Be Considered**" herein.  The Financial Projections should not be relied upon as necessarily indicative of future, actual recoveries.

Holders of Claims against and Interests in the Debtor are advised that the Financial Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles.  Furthermore, the Debtor's independent certified public accountants have not compiled or examined the Financial Projections and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Projections.

In addition to the assumptions contained in the Financial Projections themselves, the Financial Projections also assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of Reorganized Debtor, and (iii) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtor.  Although considered reasonable by the Debtor as of the date hereof, unanticipated events and circumstances occurring after the preparation of the Financial Projections may affect actual recoveries under the Plan.

The Debtor does not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition.  Furthermore, the Debtor does not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

**B.**      **Acceptance Of The Plan**

As a condition to confirmation, the Bankruptcy Code requires that each Impaired Class of Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two thirds (2/3) in dollar amount and more than one half (1/2) in number of claims in that class, but for that purpose only those who actually vote to accept or to reject the Plan are counted.  Thus, Class 3 will have voted to accept the Plan only if creditors holding at least two thirds (2/3) in amount and a majority in number actually voting in such Class cast their Ballots in favor of acceptance.  Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

**C.**      **Best Interests Test**

Even if a plan is accepted by each class of holders of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interest" of any holder of a claim or interests, whose Class is impaired by the plan and who has not accepted the plan.  The "best interest" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all holders of claims or interests in an impaired class have accepted the plan or (ii) the plan will provide a holder who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of unsecured claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's unencumbered assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the costs of liquidation under Chapter 7 of the Bankruptcy Code, including the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, additional administrative claims and other wind-down expenses. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests.  The liquidation also would prompt the rejection of most (if not all) of the debtor's executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation.  If such probable distribution has a value that is not greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan meets the best interest test.

A liquidation analysis prepared with respect to the Debtor is attached as Appendix B to this Disclosure Statement. The Debtor believes that any liquidation analysis is of necessity somewhat speculative. In preparing the liquidation analysis, the Debtor has projected an amount of Allowed Claims based on their books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of claims at the projected amounts of claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including any determination of the value of any distribution to be made on account of Allowed Claims and interests under the Plan. In addition, as noted above, the valuation analysis of the Reorganized Debtor also contains numerous estimates and assumptions.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtor believe that, taking into account the liquidation analysis and the valuation analysis of the Reorganized Debtor, the Plan meets the "best interest" test of section 1129(a)(7) of the Bankruptcy Code. The Debtor believes that the members of each impaired class will receive at least as much under the Plan as they would in a liquidation in a hypothetical Chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtor as a going concern rather than a forced liquidation of the Debtor will allow the realization of more value for the Debtor's assets.

Specifically, the value of the Reorganized Debtor is tied to its ability to monetize its intellectual property. The Debtor believes that a conversion to Chapter 7 would cause a precipitous decline in its value as it would be difficult to find a buyer for the intellectual property on a standalone basis at this pre-commercialization stage of the Debtor's operations. Such a Chapter 7 event would likely result in loss of the key employees with expertise in all aspects relating to the complex artificial intelligence based technology that allows the Guardian to accurately detect Acute Coronary Syndrome (ACS) events, including heart attacks. Such loss would make it difficult for any acquirer of the intellectual property to monetize its value.

Additionally, conversion to Chapter 7 would create additional costs to the estates. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, and potential litigation costs. The liquidation itself may trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. All of these factors lead to the conclusion that recoveries under the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a Chapter 7 liquidation at each impaired class.

## D.     Confirmation Without Acceptance Of All Impaired Classes: 'Cramdown'

The Plan will have at least two non-accepting Impaired Classes, Class 6 - General Unsecured Claims and Class 8 – Old Equity Interests.

Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan over the objection of an impaired rejecting class, if, among other things, at least

one Impaired Class of Claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and if the plan "does not discriminate unfairly" against and is "fair and equitable" to each impaired, rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if the value of the cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class. A plan is fair and equitable as to a class of secured claims that rejects the plan if, among other things, the plan provides (i) (a) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property, (ii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (i) or (iii) of this paragraph, or (iii) for the realization by such holders of the indubitable equivalent of such claims.

The Debtor will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Plan by such Class and reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Plan by other Classes of Claims.

## X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plan(s) might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of assets.

Further, although the Debtor could theoretically solicit votes with respect to an alternative plan if the requisite acceptances are not received, or the Plan is not confirmed and effectuated, a possible result would be the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code. As set forth above, in a Chapter 7 liquidation, a trustee is elected or appointed to liquidate the Debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. As detailed above, the Debtor believes the Plan is superior to a Chapter 7 liquidation because of the greater return that is anticipated to be provided by the Plan.

## XI.    THE SOLICITATION

## A.    Parties In Interest Entitled To Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable,

and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than the defaults set forth in section 365(b)(2) of the Bankruptcy Code) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is impaired by the plan and (ii) the holder of the claim or interest will receive or retain some value on account of such claim or interest.  If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  Here, the Debtor has elected to treat Class 6 (General Unsecured Claims) as rejecting the Plan, even though General Unsecured Creditors will receive a distribution under the Plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

## B.  Classes Impaired Under The Plan

Class 3 (2012 Note Claims), Class 4 (2014 Note Claims) and Class 5 (2016 Note Claims) are entitled to vote to accept or reject the Plan.  By operation of law, each Unimpaired Class of Claims, Classes 1, 2, and 7, respectively, are deemed to have accepted the Plan and, therefore, creditors holding Claims in these Classes are not entitled to vote to accept or reject the Plan.  Classes 6 and 8, respectively, are deemed to have rejected the Plan and, therefore, creditors holding Interests in Classes 6 and 8 are not entitled to vote to accept or reject the Plan.

## C.  Revocation; Waivers Of Defects; Irregularities

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Voting Agent and the Debtor in their sole discretion, which determination will be final and binding.  Once a party delivers a valid Ballot for the acceptance or rejection of the Plan, such party may not withdraw or revoke such acceptance or rejection without the Debtor's written consent or an order of the Bankruptcy Court.  The Debtor also reserves the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtor or their counsel, be unlawful.  The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines.  Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

**D.      Further Information; Additional Copies**

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents, please contact Morris James LLP:

**Jeffrey R. Waxman**
**Morris James LLP**
**500 Delaware Avenue, Suite 1500**
**Wilmington, DE  19801-1494**
**DIRECT PHONE: (302) 888-5842**

Please note that Morris James LLP is the proposed counsel to the Debtor, and will not provide legal advice to any Holder of a Claim or Interest with respect to the contents of the Plan. Holders of Claims or Interests with questions with respect to their rights under the Plan or the Bankruptcy Code are advised to seek legal counsel.

## XII.   CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any other the alternative under the circumstances.  Other alternatives would involve significant delay, uncertainty, substantial additional administrative costs, and/or a lower recovery to the Holders of Impaired Claims.

Consequently, the Debtor urges all Holders of Impaired Claims to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before 4:00 P.M., Prevailing Eastern Time, on January 14, 2018.

Dated:  December 26, 2018          Respectfully submitted,

On behalf of Angel Medical Systems, Inc.

By:  /s/ David R. Fischell, Ph.D.,
Name: David R. Fischell, Ph.D.,
Title: Chief Executive Officer

56

APPENDIX A

TO

DISCLOSURE STATEMENT
OF ANGEL MEDICAL SYSTEMS INC.

PREPACKAGED PLAN OF REORGANIZATION
OF ANGEL MEDICAL SYSTEMS INC.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| ANGEL MEDICAL SYSTEMS, INC., | ) | Chapter 11 |
| a Delaware corporation, | ) | Case No. 18-12903 (   ) |
| | ) | |
| Debtor.[1] | ) | |
| | ) | |

**AMENDED PLAN OF REORGANIZATION OF ANGEL MEDICAL SYSTEMS, INC.**

HONIGMAN MILLER SCHWARTZ
AND COHN LLP
Joseph R. Sgroi, Esquire
Glenn S. Walter, Esquire
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226-3506

MORRIS JAMES LLP
Jeffrey R. Waxman, Esquire
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494

Proposed Counsel to the Debtor

Dated:  December 26, 2018

---

[1] The Debtor's address is 40 Christopher Way, Suite 201, Eatontown, NJ 07724.  Its EIN is 52-2360129.

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION .....................................1

| | | |
|---|---|---|
| 1.1 | *2012 Notes Claims* | 2 |
| 1.2 | *2012 Notes* | 2 |
| 1.3 | *2014 Notes Claims* | 2 |
| 1.4 | *2014 Notes* | 2 |
| 1.5 | *2016 Notes Claims* | 2 |
| 1.6 | *2016 Notes* | 2 |
| 1.7 | *Administrative Claim* | 2 |
| 1.8 | *Allowed* | 2 |
| 1.9 | *Amended and Restated Articles of Incorporation* | 2 |
| 1.10 | *Assumed Contract* | 2 |
| 1.11 | *Assumed Contract List* | 2 |
| 1.12 | *Avoidance Action* | 3 |
| 1.13 | *Bankruptcy Code* | 3 |
| 1.14 | *Bankruptcy Court* | 3 |
| 1.15 | *Bankruptcy Rules* | 3 |
| 1.16 | *Benefit Plans* | 3 |
| 1.17 | *Business Day* | 3 |
| 1.18 | *Cash* | 3 |
| 1.19 | *Causes of Action* | 3 |
| 1.20 | *Chapter 11 Case* | 3 |
| 1.21 | *Claim* | 3 |
| 1.22 | *Claims Objection Deadline* | 3 |
| 1.23 | *Class* | 3 |
| 1.24 | *Confirmation* | 4 |
| 1.25 | *Confirmation Date* | 4 |
| 1.26 | *Confirmation Hearing* | 4 |
| 1.27 | *Confirmation Order* | 4 |
| 1.28 | *Convenience Claims* | 4 |
| 1.29 | *Creditors' Committee* | 4 |
| 1.30 | *Cure* | 4 |
| 1.31 | *Debtor* | 4 |
| 1.32 | *DIP Facility* | 4 |
| 1.33 | *DIP Facility Claims* | 4 |
| 1.34 | *DIP Lender* | 4 |
| 1.35 | *Disclosure Statement* | 4 |
| 1.36 | *Disputed Claim* | 4 |
| 1.37 | *Distribution Reserve* | 5 |
| 1.38 | *Effective Date* | 5 |
| 1.39 | *Eligible Participants* | 5 |
| 1.40 | *Estate* | 5 |

i

| | | |
|---|---|---|
| 1.41 | *Exculpated Parties* | 5 |
| 1.42 | *Executory Contracts and/or Unexpired Leases* | 5 |
| 1.43 | *Exhibit* | 5 |
| 1.44 | *Executory Contract Objection Deadline* | 5 |
| 1.45 | *Final Order* | 5 |
| 1.46 | *General Unsecured Claim* | 5 |
| 1.47 | *Holder* | 5 |
| 1.48 | *Impaired* | 6 |
| 1.49 | *Indemnification Obligation* | 6 |
| 1.50 | *Interest* | 6 |
| 1.51 | *Junior Noteholder Allocation of New Common Stock* | 6 |
| 1.52 | *Lead Investor* | 6 |
| 1.53 | *Lien* | 6 |
| 1.54 | *Local Rules* | 6 |
| 1.55 | *Management Incentive Plan* | 6 |
| 1.56 | *New Common Stock* | 6 |
| 1.57 | *New Equity Interests* | 6 |
| 1.58 | *New Series A Preferred Stock* | 6 |
| 1.59 | *New Series A Preferred Stock* | 6 |
| 1.60 | *Non-Tax Priority Claim* | 7 |
| 1.61 | *Old Equity Interests* | 7 |
| 1.62 | *Other Secured Claim* | 7 |
| 1.63 | *Person* | 7 |
| 1.64 | *Petition Date* | 7 |
| 1.65 | *Plan* | 7 |
| 1.66 | *Plan Supplement* | 7 |
| 1.67 | *Priority Tax Claim* | 7 |
| 1.68 | *Professional* | 7 |
| 1.69 | *Professional Fee Claim* | 7 |
| 1.70 | *Rejected Contract* | 7 |
| 1.71 | *Rejected Contract List* | 7 |
| 1.72 | *Reinstated* | 8 |
| 1.73 | *Related Persons* | 8 |
| 1.74 | *Released Parties* | 8 |
| 1.75 | *Releasing Party* | 8 |
| 1.76 | *Reorganized Debtor* | 8 |
| 1.77 | *Retained Actions* | 9 |
| 1.78 | *Rights Offering* | 9 |
| 1.79 | *Schedules* | 9 |
| 1.80 | *Secured Claim* | 9 |
| 1.81 | *Senior Noteholder Allocation of New Series A Preferred Stock* | 9 |
| 1.82 | *SOFAs* | 9 |
| 1.83 | *Transaction Documents* | 9 |
| 1.84 | *Unclassified Claims* | 9 |
| 1.85 | *Unimpaired* | 9 |
| 1.86 | *UST Fees* | 9 |

28955045.9

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ......................................................9

    2.1    *Administrative Claims*.................................................................9
    2.2    *DIP Facility Claims*.................................................................10
    2.3    *Priority Tax Claim*.................................................................10
    2.4    *Professional Fee Claims*.........................................................10

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS ...............................................................................................10

    3.1    *Introduction*.........................................................................10
    3.2    *Summary of Classes*...............................................................11
    3.3    *Treatment of Classes*..............................................................11
    3.4    *Alternative Treatment*.............................................................15
    3.5    *Special Provision Regarding Unimpaired Classes of Claims*.............15

ARTICLE IV ACCEPTANCE OF THIS PLAN ...........................................................15

    4.1    *Classes Entitled to Vote*...........................................................15
    4.2    *Acceptance by Impaired Classes*................................................15
    4.3    *Elimination of Classes*.............................................................15
    4.4    *Cramdown*...........................................................................15

ARTICLE V MEANS FOR IMPLEMENTATION OF THIS PLAN .........................................16

    5.1    *Continued Legal Existence and Revesting of Assets*........................16
    5.2    *Sources of Cash for Distribution*................................................16
    5.3    *Issuance of New Equity Interests*................................................16
    5.4    *Rights Offering*......................................................................16
    5.5    *Section 1145 Exemption*...........................................................16
    5.6    *Company Action*.....................................................................16
    5.7    *Preservation of Causes of Action*...............................................17
    5.8    *Effectuating Documents; Further Transactions*..............................17
    5.9    *Exemption From Certain Transfer Taxes and Recording Fees*.............17
    5.10   *Further Authorization*.............................................................17
    5.11   *Dissolution of Creditors' Committee*...........................................17
    5.12   *Cancellation of Existing Securities and Agreements*.......................18
    5.13   *Officers and Directors of Reorganized Debtor*..............................18

ARTICLE VI ALLOWANCE AND RESOLUTION OF CLAIMS .........................................19

    6.1    *Allowed Claims and Interests*....................................................19
    6.2    *Full Satisfaction*....................................................................19
    6.3    *Interest and Penalties on Claims*................................................19
    6.4    *Post Confirmation Claim and Asset Resolution*.............................19
    6.5    *Deadline to Object to Claims*....................................................19

28955045.9

ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..........................................................................................20

    7.1    *Assumption/Rejection of Executory Contracts and Unexpired Leases*. ..............20
    7.2    *Rejection Damages Claim Deadline*.................................................................21
    7.3    *Cure Amounts*...................................................................................................21
    7.4    *Compensation and Benefit Programs*. .............................................................21
    7.5    *Employment Contracts*....................................................................................21
    7.6    *Indemnification*................................................................................................22
    7.7    *Right of First Refusal*. .....................................................................................22

ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS ................................22

    8.1    *Fractional Shares*.............................................................................................22
    8.2    *Delivery of Distributions*.................................................................................22
    8.3    *Distributions Relating to Allowed Insured Claims*..........................................22
    8.4    *Defenses; Setoff*...............................................................................................22
    8.5    *Distributions for Claims Allowed as of the Effective Date*..............................23
    8.6    *Distribution Reserve*........................................................................................23
    8.7    *Means of Cash Payment*. .................................................................................23
    8.8    *Withholding and Reporting Requirements*. ......................................................23

ARTICLE IX CONFIRMATION AND CONSUMMATION OF THIS PLAN ...........23

    9.1    *Condition To Entry of the Confirmation Order*...............................................23
    9.2    *Conditions To Effective Date*...........................................................................24
    9.3    *Waiver Of Conditions*......................................................................................24
    9.4    *Notice of Effective Date.* ..................................................................................24

ARTICLE X EFFECT OF PLAN CONFIRMATION ...............................................25

    10.1   *Binding Effect*. .................................................................................................25
    10.2   *Revesting of Assets*..........................................................................................25
    10.3   *Releases*. ...........................................................................................................25
    10.4   *Discharge of the Debtor*...................................................................................26
    10.5   *Injunction*.........................................................................................................27
    10.6   *Exculpation and Limitation of Liability*...........................................................27
    10.7   *Term of Bankruptcy Injunction or Stays*. ........................................................28
    10.8   *Post-Effective Date Retention of Professionals*. ..............................................28

ARTICLE XI RETENTION OF JURISDICTION .....................................................28

    11.1   *Retention of Jurisdiction*. .................................................................................28
    11.2   *Failure of Bankruptcy Court to Exercise Jurisdiction*.....................................30

ARTICLE XII MISCELLANEOUS PROVISIONS .................................................30

    12.1   *Effectuating Documents and Further Transactions*. .........................................30

12.2    ***Company Action***...............................................................................................30
12.3    ***Payment Of Statutory Fees***..............................................................................30
12.4    ***Amendment Or Modification Of This Plan***. ........................................................30
12.5    ***Severability of Plan Provisions***.........................................................................31
12.6    ***Successors and Assigns***...................................................................................31
12.7    ***Revocation, Withdrawal, or Non-Consummation***. .............................................31
12.8    ***Notice***..............................................................................................................31
12.9    ***Governing Law***.................................................................................................32
12.10  ***Tax Reporting and Compliance***.........................................................................32
12.11  ***Conflicts***..........................................................................................................32

28955045.9

# EXHIBITS

EXHIBIT A -    Terms New Series A Preferred Stock Purchase Documents
EXHIBIT B -    List of Assumed Contracts (Plan Supplement)
EXHIBIT C -    List of Rejected Contracts (Plan Supplement)
EXHIBIT D -    Amended and Restated Articles of Incorporation (Plan Supplement)
EXHIBIT E -    New Series A Preferred Stock Purchase Agreement (Plan Supplement)
EXHIBIT F -    New Investors' Rights Agreement (Plan Supplement)
EXHIBIT G -    New Voting Agreement (Plan Supplement)
EXHIBIT H -    New Right of First Refusal and Co-Sale Agreement (Plan Supplement)
EXHIBIT I -    Identification of Directors of Reorganized Debtor (Plan Supplement)

28955045.9

## INTRODUCTION

Angel Medical Systems, Inc. (the ***"Debtor"***) proposes this prepackaged plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtor. Reference is made to the Disclosure Statement, filed contemporaneously herewith, for a discussion of (a) certain information relating to the Debtor, (b) a summary and analysis of this Plan, and (c) certain matters related to the confirmation and the consummation of this Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, Angel Medical Systems, Inc. reserves the right to alter, amend, modify, revoke, or withdraw this Plan.

## ARTICLE I

## <u>DEFINED TERMS AND RULES OF INTERPRETATION</u>

***Rules Of Interpretation And Computation Of Time***.  For purposes of this Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions with any modifications; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means including without limitation;" and (l) with reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

***Exhibits***.  All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court in the form of a Plan Supplement, no later than seven days prior to the Confirmation Hearing and shall be in form and substance satisfactory to the Debtor.

***Defined Terms***.  As used herein, capitalized terms shall have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy

Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1     ***2012 Notes Claims*** means Claims arising under the 2012 Notes.

1.2     ***2012 Notes*** means notes issued under that certain Note Purchase and Security Agreement, dated as of December 5, 2012 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof) by and among the Debtor, as the borrower, Bioinfo Accelerator Fund, LLC, as agent, and the noteholders party thereto.

1.3     ***2014 Notes Claims*** means Claims arising under the 2014 Notes.

1.4     ***2014 Notes*** mean notes issued under that certain Note Purchase and Security Agreement, dated as of November 25, 2014 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof) by and among the Debtor, as the borrower, Bioinfo Accelerator Fund, LLC, as agent, and the noteholders party thereto.

1.5     ***2016 Notes Claims*** means Claims arising under the 2016 Notes.

1.6     ***2016 Notes*** means notes issued under that certain Note Purchase and Security Agreement, dated as of September 20, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof) by and among the Debtor, as the borrower, Bioinfo Accelerator Fund, LLC, as agent, and the note holders party thereto.

1.7     ***Administrative Claim*** means a Claim for costs and expenses of administration of the Chapter 11 Case under sections 503(b) or 507(b) of the Bankruptcy Code.

1.8     ***Allowed*** means: (a) listed in the Schedules in an amount greater than zero and (i) not listed as disputed, contingent or unliquidated, as to which any objection or motion to estimate, equitably subordinate, reclassify, or otherwise limit the recovery thereon has been resolved, and (ii) as to which no proof of claim has been filed; (b) as to which a timely proof of claim has been filed in a sum certain, as to which any objection or motion to estimate, equitably subordinate, reclassify, or otherwise limit the recovery thereon has been resolved; (c) allowed in accordance with Section 502(h) of the Bankruptcy Code; or (d) allowed under this Plan or by Final Order of the Bankruptcy Court.  A claim shall not be deemed Allowed until any period to object to such claim has expired.

1.9     ***Amended and Restated Articles of Incorporation*** means the Amended and Restated Articles of Incorporation of the Reorganized Debtor, in the form attached as Exhibit D.

1.10    ***Assumed Contract*** is defined in Section 7.1 hereof.

1.11    ***Assumed Contract List*** means the list, attached hereto as Exhibit B, of the Executory Contracts and Unexpired Leases to be assumed under Section 7.1 hereof.

1.12     ***Avoidance Action*** means any claim or cause of action of the Estate arising out of or maintainable pursuant to sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b) or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

1.13     ***Bankruptcy Code*** means title 11 of the United States Code, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Case.

1.14     ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware or any other court with jurisdiction over the Chapter 11 Case.

1.15     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Case.

1.16     ***Benefit Plans*** is defined in Section 7.4 hereof.

1.17     ***Business Day*** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.18     ***Cash*** means legal tender of the United States of America, and equivalents thereof.

1.19     ***Causes of Action*** means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt.  "Causes of Action" include:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress and usury; and any other defenses set forth in section 558 of the Bankruptcy Code, (e) any state or foreign law fraudulent transfer or similar claim; and (f) any cause of action described on the Debtor's Schedules or Statement of Financial Affairs.

1.20     ***Chapter 11 Case*** means the bankruptcy case of the Debtor under Chapter 11 of the Bankruptcy Code.

1.21     ***Claim*** means a "claim" as defined in section 101(5) of the Bankruptcy Code.

1.22     ***Claims Objection Deadline*** is defined in Section 6.5 hereof.

1.23     ***Class*** means a category of Claims or Interests, as described in Article III hereof.

1.24    ***Confirmation*** means the confirmation of this Plan by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code.

1.25    ***Confirmation Date*** means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

1.26    ***Confirmation Hearing*** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.27    ***Confirmation Order*** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.28    ***Convenience Claims*** means Claims of a single Holder that would otherwise be included in the Class of General Unsecured Claims that are either (i) $7,500 or less in the aggregate or (ii) by election of the Holder of the Claims(s) prior to the Effective Date to treat such Claim(s) as totaling less than $7,500 in the aggregate.

1.29    ***Creditors' Committee*** means the statutory committee of unsecured creditors, if any, appointed in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

1.30    ***Cure*** means the payment of cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an executory contract or unexpired lease of the Debtor and to permit that Debtor to assume the contract or lease under Section 365(a) of the Bankruptcy Code.

1.31    ***Debtor*** means Angel Medical Systems, Inc., a Delaware corporation.

1.32    ***DIP Facility*** means any debtor-in-possession financing facility provided to the Debtor pursuant to an order of the Bankruptcy Court.

1.33    ***DIP Facility Claims*** means the obligations owed to the lender(s) under the DIP Facility.

1.34    ***DIP Lender*** means a Person identified as a lender under the DIP Facility in its capacity as such.

1.35    ***Disclosure Statement*** means that certain Disclosure Statement with respect to this Plan, as amended, supplemented, or modified from time to time.

1.36    ***Disputed Claim*** means (a) any Claim as to which an objection or request for estimation has been made in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any claim otherwise disputed by the Debtor or the Reorganized Debtor, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtor as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtor as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

1.37    ***Distribution Reserve*** is defined in Section 8.6 hereof.

1.38    ***Effective Date*** means a Business Day on or after the Confirmation Date specified by the Debtor on which (a) no stay of the Confirmation Order is in effect and (b) the conditions to effectiveness set forth in Article IX hereof have been satisfied or waived.

1.39    ***Eligible Participants*** means each holder of 2012 Notes, 2014 Notes, 2016 Notes Rights and Old Equity Interests that is an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act of 1933.

1.40    ***Estate*** means the estate of the Debtor created under section 541 of the Bankruptcy Code.

1.41    ***Exculpated Parties*** means each of the following in their capacity as such (a) the Debtor, (b) the Reorganized Debtor, (c) the Creditors' Committee, if any, (d) the members of the Creditors' Committee in their capacity as such, if any, (e) any DIP Lender, (f) the Lead Investor, and (g) the respective Related Persons of each of the foregoing.

1.42    ***Executory Contracts and/or Unexpired Leases*** means all executory contracts and unexpired leases to which the Debtor is a party.

1.43    ***Exhibit*** means an exhibit annexed to the Disclosure Statement and Plan or contained in the Plan Supplement, as such exhibit may be amended, modified or supplemented from time to time.

1.44    ***Executory Contract Objection Deadline*** is defined in Section 7.1 hereof.

1.45    ***Final Order*** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal, that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed, has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken for granted.

1.46    ***General Unsecured Claim*** means a Claim against the Debtor that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Non-Tax Priority Claim, 2012 Notes Claim, 2014 Notes Claim, 2016 Notes Claim, Other Secured Claim or Convenience Claim. For avoidance of doubt, General Unsecured Claims do not include any unsecured deficiency claims arising under the 2012 Notes, 2014 Notes, or 2016 Notes.

1.47    ***Holder*** means a holder of a Claim or Interest, as applicable.

1.48    ***Impaired*** means when used in reference to a Claim or Interest, a Claim or Interests that is in a Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.49    ***Indemnification Obligation*** is defined in Section 7.6 hereof.

1.50    ***Interest*** means the legal, equitable, contractual (including, without limitation, any contractual right to acquire equity in the Debtor contingent upon future events), and other rights of any Person with respect to any equity interest, including all common stock and preferred stock, or other ownership interest in the Debtor, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in the Debtor.

1.51    ***Junior Noteholder Allocation of New Common Stock*** means 5,970,949 shares of New Common Stock of the Reorganized Debtor representing 100% of the New Common Stock to be issued on the Effective Date, subject to dilution by the Management Incentive Plan.

1.52    ***Lead Investor*** means MCM Angel Partners, LLC.

1.53    ***Lien*** means any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

1.54    ***Local Rules*** means the local rules of the United States Bankruptcy Court for the District of Delaware, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Case.

1.55    ***Management Incentive Plan*** means a management incentive plan to be adopted by the board of the Reorganized Debtor under which an options pool allocation of New Common Stock will be created in the amount of 10% of the total available stock (based on issued New Common Stock plus issued New Series A Preferred Stock) (after taking into account the shares to be issued under the Management Incentive Plan).

1.56    ***New Common Stock*** means shares of common stock of the Reorganized Debtor with a par value of $.001 to be issued by the Reorganized Debtor under the Amended and Restated Articles of Incorporation.

1.57    ***New Equity Interests*** means, collectively, the New Common Stock and the New Series A Preferred Stock.

1.58    ***New Series A Preferred Stock*** means the New Series A Preferred Stock, on the terms set forth on Exhibit A, to be issued by the Reorganized Debtor under the terms of this Plan and the New Series A Preferred Stock Purchase Documents on the Effective Date.

1.59    ***New Series A Preferred Stock Purchase Documents*** means, collectively, a (i) New Series A Stock Purchase Agreement, (ii) New Investors' Rights Agreement, (iii) New

Voting Agreement, and (iv) New Right of First Refusal and Co-Sale Agreement, each on the terms set forth on Exhibit A hereto and substantially in the form contained in Exhibits E through H in the Plan Supplement, pursuant to which the Reorganized Debtor will issue New Series A Preferred Stock.

1.60     ***Non-Tax Priority Claim*** means a Claim, other than an Administrative Claim or Priority Tax Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

1.61     ***Old Equity Interests*** means all Interests, whether or not evidenced by a security, in the Debtor issued and outstanding immediately before the Effective Date.

1.62     ***Other Secured Claim*** means a Secured Claim that is not a DIP Facility Claim, 2012 Notes Claims, 2014 Notes Claims or 2016 Notes Claims.

1.63     ***Person*** means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, joint venture, joint stock company, firm, trust, estate, unincorporated organization, association, government, governmental agency, or other entity, in each case whether acting in an individual, fiduciary or other capacity.

1.64     ***Petition Date*** means the date on which the Debtor filed its petition for relief commencing its Chapter 11 Case.

1.65     ***Plan*** means this chapter 11 plan of reorganization for the Debtor, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be amended, modified or supplemented from time to time.

1.66     ***Plan Supplement*** means the compilation of the exhibits to the Plan to be filed with the Bankruptcy Court.

1.67     ***Priority Tax Claim*** means a Claim of a governmental unit of the kind specified in sections 502(i), 507(a)(8), or 1129(a)(9)(D) of the Bankruptcy Code.

1.68     ***Professional*** means (a) any professional employed in the Chapter 11 Case pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

1.69     ***Professional Fee Claim*** means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

1.70     ***Rejected Contract*** is defined in Section 7.1 hereof.

1.71     ***Rejected Contract List*** means the list, attached hereto as Exhibit C, of the Executory Contracts and Unexpired Leases to be rejected under Section 7.1 hereof.

1.72    ***Reinstated*** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave the Class including such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (ii) compensating the holder of a Claim for any damages incurred as a result of any reasonable reliance by such holder of a Claim on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions, change of control or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured to achieve reinstatement.

1.73    ***Related Persons*** means, with respect to any Person, such Person's predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members), general partners, limited partners, agents, managers, managing members, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity on or any time before or after the Petition Date, and any Person claiming by or through any of them.

1.74    ***Released Parties*** means each of the following in their capacity as such  (a) the Debtor, (b) the Reorganized Debtor, (c) the Creditors' Committee, if any, (d) the members of the Creditors' Committee in their capacity as such, if any, (e) any DIP Lender, (f) the Lead Investor, and (g) the respective Related Persons of each of the foregoing.

1.75    ***Releasing Party*** means, each of, and in each case in its capacity as such: (a) the Debtor, (b) the Reorganized Debtor; (c) each DIP Lender, (d) the Lead Investor,  (e) all Holders of Claims; (f) all Holders of Interests; and (g) each Related Party of each Person in clause (a) through (g).  Notwithstanding the foregoing, a Person shall be neither a Releasing Party nor a Released Party if it: (x) does not vote to, and is not deemed to, accept the Plan; and (y) timely makes an election to opt out of the release provisions in the Plan by (i) indicating its election to opt out of releases on the ballot or notice provided to such Person that is timely delivered in accordance with the instruction set forth therein or (ii) filing with the Bankruptcy Court on the docket of the Chapter 11 Case an objection to the releases contained in the Article X of the Plan that is not resolved before Confirmation.  Any such Person shall be identified by name as a "non-Releasing Party" in the Confirmation Order.

1.76    ***Reorganized Debtor*** means the Debtor on and after the Effective Date.

1.77    ***Retained Actions*** means all Causes of Action; provided, however, that Retained Actions shall not include those Causes of Action, whether in law or equity, whether known or unknown, released under Article X hereof.

1.78    ***Rights Offering*** means a rights offering of New Series A Preferred Stock to Eligible Participants.

1.79    ***Schedules*** means the schedules of assets and liabilities filed in the Bankruptcy Court by the Debtor, as may be amended from time to time.

1.80    ***Secured Claim*** means a Claim that is secured by a Lien on property in which the Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

1.81    ***Senior Noteholder Allocation of New Series A Preferred Stock*** means 2,661,826 shares of New Series A Preferred Stock.

1.82    ***SOFAs*** means the Statement of Financial Affairs filed by the Debtor.

1.83    ***Transaction Documents*** means, collectively, the Amended and Restated Articles of Incorporation, the New Series A Preferred Stock Purchase Documents, the New Equity Interests, and any agreement, contract, instrument, and other agreement or document executed or delivered in connection with the foregoing.

1.84    ***Unclassified Claims*** means the Administrative Claims and Priority Tax Claims.

1.85    ***Unimpaired*** means a Claim or Interest that is not Impaired.

1.86    ***UST Fees*** is defined in Section 12.3.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on this Plan.

2.1    ***Administrative Claims***.  On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.  Notwithstanding the foregoing, (y) any Allowed

Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and the Debtor or the Reorganized Debtor.

       2.2    ***DIP Facility Claims***.  On the Effective Date, the DIP Lenders shall convert $2,000,000 of their Allowed DIP Facility Claims into New Series A Preferred Stock under the New Series A Preferred Stock Purchase Documents.  To the extent that Allowed DIP Facility Claims exceed $2,000,000, the unconverted balance of Allowed DIP Facility Claims shall be paid in full in Cash by the Debtor to the DIP Lenders on the Effective Date.  To the extent that Allowed DIP Facility Claims are less than $2,000,000, the difference between $2,000,000 and Allowed DIP Facility Claims, shall be paid in full in Cash by the DIP Lenders to the Reorganized Debtor on or before the Effective Date.

       2.3    ***Priority Tax Claim***.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the sole discretion of the Reorganized Debtor, (a) Cash equal to the unpaid portion of such Holder's Allowed Priority Tax Claim, (b) payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code over a period not ending later than five years from the Petition Date, or (c) such other treatment as to which the Debtor, Reorganized Debtor and such Holder shall have agreed upon in writing.

       2.4    ***Professional Fee Claims***.  Professional Fee Claims shall be paid in full in Cash on, or as soon as reasonably practicable after, the allowance of such claims by Final Order of the Bankruptcy Court.  Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Case prior to the Effective Date shall file with the Bankruptcy Court an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Case on or before the 45th day following the Effective Date.  Without limiting the foregoing, the Reorganized Debtor may pay the charges incurred by the Reorganized Debtor on and after the Effective Date for any Professional's fees, disbursements, expenses or related support services, without application to or approval by the Bankruptcy Court.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

       3.1    ***Introduction***.

       Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtor.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, and the respective treatment of such Unclassified Claims is set forth in Article II of this Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

3.2    *Summary of Classes*.

| Class | Impaired/Unimpaired; Entitlement To Vote |
|---|---|
| Class 1 - Non-Tax Priority Claims | Unimpaired - Deemed to have accepted this Plan and not entitled to vote |
| Class 2 – Other Secured Claims | Unimpaired - Deemed to have accepted this Plan and not entitled to vote |
| Class 3 – 2012 Notes Claims | Impaired – Entitled to vote |
| Class 4 – 2014 Notes Claims | Impaired – Entitled to vote |
| Class 5 – 2016 Notes Claims | Impaired – Entitled to vote |
| Class 6 – General Unsecured Claims | Impaired – Deemed to have rejected this Plan and not entitled to vote |
| Class 7 – Convenience Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 8 - Old Equity Interests | Impaired – Deemed to have rejected this Plan and not entitled to vote |

3.3    *Treatment of Classes*.

*Class 1 – Non-Tax Priority Claims*

*Class 1* - All Non-Tax Priority Claims against the Debtor.

*Treatment*:  Except to the extent that the Holder of an Allowed Non-Tax Priority Claim has agreed to a less favorable treatment of such Claim, on, or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, (c) the date on which such Allowed Non-Tax Priority Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between the Reorganized Debtor and the Holder of such Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive, in full

11

and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim.

*Voting*:  Class 1 is Unimpaired and the Holders of Allowed Class 1 Non-Tax Priority Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Non-Tax Priority Claims are not entitled to vote to accept or reject this Plan.

*Class 2 – Other Secured Claims*

*Class 2* - All Other Secured Claims against the Debtor.  (Each Other Secured Claim shall constitute a separate Class numbered 2.1, 2.2, 2.3, etc.)

*Treatment*:  On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Class 2 Other Secured Claim shall, at the option of the Reorganized Debtor in an exercise of its business judgment, and without need for further order of the Bankruptcy Court, be entitled to the treatment set forth below in option A, B, C, or D.  The Reorganized Debtor specifically reserves the right to challenge the validity, nature and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported Liens relating to the Other Secured Claims.

Option A:  Allowed Other Secured Claims with respect to which the Reorganized Debtor elects option A shall be Reinstated.  The failure of the Debtor to file an objection, prior to the Effective Date, with respect to any Other Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtor to contest or otherwise defend against such Claim in an appropriate forum when and if such Claim is sought to be enforced.  Any Cure amount that the Debtor may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such Reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes Allowed, or (c) such other date as mutually may be agreed to by and between such Holder and the Debtor or Reorganized Debtor.

Option B:  Allowed Other Secured Claims with respect to which the Reorganized Debtor elects option B shall be paid in Cash, in full, including any amounts owed under section 506 of the Bankruptcy Code, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, (c) the date on which such Other Secured Claim is otherwise due and payable and (d) such other date as mutually may be agreed to by and between such Holder and the Reorganized Debtor.  The failure of the Debtor to file an objection, prior to the Effective Date, with respect to any Other Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtor to

12

contest or otherwise defend against such Claim in an appropriate forum when and if such Claim is sought to be enforced.

Option C: Allowed Other Secured Claims with respect to which the Reorganized Debtor elects option C shall be satisfied by the surrender to the Holder of the Claim of the collateral securing the applicable Other Secured Claim.

Option D: Allowed Other Secured Claims with respect to which the Reorganized Debtor elects option D shall be satisfied in accordance with such other terms and conditions as may be agreed upon by the Reorganized Debtor and the Holder of such Allowed Secured Claim.

The Reorganized Debtor shall be deemed to have elected Option A with respect to all Allowed Other Secured Claims except those with respect to which the Debtor elects another option in writing prior to the Effective Date.

*Voting*: Class 2 is Unimpaired and the Holders of Allowed Class 2 Other Secured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject this Plan.

*Class 3 – 2012 Notes Claims*

Class 3 - All 2012 Notes Claims.

*Treatment*: On the Effective Date, each Holder of a 2012 Notes Claim will receive, in full and final satisfaction of its Allowed 2012 Notes Claim, its pro rata share of the Junior Noteholder Allocation of New Common Stock based on the principal amount of the 2012 Notes.

*Voting*: Class 3 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 3 2012 Notes Claim is entitled to vote to accept or reject this Plan.

*Class 4 – 2014 Notes Claims*

Class 4 - All 2014 Notes Claims.

*Treatment*: On the Effective Date, each Holder of a 2014 Notes Claim will receive, in full and final satisfaction of its Allowed 2014 Notes Claims, its pro rata share of the Junior Noteholder Allocation of New Common Stock based on the principal amount of the 2014 Notes.

*Voting*: *Class* 4 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 4 2014 Notes Claim is entitled to vote to accept or reject this Plan.

*Class 5 – 2016 Notes Claims*

> *Class 5*- All 2016 Notes Claims.

> Treatment:  On the Effective Date, each Holder of a 2016 Notes Claim will receive, in full and final satisfaction of its Allowed 2016 Notes Claims, its pro rata share of the Senior Noteholder Allocation of Series A Preferred Stock based on the principal amount of the 2016 Notes.

> *Voting*:  Class 5 is Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 5 2016 Note Claim is entitled to vote to accept or reject this Plan.

*Class 6 – General Unsecured Claims*

> *Class 6* - All General Unsecured Claims.

> *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive its pro rata share of $500,000; provided, however, that no Holder of a General Unsecured Claim shall be entitled to receive more than the amount of its Allowed General Unsecured Claim.

> *Voting*:  Class 6 is Impaired and the Holders of Allowed General Unsecured Claims are conclusively deemed to have rejected this Plan.  Therefore, the Holders of Class 6 General Unsecured Claim are not entitled to vote to accept or reject this Plan.

*Class 7 – Convenience Claims*

> *Class 7* - All Convenience Claims.

> *Treatment*:  Each Holder of an Allowed Convenience Claim shall be paid in full in Cash on the Effective Date up to $7,500.

> *Voting*:  Class 7 is Unimpaired and the Holders of Allowed Class 7 Convenience Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 7 Convenience Claims are not entitled to vote to accept or reject this Plan.

*Class 8 – Old Equity Interests*

> *Class 8* - Old Equity Interests and all Claims arising from or related to Old Equity Interests that are subject to subordination under section 510(b) of the Bankruptcy Code.

> *Treatment*:  On the Effective Date, all Old Equity Interests shall be cancelled and Holders of Old Equity Interests and Claims arising from or related

to Old Equity Interests that are subject to subordination under section 510(b) of the Bankruptcy Code shall not receive or retain any property on account thereof.

*Voting*:   Class 8 is Impaired, and the Holders of Allowed Class 8 Old Equity Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.   Therefore, the Holders of Class 8 Old Equity Interests are not entitled to vote to accept or reject this Plan.

3.4    ***Alternative Treatment***.    Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim or Interest may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it and the Reorganized Debtor agree.

3.5    ***Special Provision Regarding Unimpaired Classes of Claims***.   Except as otherwise provided in this Plan, nothing shall affect the Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Claims in Unimpaired Classes, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs against or recoupments of Claims in Unimpaired Classes.

## ARTICLE IV

## <u>ACCEPTANCE OF THIS PLAN</u>

4.1    ***Classes Entitled to Vote***. Classes 3, 4 and 5 are entitled to vote to accept or reject this Plan.  By operation of law, Classes 1, 2 and 7 are deemed to have accepted this Plan and are not entitled to vote.  Classes 6 and 8 are deemed to have rejected this Plan and are not entitled to vote.

4.2    ***Acceptance by Impaired Classes***.   An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept this Plan.

4.3    ***Elimination of Classes***.   To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

4.4    ***Cramdown***.    To the extent necessary, the Debtor shall request Confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtor reserves the right to modify this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THIS PLAN

5.1     ***Continued Legal Existence and Revesting of Assets***.  On the Effective Date, the Reorganized Debtor shall be deemed to have adopted the Amended and Restated Articles of Incorporation and the Debtor will continue to exist after the Effective Date as a Delaware corporation.  The Amended and Restated Articles of Incorporation shall include a provision to prohibit the Reorganized Debtor from issuing non-voting equity securities to the extent necessary to comply with section 1123(a) of the Bankruptcy Code.  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estate shall revest in the Reorganized Debtor.

5.2     ***Sources of Cash for Distribution***.  All Cash necessary for the Reorganized Debtor to make payments required by this Plan shall be obtained from (a) existing Cash balances, (b) the DIP Facility, and (c) sale and issuance of New Series A Preferred Stock under the New Series A Preferred Stock Purchase Documents.

5.3     ***Issuance of New Equity Interests***.  On the Effective Date, upon the terms and subject to the conditions set forth in this Plan and the Amended and Restated Articles of Incorporation, the Reorganized Debtor shall issue, sell and deliver the New Common Stock to holders of 2012 New Note Claims and 2014 Note Claims.   On the Effective Date, upon the terms and subject to the conditions set forth in this Plan and the Amended and Restated Articles of Incorporation, the Reorganized Debtor shall issue, sell and deliver the Senior Noteholder Allocation of Series A Preferred Stock to the holders of the 2016 Note Claims. On the Effective Date, upon the terms and subject to the conditions set forth in this Plan, the Amended and Restated Articles of Incorporation, and the New Series A Preferred Stock Purchase Documents, the Reorganized Debtor shall issue, sell and deliver the Series A Preferred Stock to the investors party to the New Series A Preferred Stock Purchase Documents.  The New Equity Interest issued under this Plan shall be subject to dilution by the Management Incentive Plan.    All shares of New Equity Interests issued under this Plan shall be, upon issuance, fully paid and non-assessable, and the holders thereof shall have no preemptive or other rights to subscribe for additional shares, except for awards issued under the Management Incentive Plan.

5.4     ***Rights Offering***.  Eligible Participants will be eligible to participate in the Rights Offering of New Series A Preferred Stock to be issued under the New Series A Preferred Stock Purchase Documents.

5.5     ***Section 1145 Exemption***.  Pursuant to section 1145 of the Bankruptcy Code, the issuance of shares of the New Equity Interests to the holders of 2012 Notes Claims, 2014 Notes Claims, and 2016 Notes Claims pursuant to the Plan shall be exempt from registration under the Securities Act of 1933 and any state or local law requiring registration for offer or sale of a security.

5.6     ***Company Action***.  Each of the matters provided for under this Plan or the Transaction Documents involving the company structure of the Debtor or Reorganized Debtor or any company action to be taken by, or required of, the Debtor or Reorganized Debtor shall be

deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by directors, officers or shareholders of the Debtor or the Reorganized Debtor.

5.7     ***Preservation of Causes of Action***.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor will retain and may (but is not required to) enforce all Retained Actions.  After the Effective Date, the Reorganized Debtor, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The Reorganized Debtor or any successors, in the exercise of its sole discretion, may pursue such Retained Actions so long as it is determined in the exercise of the Reorganized Debtor or any successors holding such rights of action to be in its best interest.  The failure of the Debtor to specifically list any claim, right of action, suit, proceeding, or other Retained Action in this Plan or the Disclosure Statement does not, and will not be deemed to, constitute a waiver or release by the Debtor or the Reorganized Debtor of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtor will retain the right to pursue such claims, rights of action, suits, proceedings, and other Retained Actions in its sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the Confirmation or consummation of this Plan.

5.8     ***Effectuating Documents; Further Transactions***.   The Debtor and Reorganized Debtor, and their respective officers and designees, are authorized to execute, deliver, file, or record the Transaction Documents and such other contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law.

5.9     ***Exemption from Certain Transfer Taxes and Recording Fees***.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from the Debtor to the Reorganized Debtor or to any other Person or entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtor's real or personal property, will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.10     ***Further Authorization***.  The Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions, and rulings as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

5.11     ***Dissolution of Creditors' Committee***.  The Creditors' Committee, if any, shall continue in existence until the Effective Date to exercise those powers and perform those

duties specified in section 1103 of the Bankruptcy Code. On the Effective Date, the Creditors' Committee, shall be dissolved and the Creditors' Committees members, in their capacity as such, shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Case or this Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order.

5.12    *Cancellation of Existing Securities and Agreements*. Except as provided in this Plan or in the Confirmation Order or for the purpose of evidencing a right to distribution hereunder on the Effective Date, all notes, stock, instruments, certificates, agreements, side letters, fee letters and other documents evidencing or giving rise to Claims and Interests in the Debtor shall be canceled, and the obligations of the Debtor thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person. The Holders of or parties to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents shall have no rights arising from or relating to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents or the cancellation thereof, except the rights provided pursuant to this Plan and the Confirmation Order.

5.13    *Officers and Directors of Reorganized Debtor*. On the Effective Date, each of the members of the existing board of directors of the Debtor shall be deemed to have resigned in such capacity, and the members of the existing board of directors shall return all property of the Debtor in their possession to the Debtor or Reorganized Debtor on or before such date. On the Effective Date under the Amended and Restated Articles of Incorporation, the Board will consist of five (5) individuals. The holders of New Series A Preferred Stock, voting as a separate class, will be entitled to appoint two (2) members of the board as designated by the holders of a majority in interest of the New Series A Preferred, who would initially be Victor Whitman and another to be named individual. The holders of the New Common Stock and the New Series A Preferred Stock, voting as a single class on an as converted to shares of the New Common Stock basis, would be entitled to elect the remaining three (3) members of the Board, (i) one (1) of whom would be the Company's CEO, (ii) one (1) of whom would be mutually acceptable to the other members of the board who would initially be Andrew Taylor and (iii) one of (1) of whom is designated by a the holders of the New Common Stock and the New Series A Preferred Stock, voting as a single class on an as converted to shares of the New Common Stock basis. Such composition of the board would be prescribed by the New Voting Agreement entered into by and among the Reorganized Debtor and the holders of the Debtor's capital stock. The Reorganized Debtor shall pay all reasonable expenses of the board members, including costs relating to service on a board committee. The Plan Supplement will include the biographical information of the directors to be appointed on the Effective Date. It is anticipated that the Debtor's businesses will continue to be managed, as of the Effective Date, by existing management, subject to replacement by the new board of directors after the Effective Date. On the Effective Date, the officers and directors of the Reorganized Debtor will be appointed automatically without any requirement of further action by the shareholders, officers or directors of the Debtor or the Reorganized Debtor.

# ARTICLE VI

## ALLOWANCE AND RESOLUTION OF CLAIMS

6.1    ***Allowed Claims and Interests***.  Notwithstanding any provision herein to the contrary, the Reorganized Debtor shall make distributions only to Holders of Allowed Claims. A Holder of a Disputed Claim shall only receive a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.  The Reorganized Debtor shall withhold distributions otherwise due hereunder to the holder of a Claim for a reasonable period of time to enable the Reorganized Debtor to determine whether to object to the Claim.  The presence of a Disputed Claim in any class will not be a cause to delay distribution to Allowed Claims in that Class or in other Classes.  A holder of a Convenience Claim that becomes an Allowed Claim after the Effective Date will receive its distribution as soon as practicable after Allowance.

6.2    ***Full Satisfaction***.  The Reorganized Debtor shall make, and each holder of an Allowed Claim shall receive, the distributions provided for in the Plan in full satisfaction and discharge of the Claim.

6.3    ***Interest and Penalties on Claims***.  Unless otherwise specifically provided for in this Plan or the Confirmation Order, required by applicable bankruptcy law, or necessary to render a Claim Unimpaired, postpetition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims, Non-Tax Priority Claims, and Convenience Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

6.4    ***Post Confirmation Claim and Asset Resolution***.  After the Effective Date, the Reorganized Debtor may defend, pursue or settle, without Bankruptcy Court approval, any Disputed Claim or Claim or Cause of Action of the Estate.

6.5    ***Deadline to Object to Claims***.  No later than 150 days after the Effective Date (the ***"Claims Objection Deadline"***) (unless extended by an order of the Bankruptcy Court upon motion of the Reorganized Debtor), the Reorganized Debtor may file objections to Claims with the Bankruptcy Court and serve such objections upon the holders of each of the Claims to which objections are made.  Nothing contained herein, however, shall limit the Reorganized Debtor's right to object to Claims, if any, filed or amended after the Claims Objection Deadline and unless subsequently ordered for good cause the Reorganized Debtor shall continue to have the right to amend any objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed.  Further, nothing herein shall require approval of the Bankruptcy Court for the settlement of any Claims.

## ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

7.1     ***Assumption/Rejection of Executory Contracts and Unexpired Leases***. On the Effective Date, the Reorganized Debtor shall (a) assume the Executory Contracts and Leases on the Assumed Contract List and (b) reject the Executory Contracts and Leases on the Rejected Contract List.  The Debtor reserves the right to amend the Assumed Contract List and Rejected Contract List at any time prior to the Effective Date.  Any Executory Contract and Unexpired Lease not listed on either the Assumed Contract List or Rejected Contract List shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease:

(i)     has been previously assumed or rejected by the Debtor by Final Order of the Bankruptcy Court;

(ii)    has been assumed or rejected by the Debtor by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order); or

(iii)   is the subject of a motion to assume or reject filed by the Debtor under section 365 of the Bankruptcy Code pending as of the Effective Date.

An Executory Contract or Unexpired Lease that is assumed pursuant to the foregoing sentence shall be referred to as an ***"Assumed Contract."***  An Executory Contract or Unexpired Lease that is rejected as described above shall be referred to as a ***"Rejected Contract."***  Each non-debtor party to an Assumed Contract or Rejected Contract shall receive at least twenty–one days' notice of the deadline to object to assumption or rejection, as the case may be, of the identified Executory Contract or Unexpired Lease, which date will be the deadline set by the Bankruptcy Court to object to Confirmation of the Plan (the ***"Executory Contract Objection Deadline"***).  If the Assumed Contract List or Rejected Contract List is modified less than twenty-one days prior to the Executory Contract Objection Deadline, the affected party will be provided at least twenty-one days' notice of the time to object to assumption or rejection of the identified Assumed Contract or Rejected Contract

Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (a) the Reorganized Debtor has properly provided for adequate assurance of payment of the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code, (b) each assumption (or rejection, as the case may be) is in the best interest of the Debtor and its Estate and that each Assumed Contract is assumed as of the Effective Date and each Rejected Contract rejected as of the Effective Date or such other date identified in the Rejected Contract List, and (c) the requirements for assumption, or rejection, as the case may be, of any Executory Contract or Unexpired Lease to be assumed or rejected, as the case may be, have been satisfied. No provision of any agreement or other document that permits a person to terminate or modify an

agreement or to otherwise modify the rights of the Debtor based on the filing of the Chapter 11 Case or the financial condition of the Debtor or which would restrict the assumption of any Assumed Contract under a "change in control" prohibition or similar restriction shall be enforceable.

7.2     ***Rejection Damages Claim Deadline***.  Unless otherwise provided by an order of the Bankruptcy Court, any asserted Claims arising from the rejection of an Executory Contract or Unexpired Lease must be filed by Holders of such Claims with the Bankruptcy Court and served on the parties entitled to notice under this Plan no later than sixty (60) days after the later of (a) the Effective Date or (b) the effective date of such rejection, subject to the Reorganized Debtor's right to object thereto.

7.3     ***Cure Amounts***.  Any monetary amounts by which any Executory Contract and Unexpired Lease to be assumed under the Plan is in default shall be satisfied, under Section 365(b)(l) of the Bankruptcy Code, by Cure. If the Assumed Contract List indicates a specific Cure amount for a contract or lease, the payment of the amount so specified shall be conclusively deemed to constitute Cure with respect to that contract or lease, and no other payment or performance on account of a prepetition default thereunder shall be required. If the amount so specified is zero, no payment shall be required. Notwithstanding the foregoing, if the other party to a contract or lease on the Assumed Contract List files, no later than the Executory Contract Objection Deadline, an objection disputing the Cure amount so specified with respect to its contract or lease, or otherwise raising an objection as to the nature or amount of any Cure, (a) except as provided in Section 7.1, any other matter relating to assumption, Cure shall occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption; if an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtor, in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

7.4     ***Compensation and Benefit Programs***.  All of the Debtor's existing programs, plans, agreements, and arrangements relating to employee compensation and benefits (other than as set forth in or related to any Rejected Contract), including, without limitation, all medical, dental, pharmacy, vision, dental, and disability plans entered into before the Petition Date, as amended from time to time and to the extent and as in effect immediately prior to the Effective Date (***"Benefit Plans"***), will be deemed to be, and will be treated as executory contracts that are assumed under Section 7.1 of this Plan, and the Debtor's and Reorganized Debtor's obligations and rights under such programs, plans, agreements, and arrangements will survive Confirmation of this Plan, subject to the terms and conditions of such Benefit Plans.  The Debtor does not have any retiree plans (as defined in Section 1114 of the Bankruptcy Code).  Nothing contained herein shall be deemed to modify the existing terms of the Benefit Plans, including, without limitation, the Debtor's and the Reorganized Debtor's rights of termination and amendment thereunder.

7.5     ***Employment Contracts***.  Unless included in the Assumed Contract List, all employment and management consulting agreements with the Debtor, whether in writing or not, shall be deemed rejected as of the Effective Date. Subject to approval by the board of directors of the Reorganized Debtor without need for Bankruptcy Court approval, the Reorganized Debtor shall enter into new employment and / or consulting agreements with

members of existing management that remain with the Reorganized Debtor after the Effective Date.

7.6     ***Indemnification***.  The Debtor's obligation to indemnify any former director or officer under its Articles of Incorporation, bylaws, employee indemnification policy, or any other agreement (***"Indemnification Obligation"***) shall be deemed assumed as of the Effective Date.

7.7     ***Right of First Refusal***.  On the Effective Date, that certain Right of Refusal Agreement between St. Jude Medical, Inc. and the Debtor shall be rejected.  If the Bankruptcy Court Allows rejection damage claims with respect to such rejection, the Reorganized Debtor, in its sole option, may elect to assume such Executory Contract or Unexpired Lease in lieu of rejecting it.

## ARTICLE VIII

## PROVISIONS GOVERNING DISTRIBUTIONS

8.1     ***Fractional Shares***.  No fractional shares of New Common Stock or New Series A Preferred Stock will be issued or distributed under this Plan.  The actual distribution of shares of New Common Stock or New Series A Preferred will be rounded to the next higher or lower whole number as follows:  (a) fractions less than one-half (1/2) shall be rounded to the next lower whole number and (b) fractions equal to or greater than one-half (1/2) shall be rounded to the next higher whole number.  The total number of shares of New Common Stock or New Series A Preferred Stock to be distributed herein will be adjusted as necessary to account for such rounding.  No consideration will be provided to holders of Claims in lieu of fractional shares that are rounded down.

8.2     ***Delivery of Distributions***.  Distributions shall be made by the Reorganized Debtor to each holder of an Allowed Claim (a) at the address shown on the list of creditors filed with the petitions commencing the Chapter 11 Case, (b) at the address listed in the Schedules if different from the address shown on the list creditors filed with the petitions commencing the Chapter 11 Case, or (c) if a proof of claim is filed, and the address is different from that listed in the Schedules, at the address set forth in the proof of claim.

8.3     ***Distributions Relating to Allowed Insured Claims***.  If any Claim otherwise payable under the Plan is covered by an insurance policy held by the Debtor or Reorganized Debtor, the Claim may be satisfied, in whole or in part, with the proceeds of the policy, if any.

8.4     ***Defenses; Setoff***.  Any defenses, counterclaims, rights of set off or recoupment of the Debtor with respect to a claim shall vest in and inure to the benefit of the Reorganized Debtor.  To the extent permitted by law, the Reorganized Debtor may, but shall not be required to, set off against any claim, the payments or other distributions to be made in respect thereof, and claims of any nature whatsoever that the Debtor or Reorganized Debtor may have against the Claim's holder, but neither the failure to do so nor the allowance of any Claim

hereunder shall constitute a waiver or release of a claim or Cause of Action of the Reorganized Debtor.

8.5    ***Distributions for Claims Allowed as of the Effective Date***.  Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made by the Reorganized Debtor on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  New Equity Interests shall not be certificated.  Equity Interests shall be evidenced by the official registry maintained by the Reorganized Debtor under the Amended and Restated Articles of Incorporation.

8.6    ***Distribution Reserve*** On the Effective Date, the Reorganized Debtor shall establish a distribution reserve (***"Distribution Reserve"***) on account of Disputed General Unsecured Claims.  The Distribution Reserve shall initially include Cash sufficient to distribute to each holder of a Disputed Claim the full amount that it would receive hereunder if its Claim is ultimately Allowed in its full face amount.  Any surplus remaining from the disallowance of all or part of a Disputed Claim shall be distributed to Holders of Allowed General Unsecured Claims under the terms of the Plan until all such Claims are paid in full.  In the event that all such Claims are paid in full, any amounts remaining after the satisfaction of all Allowed General Unsecured Claims shall revert to the Reorganized Debtor.

8.7    ***Means of Cash Payment***.  Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the applicable Reorganized Debtor by checks drawn on, or wire transfer from, a domestic bank selected by the Reorganized Debtor, Cash payments to foreign creditors may be made, at the option of the applicable Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

8.8    ***Withholding and Reporting Requirements***.  In connection with this Plan and all distributions hereunder, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

## ARTICLE IX

## CONFIRMATION AND CONSUMMATION OF THIS PLAN

9.1    ***Condition To Entry of the Confirmation Order***.  The following are conditions precedent to the entry of the Confirmation Order, each of which must be satisfied or waived by the Debtor in accordance with the terms hereof:

(a)    The Plan and all schedules, documents, supplements and exhibits relating to this Plan shall have been filed in form and substance acceptable to the Debtor; and

(b)    The proposed Confirmation Order shall be in form and substance acceptable to the Debtor.

9.2    ***Conditions To Effective Date***.    The Debtor shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtor in accordance with the terms hereof:

(a)    The Confirmation Order, in form and substance satisfactory to the Debtor shall have been entered by the Bankruptcy Court and be in full force and effect and not subject to any stay and shall, among other things, provide that the Debtor and Reorganized Debtor are authorized without further board or member approval or consent to take all actions necessary to enter into the Transaction Documents and other agreements or documents created in connection with this Plan.  Without limiting the foregoing, the board of directors, chief executive officer, or other appropriate officer of the Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan and the Transaction Documents;

(b)    All Transaction Documents shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date).

(c)    All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained;

(d)    All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed; and

(e)    The Debtor shall have sufficient Cash, whether on hand or from funds received under the New Series A Preferred Stock Purchase Documents to make all required payments to be made on the Effective Date.

9.3    ***Waiver of Conditions***.  The Debtor may waive, in its sole discretion, in whole or in part, the conditions to the occurrence of the Effective Date, without any notice to parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Effective Date shall preclude the occurrence of the Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The waiver of a condition to the occurrence of the Effective Date shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

9.4    ***Notice of Effective Date.***    The Reorganized Debtor will file with the Bankruptcy Court a notice of the occurrence of Effective Date on the date thereof or as soon

24

thereafter or is practicable, and such notice shall be served upon all known Holders of Claims and Interests.

## ARTICLE X

## EFFECT OF PLAN CONFIRMATION

10.1   ***Binding Effect***.  This Plan shall be binding upon and inure to the benefit of the Debtor, its Estate, all current and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtor.

10.2   ***Revesting of Assets***.  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estate (including Retained Actions) shall revest in the Reorganized Debtor, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of the Effective Date, the Reorganized Debtor may operate its businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

10.3   ***Releases***.

**(a)   Releases by the Debtor.  Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtor, the Reorganized Debtor, and its Estate, from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtor, Reorganized Debtor, or its Estate would have been legally entitled to assert in its own right or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's capital structure, the assertion or enforcement of rights and remedies against the Debtor, the Debtor's in- or out-of-court restructuring efforts, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, or filing of the Plan, the Disclosure Statement, the Plan, the Plan Supplement or any Transaction Documents, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Case, any preference, fraudulent transfer, or other Avoidance Action arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Person under the Plan, any Transaction**

Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

(b)     **Releases by Holders of Claims and Interests**.   Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtor, the Reorganized Debtor, the Debtor's Estate and each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtor, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's in- or out-of-court restructuring efforts, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Plan Supplement or any Transaction Documents, contract, instrument, release, or other agreement or document relating to any of the foregoing, created or entered into before or during the Chapter 11 Case, any preference, fraudulent transfer, or other Avoidance Action arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.   Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Person under the Plan, any Transaction Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan.   For the avoidance of doubt, nothing in this Plan shall be deemed to be, or construed as, a release, waiver, or discharge of any Indemnification Obligation.

10.4     *Discharge of the Debtor*.

(a)     Other than Claims arising from or related to the Transaction Documents and except as otherwise provided herein or in the Confirmation Order, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or Estate and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to this Plan on account of such Claims, upon the Effective Date, the Debtor, the Estate, and Reorganized Debtor shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based

upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the holder of a Claim based upon such debt accepted this Plan.

(b)     As of the Effective Date, other than Claims arising from or related to the Transaction Documents and except as provided in this Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtor or the Reorganized Debtor, any other or further Claims, debts, rights, causes of action, claims for relief, or liabilities relating to the Debtor or any Interest in the Debtor  based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, other than with respect to Claims arising from or related to the Transaction Documents and except as provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor, and the termination of all such Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or a terminated Interest.

10.5     *Injunction*.

(a)     *General*.  Except as provided in this Plan or the Confirmation Order, from and after the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released, terminated, exculpated, or discharged under this Article X, along with their respective current and former employees, agents, officers, directors, managers, principals, affiliates, shareholders, and members are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, the Released Parties and the Exculpated Parties, and their respective agents, officers, directors, managers, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns or any of their respective property on account of any such released, terminated or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or Interest:  (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

10.6     *Exculpation and Limitation of Liability*.  None of the Exculpated Parties shall have or incur any liability to any Person for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, Disclosure Statement and Plan, the transactions contemplated by or described in the Transaction Documents, the formulation, negotiation, or implementation of this Plan or the Transaction Documents, the pursuit of Confirmation of this Plan, the operation of the Debtor during the Chapter 11 Case, the

**Confirmation of this Plan, the consummation of this Plan or the Transaction Documents, or the administration of Chapter 11 Case or this Plan or the property to be distributed under this Plan, except for acts or omissions that are the result of fraud, willful misconduct, or gross negligence; provided, however, that the foregoing exculpation and limitation of liability shall not apply to and shall not operate to waive, release, or exculpate any Claims or causes of action arising from or related to the rights and obligations under this Plan, the Transaction Documents, and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby.  Without limiting the generality of the foregoing, Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.**

10.7     *Term of Bankruptcy Injunction or Stays*.   Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

10.8     *Post-Effective Date Retention of Professionals*.   Upon the Effective Date, other than filing final applications for compensation in connection with work done prior to the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtor may employ and pay professionals in the ordinary course of business.

## ARTICLE XI

## RETENTION OF JURISDICTION

11.1     *Retention of Jurisdiction*.   Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Case and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease with respect to which any Debtor or Reorganized Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)     decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving the Debtor that may be pending on the Effective Date;

(c)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

(d)     resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from, or obligations incurred in connection with, this Plan or such documents (other than a dispute arising after the Effective Date under, or directly with respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

(e)     modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission, or reconcile any inconsistency, in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(f)     hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b) and 1129(a)(4) of the Bankruptcy Code; *provided, however*, that from and after the Effective Date any fees and expenses of the Reorganized Debtor, including professional fees arising after the Effective Date, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(g)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(h)     adjudicate controversies arising out of the administration of the Estate or the implementation of this Plan;

(i)     recover all assets of the Debtor and property of the Estates, wherever located;

(j)     hear and determine causes of action by or on behalf of the Debtor, the Reorganized Debtor;

(k)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason, or in any respect, modified, stayed, reversed, revoked, or vacated, or distributions pursuant to this Plan are enjoined or stayed;

(l)     hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(m)     determine any other matters that may arise in connection with, or relate to, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the

29

Disclosure Statement, or the Confirmation Order (other than a dispute arising after the Effective Date under, or directly with respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

(n)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

(o)     hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code; and

(p)     enter an order closing the Chapter 11 Case.

11.2    ***Failure of Bankruptcy Court to Exercise Jurisdiction***.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set for in Section 11.1 of the Plan, the provisions of this Article XI shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1    ***Effectuating Documents and Further Transactions***. The Debtor and the Reorganized Debtor are authorized to execute, deliver, file, or record the Transaction Documents and such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan.

12.2    ***Company Action***.  Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan or the Transaction Documents that would otherwise require approval of the shareholders or directors of the Debtor or the Reorganized Debtor shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) without any requirement of further action by the shareholders or directors of the Debtor or the Reorganized Debtor.

12.3    ***Payment of Statutory Fees***.  All fees payable pursuant to section 1930 of title 28 of the United States Code (***"UST Fees"***), as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Reorganized Debtor shall pay any UST fees that become payable after the Effective Date.

12.4    ***Amendment or Modification of This Plan***.  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, Debtor reserves the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

12.5    ***Severability of Plan Provisions***.  If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, upon the request of the Debtor to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.6    ***Successors and Assigns***.  This Plan shall be binding upon and inure to the benefit of the Debtor, and its successors and assigns, including, without limitation, the Reorganized Debtor.  The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

12.7    ***Revocation, Withdrawal, or Non-Consummation***.

The Debtor reserves the right to revoke or withdraw this Plan at any time prior to the Confirmation Date and to file a different plan of reorganization.  If the Debtor revokes or withdraw this Plan, or if Confirmation or consummation of this Plan does not occur, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Class of Claims or any release contemplated hereby), assumption or rejection of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (c) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor, or (iii) constitute an admission of any sort by the Debtor or any other Person.

12.8    ***Notice***.  All notices, requests, and demands to or upon the Reorganized Debtor to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtor, to:

David R. Fischell
Angel Medical Systems, Inc.
40 Christopher Way
Suite 201
Eatontown, NJ  07724

With a copy to:

> Joseph R. Sgroi, Esq.
> Glenn S. Walter, Esq.
> Honigman Miller Schwartz and Cohn LLP
> 2290 First National Building
> 660 Woodward Avenue
> Detroit, MI  48226
>
> -   and -
>
> Morris James LLP
> Jeffrey R. Waxman, Esq.
> 500 Delaware Avenue
> Suite 1500
> Wilmington, DE  19801-1494
> Telephone:  (302) 888-5842
> Facsimile:  (302) 504-3942
> Email:  jwaxman@morrisjames.com

12.9     ***Governing Law***.  Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to the principles of conflicts of law of such jurisdiction.

12.10     ***Tax Reporting and Compliance***.  The Reorganized Debtor is hereby authorized, on behalf of each of the Debtor, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor for all taxable periods ending after the Petition Date through, and including, the Effective Date.

12.11     ***Conflicts***.  In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, the terms of this Plan shall govern.

December 26, 2018

MORRIS JAMES LLP

/s/ Jeffrey R. Waxman
Jeffrey R. Waxman
500 Delaware Avenue
Suite 1500
Wilmington, DE  19801-1494
Telephone:  (302) 888-5842
Facsimile:  (302) 504-3942
Email:  jwaxman@morrisjames.com

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Joseph R. Sgroi (P68666)
Glenn S. Walter (P79853)
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226-3506
Telephone:  (313) 465-7548
Facsimile:  (313) 465-7549
Email:  jsgroi@honigman.com
gwalter@honigman.com

Counsel for Angel Medical Systems, Inc.

<u>**EXHIBIT A**</u>

**SUMMARY OF TERMS FOR THE SERIES A PREFERRED FINANCING**
**OF**
**ANGEL MEDICAL SYSTEMS, INC.**

This Summary of Terms (this ***"Summary of Terms"***) sets forth the principal terms for the sale and issuance of the Series A Convertible Preferred Stock of **Angel Medical Systems, Inc.**, a Delaware corporation.

**GENERAL:**

| | |
|---|---|
| ***Issuer:*** | Angel Medical Systems, Inc., a Delaware corporation (the ***"Company"***), following confirmation of the Company's plan of reorganization by the United States Bankruptcy Court for the District of Delaware (the ***"Bankruptcy Court"***). |
| ***Types of Security:*** | Series A Convertible Preferred Stock, $0.001 par value per share (the ***"Series A Preferred"***). |
| ***Amount of Investment in the Series A Preferred:*** | A minimum of $10,000,000 in commitments (including the amount of the DIP Notes) (the ***"Minimum Amount"***) and a maximum of $15,000,000 (including the amount of the DIP Notes) (the ***"Maximum Amount"***). |
| ***Price Per Share:*** | The original price per share for the Series A Preferred (the ***"Original Purchase Price"***) would be no higher than $1.00 per share. The capitalization of the Company immediately before the Initial Closing and after the Initial Closing, assuming the sale by the Company of the Maximum Amount at the Initial Closing, is set forth on <u>Exhibit A</u> attached hereto. |
| ***Investors:*** | Investors who are reasonably acceptable to the Company and who qualify as "accredited investors" under Regulation D of the Securities Act of 1933, as amended (each, an ***"Investor"*** and collectively, the ***"Investors"***). |
| ***Option Pool:*** | The Company would adopt an equity incentive plan (the ***"Option Plan"***) and reserve a pool of 10% on a fully diluted basis shares of common stock of the Company (the ***"Common Stock"***) thereunder prior to the Initial Closing, as set forth on <u>Exhibit A</u> attached hereto. |
| ***Closings:*** | The closing of the sale and issuance of the Series A Preferred |

would occur as soon as practicable following the Company's receipt of confirmation of the Company's plan of reorganization by the Bankruptcy Court (the **"Initial Closing"**).  For a period of sixty (60) days following the Initial Closing, the Company could hold one or more additional closings with Investors for the purchase of additional shares of the Series A Preferred, up to the Maximum Amount.

*DIP Funding:*          In connection with the filing of the Company's Chapter 11 case with the United States Bankruptcy Court for the District of Delaware, the Company will issue to certain investors promissory notes in the aggregate amount of up to $2,500,000 (the **"DIP Notes"**).  At the Initial Closing, $2,000,000 of the outstanding principal on the DIP Notes (excluding any accrued and unpaid interest on the DIP Notes) will automatically convert into shares of the Series A Preferred at a price per share equal to 78% of the Original Purchase Price (i.e. no higher than $0.78 per share)..

## TERMS OF THE SERIES A PREFERRED:

*Liquidation Preference*:          Upon the occurrence of any (i) liquidation, dissolution or winding up of the Company, (ii) merger or consolidation (other than one in which shareholders of the Company own a majority by voting power of the outstanding shares of the surviving or acquiring corporation), or (iii) sale, lease, transfer or other disposition of all or substantially all of the assets of the Company (the events described in the foregoing clauses (ii) and (iii) are each referred to herein as a **"Deemed Liquidation Event"**), the holders of the Series A Preferred would receive an amount per share of the Series A Preferred, in preference to the holders of the Common Stock, equal to one times (1x) the Original Purchase Price, plus accrued but unpaid dividends on each share of the Series A Preferred (the **"Series A Liquidation Preference"**).

After payment of the liquidation preference of the Series A Preferred above, the balance of any proceeds shall be distributed to the holders of the Common Stock.

Notwithstanding the foregoing, if the holders of any of the Series A Preferred would receive more in the aggregate in any distribution if their shares were treated on a fully as-converted basis (i.e., no preferential distribution under (ii) above), then such shares of the Series A Preferred shall be treated as

2

though they had converted into Common Stock immediately prior to the distribution at issue.

| | |
|---|---|
| ***Dividends:*** | The Series A Preferred will accrue from the applicable closing an annual 8% cumulative dividend (based upon the Original Purchase Price), compounded annually, which shall be payable (i) upon liquidation, dissolution, winding up or a Deemed Liquidation Event or (ii) in shares of Common Stock at the then-prevailing conversion price (which shall in no event be higher than $1.00 per share) upon the conversion of the Series A Preferred to Common Stock.  After payment of any dividends on the Series A Preferred, the holders of the Series A Preferred also would be entitled to participate pro rata in any dividends paid on the Common Stock on an as-if-converted basis. |
| ***Optional Conversion:*** | The Series A Preferred would initially convert on a one-for-one basis into the Common Stock at any time at an Investor's option, subject to adjustments for stock distributions, splits, combinations and similar events and as described below under the caption ***"Anti-dilution Provisions."*** |
| ***Mandatory Conversion:*** | The Series A Preferred would automatically be converted into the Common Stock at the then applicable conversion rate (which shall in no event be lower than a 1:1 Series A Preferred to Common Stock ration)  (i) in the event of a closing of a firmly underwritten public offering of shares of the Common Stock at a price of not less than three times (3x) the Original Purchase Price (subject to adjustments for stock distributions, splits, combinations and similar events) and net proceeds to the Company of not less than $25,000,000 (a ***"QPO"***) or (ii) with the consent of the holders of at least a majority of the outstanding Series A Preferred (the ***"Requisite Investors"***). |
| ***Anti-dilution Provisions:*** | Unless waived by the Requisite Investors, in the event that the Company issues additional equity securities at a purchase price less than the current Series A Preferred conversion price (which shall in no event be higher than $1.00 per share), such conversion price would be adjusted on a broad-based, weighted average basis, provided that no such adjustment would occur with respect to: (i) securities issuable upon conversion of any of the Series A Preferred, or as a dividend or distribution on the Series A Preferred; (ii) securities issued upon the conversion of any debenture, warrant, option or other convertible security outstanding as of the date of the |

3

applicable closing; (iii) shares of the Common Stock issuable upon a stock split, stock dividend or any subdivision of shares of the Common Stock; (iv) shares of the Common Stock issued or issuable to employees or directors of, or consultants to, the Company pursuant to any plan approved by the Company's Board of Directors (the **"Board"**), including at least one Series A Director (as defined below); (v) shares of the Common Stock issued or issuable to banks, equipment lessors pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Board, including at least one Series A Director; (vi) shares of the  Common Stock issued or issuable for consideration, other than cash pursuant to a technology license, business combination, strategic partnership or joint venture transaction approved by the Board, including at least one Series A Director; (vii) shares of the Common Stock; and (viii) shares of the Common Stock issued in connection with a QPO (collectively, **"Excluded Issuances"**).

*Registration Rights:*

*Registrable Securities:*   All shares of the Common Stock issuable upon conversion of the Series A Preferred and any other shares of the Common Stock held by the holders of the Series A Preferred would be **"Registrable Securities"**.

*Demand Registration:*   Upon the earlier of (i) three (3) years after the Initial Closing or (ii) six (6) months following an initial public offering of the Company's shares of the Common Stock (**"IPO"**), persons holding not less than an aggregate of fifty percent (50%) of Registrable Securities may demand not more than two registrations by the Company of their shares, but only if the aggregate offering price is at least $10,000,000. A registration would count for this purpose only if (A) not less than seventy-five percent (75%) of all Registrable Securities requested to be registered are included in the registration, or (B) it is closed or withdrawn at the request of the demanding holders (other than as a result of a material adverse change to the Company). Holders of the Registrable Securities would have priority in all registrations over all other shares except for in registrations initiated by the Company, in which case the shares being sold by the Company for its own account would have priority.

*Registration on Form S-3:*   The holders of not less than twenty percent (20%) of the Registrable Securities would have the right to require the Company to register on Form S-3, if available for use by the Company, Registrable Securities for an aggregate offering

price of at least $1,000,000.  There would be no limit on the aggregate number of such Form S-3 registrations, provided that there are no more than two (2) per year.  Form S-3 registration rights would be subject to customary limitations, including provisions giving the Company the right under certain circumstances to defer a registration.

*Piggyback Registration:*    The holders of Registrable Securities would be entitled to ***"piggyback"*** registration rights on all registration statements of the Company, subject to the right, however, of the Company and its underwriters to reduce the number of shares proposed to be registered to a minimum of thirty percent (30%) on a pro rata basis and to complete reduction on an IPO at the underwriter's discretion. In all events, the shares to be registered by holders of Registrable Securities would be reduced only after all other stockholders' shares are reduced.

*Expenses:*    The registration expenses (exclusive of stock transfer taxes, underwriting discounts and commissions) would be borne by the Company.  The Company would also pay the reasonable fees and expenses, not to exceed $25,000, of one special counsel to represent all the participating holders of Registrable Securities.

*Lock-up:*    The Investors would agree in connection with the IPO, if requested by the managing underwriter, not to sell or transfer any shares of the Common Stock of the Company for a period of up to one hundred-eight (180) days following the IPO provided all directors and officers of the Company agree to the same restriction, subject to hardship exemptions agreed to by the underwriters.

*Termination of Registration   Rights:*    Registration rights would terminate upon the earlier of: (i) a Deemed Liquidation Event or (ii) when all Registrable Securities of an Investor are eligible to be sold without restriction under Rule 144 within any ninety (90)-day period.

**GOVERNANCE:**

***Voting Rights:***    The Series A Preferred would vote together with the Common Stock on an as-converted to Common Stock basis and not as a separate class, except (i) with respect to election of directors as described below, (ii) as provided under the caption ***"Protective Provisions"*** below or (iii) as required by law.

***Protective Provisions:***    The Company would not, without the written consent of the

holders of at least a majority of the Series A Preferred, either directly or by amendment, merger, consolidation or otherwise: (i) liquidate, dissolve or wind-up the affairs of the Company, or effect any Deemed Liquidation Event; (ii) amend, alter, or repeal any provision of the Certificate of Incorporation or Bylaws in a manner adverse to the Series A Preferred; or (iii) create or authorize the creation of or issue any other security convertible into or exercisable for any equity security having rights, preferences or privileges senior to, or on parity with, the Series A Preferred, or increase the authorized number of shares of the Series A Preferred.

The Company would not, without the approval of the Board, including the approval of at least one Series A Director (as defined below), either directly or by amendment, merger, consolidation or otherwise: (i) adopt an annual operating budget (the **"Budget"**); (ii) create or authorize the creation of any debt in excess of $100,000 individually or $200,000 in the aggregate; (iii) make any capital expenditure in excess of $200,000 individually or $500,000 in the aggregate that was not contemplated by the then-approved Budget; (iv) hire or terminate any senior executive; (v) purchase or redeem or pay any dividend on any capital stock prior to the Series A Preferred, other than stock repurchased from former employees or consultants in connection with the cessation of their employment/services or other than as approved by the Board; (vi) increase or decrease the size of the Board; (vii) make any loan or advance to any person, including any employee or director, except advances and similar expenditures in the ordinary course of business or under the terms of an employee stock or option plan approved by the Board; or (viii) guarantee any indebtedness except for trade accounts of the Company.

| | |
|---|---|
| ***Board of Directors:*** | After the Initial Closing, the Board would consist of five (5) individuals.  The holders of the Series A Preferred, voting as a separate class, would be entitled to appoint two (2) members of the Board as designated by the holders of a majority in interest of the Series A Preferred (each a **"Series A Director"**), who would initially be Victor Whitman and another to be named individual.  The holders of the Common Stock and the Series A Preferred, voting as a single class on an as converted to shares of the Common Stock basis, would be entitled to elect the remaining three (3) members of the Board, (i) one (1) of whom would be the Company's CEO, (ii) one (1) of whom would be mutually acceptable to the |

other members of the Board who would initially be Andrew Taylor and (iii) one of (1) of whom is designated by a the holders of the Common Stock and the Series A Preferred, voting as a single class on an as converted to shares of the Common Stock basis.  Such composition of the Board would be prescribed by a voting agreement entered into by and among the Company and the holders of the Company's capital stock.  The Company shall pay all reasonable expenses of the Board members, including costs relating to service on a Board committee.

**ADDITIONAL RIGHTS:**

*Information Rights:*

The Company would deliver to the Investors (unless waived by the holders of at least a majority of the Series A Preferred): (a) within thirty (30) days after the end of each calendar quarter, management-prepared and certified financial statements; and (b) at least thirty (30) days prior to the end of each fiscal year, a comprehensive operating budget forecasting the Company's revenues, expenses and cash position on a month-to-month basis for the upcoming fiscal year, which would be subject to Board approval, including at least one Series A Director.

*Right to Participate Pro Rata in Future Financings:*

The Investors would have a pro rata right, based on their respective percentage equity ownership in the Company (assuming the conversion of all outstanding shares of the Series A Preferred into shares of the Common Stock and the exercise of all warrants and options outstanding under any stock plan of the Company), to participate in subsequent issuances of equity securities of the Company (other than Excluded Issuances and issuances in connection with acquisitions by the Company).

*Rights of Refusal/Co-Sale:*

The Company first and the Investors second would have a right of first refusal with respect to any shares of capital stock of the Company proposed to be sold by any holder of the Common Stock or any other management employee holding Common Stock or rights to acquire Common Stock for more than five percent (5%) of the fully diluted equity of the Company (collectively, the ***"Key Holders"***).  Before any Key Holder could sell such capital stock, such Key Holder would give the Investors an opportunity to participate in such sale on a basis proportionate to the number of shares of capital stock held by such Key Holder and those held by the Investors.

| | |
|---|---|
| ***Drag-Along Right:*** | Each holder of shares of capital stock of the Company (including without limitation the Series A Preferred) would be required to enter into an agreement that provides that such holders will vote their capital stock in favor of any sale of the Company (whether structured as a merger, reorganization, asset sale, stock sale, licensing transaction or otherwise), that is approved by a majority of the Board and holders of at least a majority of the Series A Preferred and the Common Stock, voting together as a single class on an as if converted to Common Stock basis. |

**OTHER:**

| | |
|---|---|
| ***Vesting of Stock Awards:*** | Unless otherwise approved by the Board, stock awards under the equity incentive plan would vest as follows: twenty five percent (25%) after one (1) year, with the remainder vesting in equal quarterly installments over the following three (3) years. |
| ***Documentation:*** | The transaction would be documented by counsel to the Company with documents containing the provisions described above and consisting of the following:<br>• Amended and Restated Certificate of Incorporation;<br>• Series A Preferred Stock Purchase Agreement;<br>• Investor Rights Agreement;<br>• Right of First Refusal and Co-Sale Agreement; and<br>• Voting Agreement. |
| ***Conditions to Closing:*** | The Initial Closing would be subject to satisfaction or waiver of the following conditions, among others: (i) satisfactory completion of intellectual property, financial, regulatory and legal due diligence of the Company by the Investors; (ii) qualification of the sale of the Series A Preferred under applicable Blue Sky laws; (iii) filing of the Amended and Restated Certificate of Incorporation establishing the rights and preferences of the Series A Preferred; and (iv) the Company's receipt of confirmation of the Company's plan of reorganization by the Bankruptcy Court. |
| ***Expenses:*** | Each party shall bear its own costs and expenses incurred in connection with transactions contemplated hereby except that the Company shall at the Initial Closing reimburse one counsel to the Investors for the reasonable fees and expenses (including, without limitation, legal fees and disbursements) incurred by the Investors in connection with the transactions contemplated hereby (up to the aggregate amount of $40,000). |

**Exhibit A**

**PRO-FORMA CAPITALIZATION***

| | PRE-CLOSING** | | POST-CLOSING | |
| --- | --- | --- | --- | --- |
| | # of Shares | % Fully Diluted | # of Shares | % Fully Diluted |
| Series A Preferred from Senior Notes | 2,661,826** | 30.8% | 2,661,826 | 12..5% |
| Common Stock Outstanding from Junior Notes | 5,970,949** | 69.2% | 5,970,949 | 28% |
| Series A Preferred Outstanding (DIP Notes) | 0 | | 2,564,103 | 12.% |
| Series A Preferred Outstanding (New Money) | 0 | | 8,000,000 | 37.5% |
| Unallocated Stock Pool | 0 | | 2,132,986 | 10% |
| **TOTAL:** | **8,632,775** | **100.00%** | **21,329,864** | **100.00%** |

*These figures represent the conversion of $2,000,000 in principal of the outstanding DIP Notes (excluding interest) and the sale of the Minimum Amount of $10,000,000 (including the DIP Amount) in new money in value of the Series A Preferred.

**Following Conversion of 2012, 2014 and 2016 notes to common/Series A preferred, but before conversion DIP Notes to Series A and before closing of Series A for New Money.

APPENDIX B

TO

DISCLOSURE STATEMENT
OF ANGEL MEDICAL SYSTEMS INC.

LIQUIDATION ANALYSIS

**ANGEL MEDICAL SYSTEMS, INC.**

**LIQUIDATION ANALYSIS**

**Balance per financials as of 11/30/18 with Certain Adjustments through 12/31/18**

| | | | Balance per financials as of 11/30/18 with Certain Adjustments through 12/31/18 (1) | Estimated Realization Factor | Estimated Liquidation Balance |
|---|---|---|---|---|---|
| **ASSETS TO BE LIQUIDATED:** | | | | | |
| Cash | (2) | $ | 128,557 | 100% | $ 128,557 |
| Direct Pay Funding | (3) | | 43,172 | 0% | - |
| Prepaid | (4) | | 13,596 | 0% | - |
| Employee Advance | (5) | | 1,069 | 100% | 1,069 |
| Total Current Assets | | | 57,837 | | 1,069 |
| Fixed Asset | | | | | |
| Furniture and Office Equip. | (6) | | - | | 15,262 |
| Programmers | (7) | | 892,617 | 0% | - |
| Computer & IT Euipment | (8) | | 124,123 | 14% | 17,052 |
| Test Equipment | (9) | | 292,713 | 21% | 62,523 |
| Accumulated Depreciation | | | (1,293,855) | | - |
| Total Fixed Assets | | | 15,598 | | 94,837 |
| Other Non-current Assets | (10) | | 35,660 | 0% | - |
| Intellectual Property | (11) | | - | | - |
| **TOTAL ASSETS LIQUIDATION VALUE** | | $ | 237,652 | | $ 224,463 |

| | | | Total Claim | Recovery % | Recovery Amount |
|---|---|---|---|---|---|
| **TOTAL CLAIMS** | | | | | |
| Secured Notes: | | | | | |
| 2016 Notes (principal plus interest) | (12) | $ | 2,312,088 | 10% | $ 224,463 |
| 2012 Notes (principal plus interest) | (12) | | 33,684,201 | 0% | - |
| 2014 Notes (principal plus interest) | (12) | | 28,481,781 | 0% | - |
| Other Liquidation Claims: | | | | | |
| Chapter 7 Liquidating Trustee Fees | (13) | | 50,000 | 0% | - |
| Accrued Payroll/Benefit Liabilties | (14) | | 86,874 | 0% | - |
| Trade Payables | (15) | | 459,720 | 0% | - |
| Lease Rejection Damages | (16) | | 181,740 | 0% | - |
| **TOTAL CLAIMS / RECOVERY** | | | 65,256,404 | | 224,463 |
| **NET REMAINING LIQUIDATION VALUE AFTER CLAIMS** | | | | | $ - |

**ANGEL MEDICAL SYSTEMS, INC**
**Notes to liquidation Analysis**
**Based on financials as of 11/30/18 with Certain Adjustments through 12/31/18**

The following notes describe the significant assumptions that are reflected in the Liquidation Analysis.

1. The balances used in this Liquidation Analysis are the balances as of November 30, 2018, (per Angel Medical Systems, Inc. ("AMS") financial statements) with adjustments for additional estimated liabilities and cash inflows / outflows prior to an assumed liquidation date of December 31, 2018.

2. Cash per the financial statements as of November 30, 2018 of $166,000 includes petty cash, cash on hand, cash deposited in depository accounts. In addition, cash includes an estimated cash inflow in the month of December of ~$651,000 related to the proceeds from the sale of NOLs offset by payment of liabilities incurred in the ordinary course of business of $688,000. All cash is assumed to be fully recoverable.

3. Direct Pay Funding represents company contributed funds to a self-insured employee benefits account. These funds are held by a third party for the benefit of employees and are not recoverable.

4. The prepaid balance is mostly attributable to prepaid insurance. The policy expires on 1/21/19 and is estimated to have no value at the time of liquidation. A small amount is attributable to an annual membership fee which is not refundable.

5. Employee advance of $1K is recoverable.

6. Furniture and fixtures consists of cabinets, bookcases and office furniture recently purchased. The purchases were expensed and not included in capitalized assets on the financials since on an individual basis they were lower than the Company's capitalization threshold. Values are based on estimates of comparable items on E-bay.

7. Programmers do not have a resale value outside of AMS since there functionality is specific to AMS.

8. Computer and network equipment consist of laptops, desktops, monitors and network servers. The values are based on estimates on E-bay and Avaya reseller website.

9. The Test equipment consists of various types of equipment that has a resale value on the open market. The values were based on resale prices on E-bay for comparable items as well as authorized reseller websites such as testequity.com.

10. The security deposit with Victory Global, LLC is for the leased property in Eatontown, NJ. In a liquidation, the lease would be rejected and the landlord would apply the security deposit against its claim thus no recoverable value.

11. Because the Debtor's intellectual property was developed internally, it has a book value of $0 under GAAP. Although the Debtor believes that the value of the intellectual property as part of its operations as a going concern is material, it would be difficult to find a buyer for the intellectual property on a standalone basis at this pre-commercialization stage of the Debtor's operations. A Chapter 7 case would likely result

in loss of the key employees with expertise in all aspects relating to the complex artificial intelligence based technology that allows the Guardian to accurately detect Acute Coronary Syndrome (ACS) events, including heart attacks.  Such loss would make it difficult for any acquirer of the intellectual property to monetize its value.

12. Pursuant to an inter-creditor agreement, the 2016 Notes have lien and payment priority and need to be paid in full before any distribution is made to holders of 2014 Notes or 2012 Notes.

13. A Chapter 7 Trustee would be appointed by the Bankruptcy Court to administer the estate.  The Chapter 7 Trustee is independent and would be entitled to make all of his or her own decisions regarding the liquidation of the estate, firing of professionals, the pursuit of claims or litigation and the payment of or objection to claims.  The Chapter 7 Trustee would be compensated in accordance with Section 326 of the U.S. Bankruptcy Code.  This compensation is assumed to be 3% of the asset recovery amount. A Chapter 7 Trustee would also be entitled to retain professionals.   Although no recovery is shown, a portion of this amount may be recoverable as a surcharge on the collateral securing the Notes under Section 506(c) of the Bankruptcy Code.

14. Payroll liabilities includes all accrued vacation and payroll tax liabilities per the financial statements as of November 30, 2018 adjusted for December liabilities.

15. Current Trade Payables includes all current liabilities and accrued expenses and excludes accrued interest, and payroll related liabilities.

16. AMS has a remaining lease obligation of $544,000 with Victory Global for a facility in Eatontown, NJ which expires on April 31, 2021. The recovery amount reflects the rejection damages of the lease as capped by Section 503(b)(6) of the Bankruptcy Code.

APPENDIX C


TO


DISCLOSURE STATEMENT
OF ANGEL MEDICAL SYSTEMS INC.


USE OF FUNDS AND FINANCIAL PROJECTIONS

# Angel Medical Systems Business Model - Summary

This document summarizes a 5 year operations plan for Angel Medical Systems Inc.  Using realistic and conservative assumptions this plan generates revenues of $19 million dollars and reaches cash flow positive by the end of year 2 based on a $10.0 million dollar investment. Annual revenue reaches $129 million dollars by year 5. Details for this summary plan are contained in the Angel Medical Systems Inc. Financial Plan spreadsheet.

This plan incorporates an assumption of $1 million dollars in 2019 and 2020 in non-dilutive funding provided by NJ under the NOL program (sales of additional NJ Operating Losses (NOL)).

This plan leverages unique factors available to Angel Medical Systems during commercial rollout. These factors enable Angel Medical Systems  to begin commercial implants in an expedited fashion with minimized costs because of a large embedded base of previously trained cardiologists and supporting medical professionals inherited from our~100 center and 5-year clinical trial.

These factors include:

1) Angel Medical Systems has conducted a successful pivotal trial in the US and performed OUS trial and commercial rollouts in Germany and Brazil during this same period. These efforts provided unique real world experience and resources that can be leveraged to enable a very cost-effective and staged commercial rollout; both in the US and also eventually OUS.

   a. Medical staff at ~100 trial sites in the US, a single site in Germany, and a dozen hospitals in Brazil are already trained and experienced with the Guardian System.
      i. ~500 cardiologists and cardiology nurses
      ii. ~100 Emergency Departments received in-service staff training (~1000 MDs and clinical staff).
      iii. ~100 EMS 911 organizations received in-service training sessions for the geographical regions with trial sites.

   b. Angel Medical Systems has already developed and optimized a cost-effective logistics and operations process to sufficiently support this field presence domestically.

   c. Angel Medical Systems has already developed and optimized an in-country distribution model in Brazil. This distribution model will be replicated to target countries for OUS sales.

    d. Angel Medical Systems has already developed and optimized low cost manufacturing processes resulting in a reduced cost model that will be applied to the commercial rollout.

2) The commercial rollout plan leverages existing trial sites early on to minimize roll out costs in the following ways:

    a. Controlled regional Rollout: Commercial rollout will target 6 geographical regions based on existing trial site locations.

| CONTROLLED ROLLOUT |
| --- |
| By Region/states/number of sites/ anchor sites. |
| **FIRST ROLLOUT** |
| Region 1: New Jersey and New York - 11 sites;<br>Region 2: Michigan, Indiana, Illinois, Ohio - 19 sites. |
| |
| **SECOND ROLLOUT** |
| Region 3: Oklahoma, Texas, Louisiana - 19 sites;<br>Region 4: Florida, Georgia, South Carolina, North Carolina, Tennessee - 19 sites |
| |
| **THIRD ROLLOUT** |
| Region 5: California and Arizona - 14 sites;<br>Region 6: Pennsylvania, Maryland, District of Columbia, Virginia - 20 sites |
| |

    b. <u>Anchoring:</u> Each region is anchored by at least 2 of the Top 20 performing trial sites (in terms of patient acquisition).
- These sites have already proven they can acquire patients at a rate of ~2 per month on average (some sites did as many as 6 implants per month).
- Angel Medical Systems will coordinate with these anchor sites for PR purposes to get maximum press coverage of initial commercial implants at each site.
- Startup costs are limited since all of these sites are already trained and familiar with the Guardian System and Angel Medical Systems.

    c. <u>Cost-minimization:</u> To minimize initial personnel costs, Angel Medical Systems will target rollout of 2 regions at a time beginning in 3rd quarter of 2019 using a roll out team with members from each logical area of the company (sales, marketing, R&D, operations, regulatory, etc.).
- Rollout will be conducted in those two regions until implants begin, then the team will focus on the next 2 regions to rollout.

- Based on our experience we expect that each region will take 30 days to enable the first implant with coordinated PR.
- All 6 regions will be actively implanting by the first quarter of 2020. Once all sites in a region are active, our salesforce can begin recruiting additional sites.
- A focus will be placed on expansion within common umbrella health organizations where a trial site was already in place.

d. Existing customer base: There are over 800 previous trial patients in the US. In many cases, these patients have already contacted us to ask about availability of a replacement commercial device.

- This embedded base of previous trial patients provides hundreds of easily acquired initial patients in the 6 regions and will be the first patients implanted as commercial patients.
- These patients make up the bulk of the revenue for year 1 of the financial plan.

3) Reimbursement: CMS has already assigned the outpatient Guardian System implant procedure (which includes cost of the device) to the existing APC 5223 code. Assignment to an existing APC code is valuable in the context of a coverage decision.

4) The plan minimizes employee costs in the first two years as breakeven is reached (a total of 35 employees for 2019 and 39 in 2020). However, our previous experience has demonstrated that the exceptional management team is capable of getting the job done effectively with the proposed employee numbers. In years 3 through 5 of the plan, as we become cash flow positive, we expand the employee count to meet the increased workload; the employee numbers are 56, 95, and 109 for years 2021, 2022, and 2023 respectively.

5) The plan targets 369 new cardiology practices by 2023 in addition to the 100 we already have in the US. This total of 469 practices average 2 implants per month to generate the revenue numbers of the plan (in addition to the OUS distributor numbers which are bulk sales).

6) In the first two years of the plan (2019 and 2020) all revenue is generated by US only sales of the Guardian System primarily through the 100+ ALERTS Study sites (as previously detailed in the rollout discussion). Year 2021 adds recurring monthly subscription revenues. Year 2022 adds revenue from OUS sales. And finally 2023 adds revenue from the introduction of a next generation form factor for the Guardian System that uses a subcutaneous lead.

7) As stated, the plan assumes OUS implants start in 2022. This provides all of 2019 and 2020 to perform whatever regulatory work is required on a per country basis and then operationalize the logistics and support models in 2021. The OUS component of the plan is based on a distributor model in order to minimize Angel Medical Systems costs and maximize coverage. The plan targets 11 countries and one country group made up of 9 gulf countries in the Middle East. Conservative estimates are used for reimbursement amounts. Six countries and the country group are activated in 2022 and the remaining 5 countries come on line in 2023. We have already received multiple direct requests from distributors in 12 countries around the world. OUS sales contribute ~27% of the revenue in 2022 and ~34% of the revenue in 2023.

8) Cellular capable remote monitoring service begins in 2021 in the US and contributes a modest amount of monthly recurring revenue (~3%) by 2023. Remote telemetry and review of cardiac information is proposed as a patient pay service which we have modeled at about 30% adoption rate.

9) The plan assumes a subcutaneous version of the Guardian System obtains FDA approval and begins initial shipments in 2023. The plan assumes volume shipments in the first year of availability will be equivalent to ~75% of the volume shipments seen for the first full year of the intracardiac version of the system to account for a period of market acceptance. This contributes ~26% of year 2023 revenues.

10) This plan is a 5 year plan without re-implants, which start in year 6. Re-implants will generate additional device revenue. As a point of reference, the ALERTS Study patients that reached the need for a re-implant due to battery depletion demonstrated a 90% take rate for a replacement device.

Table 1 illustrates the potential revenue from Re-implants starting 6 years after initial release of the product. Table 1 conservatively assumes that only 50% of the patients request a replacement device when their initial implant reaches end of battery life. Table 1 also assumes a device payment of $7k per device.

| Table 1 - Numbers of and Revenue From Guardian Replacement Procedures | | | | | |
|---|---|---|---|---|---|
| Year | 2025 | 2026 | 2027 | 2028 | 2029 |
| Number of Replacements | 180 | 1100 | 2040 | 3300 | 5500 |
| Revenue from Replacements | $1,260,000 | $7,700,000 | $14,280,000 | $23,000,000 | $38,500,000 |

11) Table 2 summarizes the P&L and CF for this 5 year plan.

| Table 2 – Summary of 5 Year P&L and CF Analysis | | | | | |
|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 |
| Head Count | 35 | 39 | 56 | 101 | 107 |
| Total Devices Implanted | 360 | 2,202 | 4,080 | 10,981 | 19.794 |
| Total Revenues (000) | $ 3,150 | $ 19,268 | $ 29,836 | $ 69,057 | $ 129,830 |
| Total COGS (000) | $ 734 | $ 3,940 | $ 6,941 | $ 17,490 | $ 25,403 |
| GP (000) | $ 2,416 | $ 15,327 | $ 22,895 | $ 51,567 | $ 104,426 |
| Total Operation Expenses (000) | $ 7,265 | $ 14,543 | $ 19,346 | $ 36,586 | $ 54,745 |
| EBITDA (000) | $ (4,849) | $ 784 | $ 3,549 | $ 14,981 | $ 49,681 |
| EBITDA Margin | -153.93% | -4.07% | 11.89% | 21.69% | 38.27% |
| Beginning Cash (000) | $ - | $ 4,395 | $ 2,608 | $ 829 | $ 3,990 |
| Net Cash Flow (000) | $ (6,205) | $ (2,187) | $ (1,779) | $ 3,161 | $ 33,539 |
| Financing (000) | $ 10,000 | | | | |
| NOL (000) | $ 650 | $600 | | | |
| | | | | | |
| Ending Cash (000) | $ 4,445 | $ 2,858 | $ 1,079 | $ 4,240 | $ 37,779 |

AMS Financial Plan Rev A

## FIVE YEAR P&L MODEL ASSUMPTIONS

**FOCUS**: **reduced costs; controlled rollout; by region; focused on top ALERTS sites as anchors for each region.**
**PRIMARY GOAL**: **get to break-even as quickly as reasonably possible while generating sufficient revenue to prove acceptance of Guardian in the commercial arena.**

**Target of 469 actively implanting cardiology practices in the US by 2023 with overall average of 2 implants per month at each.**

**Plan also assumes OUS implants starting in 2022. However, that effort occurs via distributors - and therefore a different financial model should be employed. Assume distributors reach 320 cardiology practices by 2023.**

**Controlled Rollout: Region/states/number of ALERTS sites/candidate anchor sites.**

First Rollout: Region: Nj/Ny - 11 sites; Region: Mi/Ind/Ill/Oh - 19 sites.

Second Rollout: Region: Ok/Tx/La - 19 sites; Region:Fla/Ga/S.Car/N.Car/Ten - 19 sites

Third Rollout: Region:Cal/Az - 14 sites; Pa/Md/DC/Va - 20 sites

**OUS distribution begins in 2022 via in-country distributors.**

**Cellular capable EXDs in late 2020; service begins in 2021.**

**SubQ IMDs begin in 2023. Revenue for the first full year for SubQ equals 75% of the first full year of intra-cardiac model. Market eventually grows to equal Intracardiac.**

**5 year model - Does not include  reimplants (which start in year 6)**

# **AngelMed Summary P&L and CF Analysis 2019-23**

| | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| *Total Units Sold (worldwide)* | 360 | 2,202 | 4,080 | 10,981 | 19,794 |
| *Average Unit Price (worldwide)* | $ 8,750 | $ 8,750 | $ 7,250 | $ 6,180 | $ 6,412 |
| *Total Practices (worldwide)* | 40 | 120 | 260 | 520 | 789 |
| *Incremental Annual New Practices (worldwide)* | 40 | 80 | 140 | 260 | 269 |
| *Avg. Devices Per Site Per Year* | 9 | 18 | 16 | 21 | 25 |
| *Avg. Devices Per Site Per Month* | 0.75 | 1.53 | 1.31 | 1.76 | 2.09 |
| *High Risk ACS Patient Market Size (incidence worldwide)* | 175,000 | 175,000 | 175,000 | 350,000 | 700,000 |
| | | | | | |
| *Market Penetration (incidence worldwide)* | 0.21% | 1.26% | 2.33% | 3.14% | 2.83% |
| *Cumulative Units Sold (US)* | 360 | 2,562 | 6,642 | 13,275 | 23,078 |
| *Total US ACS Prevalence* | 14,000,000 | 14,350,000 | 14,700,000 | 15,050,000 | 15,400,000 |
| *Cumulative Penetration of US Prevalence Market* | 0.003% | 0.018% | 0.045% | 0.088% | 0.150% |
| *Cumulative Units Sold (worldwide)* | 360 | 2,562 | 6,642 | 17,623 | 37,417 |
| *Total Worldwide ACS Prevalence* | 28,000,000 | 28,700,000 | 29,400,000 | 30,100,000 | 30,800,000 |
| *Cumulative Penetration of Worldwide Pevalence Market* | 0.001% | 0.009% | 0.023% | 0.059% | 0.121% |
| *in thousands* | | | | | |
| US Guardian Revenue | 3,150 | 19,268 | 29,580 | 48,089 | 45,340 |
| US Qguard Revenue | - | - | - | - | 33,086 |
| OUS Revenue (all) | - | - | - | 19,778 | 48,500 |
| US OnGuard Service Revenue | - | - | 256 | 1,190 | 2,904 |
| **Total Revenues** | **$ 3,150** | **$ 19,268** | **$ 29,836** | **$ 69,057** | **$ 129,830** |
| *YoY Growth* | *NA* | *511.67%* | *54.85%* | *131.46%* | *88.00%* |
| | | | | | |
| Implantable Device COGS | 558 | 3,171 | 5,467 | 13,616 | 18,607 |
| External Device COGS | 101 | 619 | 1,148 | 3,088 | 5,567 |
| Programmer COGS | 75 | 150 | 263 | 488 | 504 |
| OnGuard Service COGS | - | - | 64 | 298 | 726 |
| **Total COGS** | **$ 734** | **$ 3,940** | **$ 6,941** | **$ 17,490** | **$ 25,403** |
| **GP** | **$ 2,416** | **$ 15,327** | **$ 22,895** | **$ 51,567** | **$ 104,426** |
| *Gross Margin* | *76.69%* | *79.55%* | *76.74%* | *74.67%* | *80.43%* |
| | | | | | |
| Labor/Personnel Related Operating Expens | 4,973 | 5,966 | 8,558 | 15,043 | 15,767 |
| Non-labor Operating Expenses | 2,292 | 8,577 | 10,788 | 21,543 | 38,978 |
| **Total Operation Expenses** | **7,265** | **14,543** | **19,346** | **36,586** | **54,745** |
| **EBITDA** | **$ (4,849)** | **$ 784** | **$ 3,549** | **$ 14,981** | **$ 49,681** |
| *EBITDA Margin* | *-153.93%* | *4.07%* | *11.89%* | *21.69%* | *38.27%* |
| | | | | | |
| CAPEX adjustment | (500) | (1,000) | (2,000) | (3,000) | (6,000) |
| WC adjustment (AR.) | (388) | (1,987) | (1,283) | (6,285) | (7,943) |
| WC adjustment (AP.) | 188 | 517 | 370 | 1,401 | 1,803 |
| WC adjustment (inv.) | (657) | (500) | (2,415) | (3,936) | (4,003) |
| **Cash Flow** | **$ (6,205)** | **$ (2,187)** | **$ (1,779)** | **$ 3,161** | **$ 33,539** |
| | | | | | |
| **Beginning Cash** | **$ -** | **$ 4,445** | **$ 2,858** | **$ 1,079** | **$ 4,240** |
| **Net Cash Flow** | (6,205) | (2,187) | (1,779) | 3,161 | 33,539 |
| **Financing** | 10,000 | | | | |
| **NOLs** | 650 | 600 | | | |
| **Ending Cash** | **$ 4,445** | **$ 2,858** | **$ 1,079** | **$ 4,240** | **$ 37,779** |
| | | | | | |
| **Headcount** | **35** | **39** | **56** | **101** | **107** |

APPENDIX D


TO


DISCLOSURE STATEMENT
OF ANGEL MEDICAL SYSTEMS INC.


INDEPENDENT ACCOUNTANT'S COMPLIATION REPORT
(FISCAL YEARS ENDING, DECEMBER 2016 AND DECEMBER 2017)

# EisnerAmper

## ANGEL MEDICAL SYSTEMS, INC.

### FINANCIAL STATEMENTS

### DECEMBER 31, 2017 and 2016



**ANGEL MEDICAL SYSTEMS, INC.**

**Contents**

|  | <u>Page</u> |
|---|---|
| **Independent Accountants' Compilation Report** | 1 |

**Financial Statements**

|  | |
|---|---|
| Balance sheets as of December 31, 2017 (unaudited) and 2016 (unaudited) | 2 - 3 |
| Statements of operations for the years ended December 31, 2017 (unaudited) and 2016 (unaudited) | 4 |
| Statements of changes in stockholders' deficit for the years ended December 31, 2017 (unaudited) and 2016 (unaudited) | 5 |
| Statements of cash flows for the years ended December 31, 2017 (unaudited) and 2016 (unaudited) | 6 |
| Notes to financial statements | 7 - 21 |



**EisnerAmper LLP**
111 Wood Avenue South
Iselin, NJ 08830-2700
T  732.243.7000
F  732.951.7400
www.eisneramper.com

**INDEPENDENT ACCOUNTANTS' COMPILATION REPORT**

To the Board of Directors and Stockholders of
Angel Medical Systems, Inc.

Management is responsible for the accompanying financial statements of Angel Medical Systems, Inc., which comprise the balance sheets as of December 31, 2017 and 2016, and the related statements of operations, changes in stockholders' deficit, and cash flows for each of the years then ended, and the related notes to the financial statements in accordance with accounting principles generally accepted in the United States of America.  We have performed compilation engagements in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the American Institute of Certified Public Accountants.  We did not audit or review the financial statements nor were we required to perform any procedures to verify the accuracy or the completeness of the information provided by management.  Accordingly, we do not express an opinion, a conclusion, nor provide any form of assurance on these financial statements.

As disclosed in Note A[3] to the financial statements, certain conditions indicate that Angel Medical Systems, Inc. may be unable to continue as a going concern.  The accompanying financial statements do not include any adjustments to the financial statements that might be necessary should Angel Medical Systems, Inc. be unable to continue as a going concern.

*EisnerAmper LLP*

EISNERAMPER LLP
Iselin, New Jersey
May 17, 2018



**ANGEL MEDICAL SYSTEMS, INC.**

**Balance Sheets**
*(See independent accountants' compilation report and notes to financial statements)*

| | December 31, | |
| --- | --- | --- |
| | **2017** | **2016** |
| | **(unaudited)** | **(unaudited)** |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | **$2,912,013** | $3,660,648 |
| Inventory | **-** | 773 |
| Prepaid expenses and other current assets | **72,956** | 94,643 |
| Total current assets | **2,984,969** | 3,756,064 |
| Property and equipment, net | **44,454** | 219,653 |
| Other assets | **4,450** | 4,450 |
| Total assets | **$3,033,873** | $3,980,167 |

# ANGEL MEDICAL SYSTEMS, INC.

## Balance Sheets (continued)
*(See independent accountants' compilation report and notes to financial statements)*

| | December 31, | |
|---|---|---|
| | **2017** | **2016** |
| | **(unaudited)** | **(unaudited)** |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Accounts payable | $ **88,303** | $ 20,602 |
| Accrued expenses | **1,091,244** | 2,049,029 |
| Accrued interest | **16,652,205** | 12,011,178 |
| Convertible promissory notes, net | **47,324,535** | 42,018,018 |
| Deferred revenue | **-** | 10,083 |
| Total current liabilities | **65,156,287** | 56,108,910 |
| Commitments | | |
| Stockholders' deficit: | | |
| Preferred stock, $.001 par value; 37,720,833 shares authorized | | |
| Series I Preferred Stock; 2,500,000 shares designated, no shares issued and outstanding | **-** | - |
| Series H Preferred Stock; 11,000,000 shares designated, no shares issued and outstanding | **-** | - |
| Series G Preferred Stock; 14,000,000 shares designated, no shares issued and outstanding | **-** | - |
| Series F Preferred Stock; 3,022,675 shares designated, issued and outstanding (liquidation preference of $30,226,750) | **3,023** | 3,023 |
| Series E Preferred Stock; 1,676,318 shares designated, issued and outstanding (liquidation preference of $12,572,385) | **1,676** | 1,676 |
| Series D Preferred Stock; 1,100,000 shares designated, issued and outstanding (liquidation preference of $6,600,000) | **1,100** | 1,100 |
| Series C Preferred Stock; 1,600,000 shares designated, issued and outstanding (liquidation preference of $6,400,000) | **1,600** | 1,600 |
| Series B Preferred Stock; 2,000,000 shares designated issued and outstanding  (liquidation preference of $4,000,000) | **2,000** | 2,000 |
| Series A Preferred Stock;  821,840 shares designated, issued and outstanding (liquidation preference of $977,990) | **822** | 822 |
| Common stock, $.001 par value; 51,500,000 shares authorized, 6,170,204 issued and outstanding | **6,169** | 6,169 |
| Additional paid-in capital | **66,873,104** | 66,853,045 |
| Accumulated deficit | **(129,011,908)** | (118,998,178) |
| Total stockholders' deficit | **(62,122,414)** | (52,128,743) |
| Total liabilities and stockholders' deficit | $ **3,033,873** | $ 3,980,167 |

**ANGEL MEDICAL SYSTEMS, INC.**

**Statements of Operations**
*(See independent accountants' compilation report and notes to financial statements)*

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | **2017** | **2016** |
|  | **(unaudited)** | **(unaudited)** |
| **Revenues:** | | |
| Product sales | $ **10,082** | $ 31,168 |
| Grant income | **-** | 132,476 |
| Total revenues | **10,082** | 163,644 |
| Cost of product sales | **3,501** | 29,468 |
| Gross profit | **6,581** | 134,176 |
| **Operating expenses:** | | |
| Research and development | **1,895,443** | 9,205,386 |
| General and administrative | **1,007,348** | 2,193,720 |
| Selling and marketing | **14,581** | 90,515 |
|  | **2,917,372** | 11,489,621 |
| Loss before other income (expense) | **(2,910,791)** | (11,355,445) |
| **Other income (expense):** | | |
| (Loss) gain on disposal of assets | **809** | (31,950) |
| Interest expense, net | **(8,569,727)** | (5,132,771) |
| Other income | **-** | 140,000 |
|  | **(8,568,918)** | (5,024,721) |
| Loss before income tax benefit | **(11,479,709)** | (16,380,166) |
| Income tax benefit - sale of New Jersey net operating loss carryforwards and research and development costs | **1,465,979** | 1,630,810 |
| **Net loss** | **$ (10,013,730)** | $ (14,749,356) |

4

# ANGEL MEDICAL SYSTEMS, INC.

## Statements of Changes in Stockholders' Deficit
*(See independent accountants' compilation report and notes to financial statements)*
**Years Ended December 31, 2017 (unaudited) and 2016(unaudited)**

| | Preferred Stock Series F | | Preferred Stock Series E | | Preferred Stock Series D | | Preferred Stock Series C | | Preferred Stock Series B | | Preferred Stock Series A | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Deficit |
| | No. of Shares | Amount | No. of Shares | Amount | No. of Shares | Amount | No. of Shares | Amount | No. of Shares | Amount | No. of Shares | Amount | No. of Shares | Amount | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance at January 1, 2016** | 3,022,675 | $ 3,023 | 1,676,318 | $ 1,676 | 1,100,000 | $ 1,100 | 1,600,000 | $ 1,600 | 2,000,000 | $ 2,000 | 821,840 | $ 822 | 6,170,204 | $ 6,169 | $ 60,798,155 | $ (104,248,822) | $ (37,434,277) |
| Proceeds from exercise of stock options | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 54,890 | - | 54,890 |
| Stock-based compensation | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net loss | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (14,749,356) | (14,749,356) |
| **Balance at December 31, 2016 (unaudited)** | 3,022,675 | 3,023 | 1,676,318 | 1,676 | 1,100,000 | 1,100 | 1,600,000 | 1,600 | 2,000,000 | 2,000 | 821,840 | 822 | 6,170,204 | 6,169 | 66,653,045 | (118,998,178) | (52,128,743) |
| Proceeds from exercise of stock options | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Stock-based compensation | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 20,059 | - | 20,059 |
| Net loss | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (10,013,730) | (10,013,730) |
| **Balance at December 31, 2017 (unaudited)** | 3,022,675 | $ 3,023 | 1,676,318 | $ 1,676 | 1,100,000 | $ 1,100 | 1,600,000 | $ 1,600 | 2,000,000 | $ 2,000 | 821,840 | $ 822 | 6,170,204 | $ 6,169 | $ 66,673,104 | $ (129,011,908) | $ (62,122,414) |

**ANGEL MEDICAL SYSTEMS, INC.**

**Statements of Cash Flows**
*(See independent accountants' compilation report and notes to financial statements)*

| | Year Ended December 31, | |
|---|---|---|
| | **2017** | **2016** |
| | **(unaudited)** | **(unaudited)** |
| **Cash flows from operating activities:** | | |
| Net loss | **$ (10,013,730)** | $ (14,749,356) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation | **175,202** | 246,219 |
| Stock-based compensation | **20,059** | 54,890 |
| Amortization of deferred financing costs | **108,874** | 139,752 |
| Accretion of final loan payment | **3,831,468** | 483,083 |
| Loss (gain) on disposal of equipment | **-** | 31,950 |
| Increase (decrease) in cash resulting from changes in operating assets and liabilities: | | |
| Inventory | **773** | 12,924 |
| Prepaid expenses and other current assets | **21,687** | 113,660 |
| Accounts payable and accrued expenses | **3,750,942** | 3,797,043 |
| Deferred revenue | **(10,082)** | (31,168) |
| Net cash used in operating activities | **(2,114,807)** | (9,901,003) |
| **Cash flows from investing activities:** | | |
| Purchase of equipment | **-** | (4,640) |
| Proceeds from sale of equipment | **-** | 11,900 |
| Net cash provided by investing activities | **-** | 7,260 |
| **Cash flows from financing activities:** | | |
| Proceeds from issuance of convertible debt | **1,403,154** | 553,288 |
| Debt issuance costs paid | **(36,982)** | (112,705) |
| Net cash provided by financing activities | **1,366,172** | 440,583 |
| **Net decrease in cash and cash equivalents** | **(748,635)** | (9,453,160) |
| **Cash and cash equivalents:** | | |
| Beginning of year | **3,660,648** | 13,113,808 |
| **End of year** | **$ 2,912,013** | $ 3,660,648 |

6

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE A - DESCRIPTION OF BUSINESS

[1]   **Nature of business:**

Angel Medical Systems, Inc. ("AMS" or the "Company") is a privately held medical device company incorporated in Delaware on November 29, 2001. AMS has developed the AngelMed Guardian System, which is an implantable cardiac monitoring and alerting system that is designed to warn cardiac patients of potentially life-threatening heart conditions. A pivotal clinical trial ("ALERTS") for this system was conducted in the U.S., and the completed Pre-Market Approval (PMA) application was submitted to the FDA for review in 2015. In May 2016, the Company received a "non-approvable" letter from the FDA with respect to its Pre-Market Approval (PMA) application for the AngelMed Guardian System. Subsequently, the Company met with the Food and Drug Administration (FDA) and discussed a re-submission plan that could correct the deficiencies noted in the "non-approvable" letter through a re-analysis and augmentation of its ALERTS Study data. The Company submitted the PMA Amendment to the FDA on May 5, 2017. The Company also received FDA agreement on a plan to exit patients from its ALERTS study and close the trial sites. This effort has largely been completed. On April 9, 2018, the Company received a letter from the FDA stating that its Pre-Market Approval submission had been approved and that the AngelMed Guardian System could be commercialized. The Company intends to raise additional funds through debt or equity in order to launch a commercial effort and to manage a required post-approval study. The Company will also be seeking to secure reimbursement for the system with government and private payers.

AMS holds approximately 50 issued patents. AMS also has a technology transfer and cross-license fee agreement in place with a strategic partner providing for the licensing of certain AMS technology and intellectual property. (See Note I).

[2]   **Basis of presentation:**

The Company's financial statements have been prepared using the accrual basis of accounting in conformity with accounting principles generally accepted in the United States ("GAAP"). Any reference in these notes to applicable guidance is meant to refer to the authoritative United States GAAP as found in the Accounting Standards Codification ("ASC") of the Financial Accounting Standards Board ("FASB").

[3]   **Liquidity:**

The Company's financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business. The Company has incurred losses since inception resulting in an accumulated net deficit of approximately $129,012,000 as of December 31, 2017. Management expects to incur further losses for the foreseeable future. Further, the Company is working with the FDA on a revision to the ALERTs study PMA submission, and the costs of such plan are still being defined. The Company is in discussions with investors regarding additional funding to execute on such plan. The Company has funded itself primarily through the issuance of debt and equity. The Company expects to finance future cash needs primarily through proceeds from equity or debt financing in order to be able to sustain its operations until the Company can achieve profitability and positive cash flows, if ever. Management plans to seek additional debt and/or equity financing for the Company through private or public offerings. However, there can be no assurance as to the availability or terms upon which such financing and capital might be available.

All of the above matters raise substantial doubt about the Company's ability to continue as a going concern. The accompanying financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE B - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**[1]   Use of estimates:**

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.   Actual results could differ from those estimates.   The estimates affecting the financial statements that are particularly significant include assumptions related to research and development costs and the fair value of common stock and other stock-based instruments.

**[2]   Cash and cash equivalents:**

Cash and cash equivalents include all highly liquid instruments with maturity of three months or less, when purchased.   Cash equivalents consist primarily of balances in money market accounts.   The Company maintains some of its cash and cash equivalent balances in two financial institutions which are insured by the Federal Deposit Insurance Corporation ("FDIC").   The Company also maintains a separate money market account which is insured by the Securities Investor Protector Corporation ("SIPC").   Cash and cash equivalents from time to time may exceed federally insured limits.

**[3]   Inventory:**

Inventory is stated at the lower of cost or net relizable value on a first-in, first-out basis and is comprised principally of finished goods.   The Company determines its reserve for obsolete inventory by considering a number of factors including product shelf life, marketability, and obsolescence.

**[4]   Property and equipment and depreciation:**

Computers, AngelMed Guardian System programming devices, machinery and equipment, furniture and fixtures, and leasehold improvements are recorded at cost.   Depreciation is determined using the straight-line method over the estimated useful lives of the assets of three to five years.   Leasehold improvements are amortized over the shorter of their estimated useful lives or the remainder of the non-cancelable lease period.   Expenditures for maintenance and repairs are expensed as incurred while renewals and betterments are capitalized.   When property and equipment is sold or otherwise disposed of, the cost and related accumulated depreciation are eliminated from the accounts and any resulting gain or loss is reflected in income.

**[5]   Long-lived assets:**

Long-lived assets, primarily property and equipment, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.   Recoverability of these assets are evaluated by a comparison of the carrying amount of an asset group to future net undiscounted cash flows expected to be generated by that asset or group.   If these comparisons indicate that an asset is not recoverable, the impairment loss recognized is the amount by which the carrying amount of the asset exceeds its estimated fair value.   There have been no indications of impairment of long-lived assets during the years ended December 31, 2017 and 2016.

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE B - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

[6]   **Revenue recognition:**

Revenue for the sale of cardiac units is recognized when delivered.  Certain prior year sales include a specific fee for field engineering service for periodic data downloads, testing and interrogating the device.  Since these services are provided over multiple years, the revenue for these sales is recognized ratably over the service period, which is generally three years.

Further, AMS received grant funding from the National Heart, Lung and Blood Institute which is a Pass-Through Grantor of federal agency funds under a cost reimbursement based contract.  AMS recorded grant reimbursement revenue as expenditures were made. The grant expired in 2016.

[7]   **Stock-based compensation:**

The Company accounts for stock-based payments to employees in conformity with GAAP.  All stock-based payments to employees are grants of stock options that are recognized in the statements of operations based on their fair values at the date of grant.

The Company accounts for stock-based payments to non-employees in conformity with GAAP.  All stock-based payments to non-employees are grants of stock options, warrants or issuances of common stock that are recognized in the statements of operations based on the value of the portion of the stock option grant or warrant issuance earned during that period as measured at its then-current fair value as of each financial reporting date until vested, at which time its value is established and no longer subject to adjustment.

The Company calculates the fair value of option grants and warrant issuances utilizing the Black-Scholes pricing model.  The amount of stock-based compensation recognized during a period is based on the value of the portion of the awards that are ultimately expected to vest.  The authoritative guidance requires forfeitures to be estimated at the time stock options are granted and warrants are issued and revised if necessary in subsequent periods, an adjustment will be booked if actual forfeitures differ from those estimated.  The term "forfeitures" is distinct from "cancellations" or "expirations" and represents only the unvested portion of the surrendered stock option or warrant.  The Company estimates forfeiture rates for all unvested awards when calculating the expense for the period.   In estimating the forfeiture rate, the Company monitors both stock option and warrant exercises as well as employee and non-employee termination patterns.

The resulting stock-based compensation expense for both employee and non-employee awards is generally recognized on a straight-line basis over the requisite service period of the award.

[8]   **Income taxes:**

The Company is subject to federal, state, foreign and local income taxes.  The Company accounts for income taxes in accordance with GAAP, which requires the asset and liability method to calculate deferred taxes.  Deferred taxes are recognized based on the differences between the financial reporting and income tax bases of assets and liabilities using enacted federal and state income tax rates.  Valuation allowances are provided if, based upon the weight of available evidence, it is more-likely-than-not that some or all of the deferred tax assets will not be realized.

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE B - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES  (CONTINUED)

**[8]    Income taxes: (continued)**

The Company also accounts for uncertain tax positions in accordance with ACS Topic 740, Income Taxes. This guidance prescribes a more-likely-than-not threshold for financial statement recognition and measurement of a tax position taken in the Company's income tax returns.  As of December 31, 2017, the Company had no uncertain tax positions which affected its financial position and its results of operations or its cash flows, and will continue to evaluate for uncertain tax positions in the future.  There are no estimated interest costs or penalties provided for in the Company's financial statements for the years ended December 31, 2017 and 2016.  If at any time the Company should record interest and penalties in connection with income taxes, the interest and the penalties will be expensed within the income tax line.

**[9]    Convertible promissory notes:**

The Company evaluates and accounts for conversion options embedded in convertible instruments in accordance with GAAP.  Applicable GAAP potentially requires companies to bifurcate conversion options from their host instruments and account for them as freestanding derivative financial instruments at their fair value according to certain criteria.   The criteria include circumstances in which (a) the economic characteristics and risks of the embedded derivative instrument are not clearly and closely related to the economic characteristics and risks of the host contract, (b) the hybrid instrument that embodies both the embedded derivative instrument and the host contract is not re-measured at fair value under otherwise applicable GAAP with changes in fair value reported in earnings as they occur, and (c) a separate instrument with the same terms as the embedded derivative instrument would be considered a derivative instrument.

The Company evaluated convertible instruments at the date of issuance for the presence of a beneficial conversion feature.  A contingent beneficial conversion feature was deemed present, and will be recognized upon the occurrence of the related triggering event.

**[10]    Research and development costs:**

Research and development expenses include clinical trial costs, outside consultants and contractors for the Company's clinical and research and development activities.  The Company expenses such costs as they are incurred.

**[11]    Debt issuance costs:**

The Company is following  ASU No. 2015-03, *Interest – Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs* ("ASU 2015-03") which requires that debt issuance costs related to a recognized debt liability be presented in the balance sheet as a direct deduction from the carrying amount of that debt liability, consistent with debt discounts.

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE B - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

**[12]  Reclassification:**

Certain amounts previously reported have been reclassified to conform to the current year presentation.

**[13]  Recent accounting pronouncements:**

In February 2016, the FASB issued ASU No. 2016-02, *Leases,* which amends the existing accounting standards for lease accounting, including requiring lessees to recognize most leases on their balance sheets and making targeted changes to lessor accounting.  This ASU will be effective beginning on or after January 1, 2020.  Early adoption is permitted.  The new leases standard requires a modified retrospective transition approach for all leases existing at, or entered into after, the date of initial application, with an option to use certain transition relief.  The Company is currently evaluating the impact of adopting the new leases standard on its financial statements and disclosures.

In March 2016, the FASB issued ASU No. 2016-09, *Improvements to Employee Share-Based Payment Accounting* ("ASU 2016-09"), which provides for simplification of certain aspects of employee share-based payment accounting including income taxes, classification of awards as either equity or liabilities, accounting for forfeitures and classification on the statement of cash flows.  ASU 2016-09 will be effective for the Company January 1, 2018.  The Company is currently in the process of assessing its application methodology and the impact of ASU 2016-09 on the Company's financial statements and disclosures.

In May 2017, the FASB issued ASU No. 2017-09, *Compensation - Stock Compensation*, which is intended to reduce both (1) diversity in practice and (2) cost and complexity when applying the guidance in Topic 718, *Compensation - Stock Compensation*, to a change to the terms or conditions of a share-based payment award.  The amendments in this update are effective for all entities for annual periods, and interim periods within those annual periods, beginning after December 15, 2017.  The Company is currently evaluating the impact of adopting this guidance on its financial statements and disclosures.

NOTE C - PROPERTY AND EQUIPMENT

Property and equipment consists of the following at December 31:

|  | 2017 | 2016 |
|---|---|---|
| Computers | $ 265,069 | $ 265,069 |
| AngelMed Guardian System programming devices | 892,617 | 892,617 |
| Machinery and equipment | 395,847 | 395,847 |
|  | 1,553,533 | 1,553,533 |
| Less: accumulated depreciation and amortization | (1,509,079) | (1,333,880) |
|  | $ 44,454 | $ 219,653 |

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE C - PROPERTY AND EQUIPMENT (CONTINUED)

Depreciation and amortization expense for the years ended December 31, 2017 and 2016, was approximately $175,200 and $246,000, respectively.

NOTE D - INCOME TAXES

The components of the deferred tax assets at December 31 are comprised primarily of:

| | 2017 | 2016 |
|---|---|---|
| Deferred tax assets: | | |
| Accruals and inventory reserve | $ 25,371 | $ 34,903 |
| Interest | 1,033,063 | 200,516 |
| Depreciation | 4,719 | 37,913 |
| Net operating loss carryforwards | 23,202,286 | 35,126,683 |
| Allocated startup costs | 2,788,276 | 4,835,886 |
| Federal research and development business credit | 5,860,004 | 5,927,024 |
| Stock-based compensation | 484,912 | 720,870 |
| Capital loss carryforward and other | - | 4,041 |
| | 33,398,631 | 46,887,836 |
| Valuation allowance | (33,398,631) | (46,887,836) |
| Net deferred tax assets | $ - | $ - |

At December 31, 2017, the Company has gross federal net operating loss carryforwards of approximately $108,038,000 and gross state net operating loss carryforwards of approximately $8,974,000 available to reduce future taxable income, which expire from 2028 to 2037 for federal and from 2030 to 2037 for state income taxes. Additionally, the Company has approximately $10,341,281 in gross allocated start-up costs that will be available to reduce future taxable income, federal research and development credits of approximately $5,855,000 which begin to expire between 2025 and 2037 and state research credit carryforwards of approximately $5,300 which expire in 2037.    The valuation allowance decreased by approximately $13,489,200 and increased by approximately $5,305,853 during the years ended December 31, 2017 and 2016, respectively.

The State of New Jersey has enacted legislation permitting certain corporations located within the state to sell unused New Jersey net operating loss carryforwards and research and development credit carryforwards. In 2017, the Company received cash of $1,465,979 from the sale of $16,239,757 of net operating loss carryforwards and $106,314 of research and development credits. In 2016, the Company received $1,630,810 from the sale of $17,798,973 of net operating loss carryforwards and $150,246 of research and development tax credits. The Company will continue to apply for such programs as long as they are available and beneficial.

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE D - INCOME TAXES (CONTINUED)

Due to the change in ownership provisions of the Internal Revenue Code, the availability of the Company's net operating loss carryforwards may be subject to annual limitations against taxable income in future period, which could substantially limit the eventual utilization of such carryforwards. The Company has not analyzed the historical or potential impact of any ownership changes and therefore no determination has been made whether the net operating loss carryforward is subject to any Internal Revenue Code Section 382 limitation. To the extent there is a limitation, there would be a reduction in the deferred tax asset with an offsetting reduction in the valuation allowance.

In accordance with ASC 740, the effects of new tax legislation are recognized upon enactment. The legislation commonly referred to as the Tax Cuts and the Jobs Act (the "Act") was signed into law on December 22, 2017 and therefore its effects must be reported on your 2017 financials.

Significant changes were also made to the use of net operating losses (NOL) as well. Net operating losses arising subsequent to 2017 will no longer be allowed to be carried back while their future use will be limited to eighty percent (80%) of taxable income. Angel Medical Systems, Inc. has NOLs from years prior to December 31, 2017 which are not limited, but any losses generated in future years will be subject to this new limitation.

The Act reduces U.S. federal corporate tax rate from 35% to 21%. We are reporting the impacts of the Act provisionally based upon reasonable estimates. As a result, the Company believes that the most significant impact on its financial statements will be a reduction to the deferred tax assets related to net operating losses and other assets. Such reduction is largely offset by changes to the Company's valuation allowance. We are reporting by $16,135,000 the impacts of the Act provisionally based upon reasonable estimates.

NOTE E - CONVERTIBLE NOTES PAYABLE

Effective December 5, 2013, the Company entered into a funding agreement with various investors in exchange for convertible promissory notes (the "2013 Notes"). The Company has pledged substantially all assets (excluding intellectual property) as collateral for the Notes. Interest accrues at 11% annually on all Notes. The maturity date on all Notes was extended from December 31, 2016 to December 31, 2017 and further extended to December 31, 2018.

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE E - CONVERTIBLE NOTES PAYABLE (CONTINUED)

During 2016, the Company entered into a new note purchase agreement ("2016 Notes") with various investors in exchange for convertible promissory notes. During the years ended December 31, 2017 and 2016, the Company received $1,403,154 and $553,288, respectively, under such notes. The Company has pledged substantially all assets (excluding intellectual property) as collateral for the 2016 Notes. Interest accrues at 11% annually on all 2016 Notes. The maturity date on all Notes was extended from December 31, 2017 to December 31, 2018. A final fee equal to four hundred percent (400%) of the outstanding Principal amount of the 2016 Notes shall be paid at maturity. During 2017 and 2016, $3,831,468 and $483,083, respectively, of the final fee was accreted to the 2016 Note balance and recorded as additional interest expense.

If not paid sooner through a voluntary prepayment or an acquisition event as defined in the 2013 Notes and 2016 Notes (collectively, the "Notes"), the Company shall pay at maturity the outstanding principal amount of each of the Notes with all accrued and unpaid interest and the final fee for the 2016 Notes. The Company may voluntarily prepay all, but not less than all, of the 2013 Notes outstanding at any time prior to maturity, at an amount equal to two hundred fifty percent (250%) of the outstanding principal amount and five hundred percent (500%) of the outstanding principal amount of the 2016 Notes. All accrued interest will be considered as paid at that time.

Upon an acquisition event, the obligations under the Notes shall become immediately due and payable, and the Company shall pay to each Purchaser (a) an amount equal to two hundred fifty percent (250%) of the outstanding principal amount of the 2013 Notes and five hundred percent (500%) of the outstanding principal amount of the 2016 Notes and (b) all other sums, if any, that shall have become due and payable.

Effective upon the closing of a Qualified or Non-Qualified IPO, the Notes and the aggregate accrued interest shall convert into shares of Conversion Stock, which will immediately convert to Common Stock at the conversion ratio in effect for the Conversion Stock. At the option of the Purchaser, all of the outstanding principal amount and accrued interest may be converted at any time into shares of Voluntary Conversion Stock, which are convertible into (i) Series G Preferred Stock, (ii) Qualified Private Financing Stock, (iii) Series H Preferred Stock, or (iv) Series I Preferred Stock. If the Conversion Stock is Series H Preferred Stock then no accrued interest shall convert.

The number of shares of Conversion Stock to be issued under the Notes shall equal the conversion amount divided by the applicable Conversion Price. The Conversion Price under the 2013 Notes means (i) for any conversion in which the Conversion Stock is the Company's Series G Preferred Stock, an amount per share equal to $4.04; (ii) for any conversion in which the Conversion Stock is the Qualified Private Financing Stock, an amount equal to seventy five percent (75%) of the lowest per share price paid by any investor in any closing of the Qualified Private Financing; and (iii) for any conversion in which the Conversion Stock is the Series H Preferred Stock, an amount per share equal to $4.04. The Conversion Price under the 2016 Notes means (i) for any conversion in which the Conversion Stock is the Company's Series I Preferred Stock, an amount per share equal to $1.00; and (ii) for any conversion in which the Conversion Stock is the Qualified Private Financing Stock, an amount equal to seventy five percent (75%) of the lowest per share price paid by any investor in any closing of the Qualified Private Financing.

The related beneficial conversion feature or premiums, which may be invoked, are contingent and will be recognized upon occurrence of that event.

As of December 31, 2017 and 2016, the Company had $47,324,535 and $42,018,018 net of debt discounts and unamortized deferred financing costs of $22,464 and $94,356, respectively, outstanding in aggregate under the 2013 Notes and the 2016 Notes.

Accrued interest as of December 31, 2017 and 2016 was $16,652,205 and $12,011,178, respectively. Interest expense including amortization of debt discounts and deferred financing costs for the years ended December 31, 2017 and 2016 was approximately $8,569,000 and $5,025,000, respectively.

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE F - STOCKHOLDERS' EQUITY

**[1]    Overview:**

The Company's Certificate of Incorporation, originally filed on November 29, 2001, was most recently amended by the Certificate of Amendment of the Sixth Amended and Restated Certificate of Incorporation on September 19, 2016, which authorized the issuance of two classes of stock to be designated, respectively, "Common Stock" and "Preferred Stock".   The total number of shares which the Company is authorized to issue is 89,220,833, each with a par value of $0.001 per share.   Of these shares, 51,500,000 shall be Common Stock and 37,720,833 shall be Preferred Stock.

**[2]    Preferred stock:**

As of December 31, 2017, the articles of incorporation authorize nine series of Preferred Stock.

**a.    Dividends:**

The holders of the Preferred Stock shall be entitled to receive, if declared, in preference to the holders of Common Stock, dividends at the rate per annum of (i) $0.0952 per share on each outstanding share of Series A Preferred Stock, (ii) $0.16 per share on each outstanding share of Series B Preferred Stock, (iii) $0.32 per share on each outstanding share of Series C Preferred Stock, (iv) $0.48 per share on each outstanding share of Series D Preferred Stock, (v) $0.60 per share on each outstanding share of Series E Preferred Stock, (vi) $0.80 per share on each outstanding share of Series F Preferred Stock, (vii) $0.3232 per share on each outstanding share of Series G Preferred Stock, (viii) no dividends shall be declared on shares of Series H Preferred Stock, and (ix) $0.0808 per share on each outstanding share of Series I Preferred Stock.   Such dividends are not cumulative.   No dividends are to be declared or paid on shares of Common Stock as long as any shares of Preferred Stock are outstanding.

**b.    Liquidation:**

The holders of the Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any assets of the Company to the holders of any series of Preferred Stock or Common Stock in the following order.   Amounts are equal to: (i) $2.00 for each share of Series I Preferred Stock, plus declared but unpaid dividends, (ii) $10.10 for each share of Series H Preferred Stock, (iii) $6.06 for each share of Series G Preferred Stock, plus declared but unpaid dividends, (iv) $10.00 for each share of Series F Preferred Stock, plus declared but unpaid dividends, (v) $7.50 for each share of Series E Preferred Stock, plus declared but unpaid dividends, (vi) $6.00 for each share of Series D Preferred Stock, plus declared but unpaid dividends, (vii) $4.00 for each share of Series C Preferred Stock, plus declared but unpaid dividends, (viii)  $2.00 for each share of Series B Preferred Stock, plus declared but unpaid dividends, and (ix) $1.19 for each share of Series A Preferred Stock, plus declared but unpaid dividends.

After distribution per above, any remaining assets will be distributed to the holders of the Common Stock, the Series G Preferred Stock and the Series I Preferred Stock pro rata based on the number of shares of Common Stock then held assuming conversion of the shares of Series G Preferred Stock and Series I Preferred Stock.

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE F - STOCKHOLDERS' EQUITY (CONTINUED)

**[2]    Preferred stock: (continued)**

c.    **Conversion:**

Each share of Series A through G and I Preferred Stock is convertible, at the option of the holder, on a one-for-one basis into shares of Common Stock based upon the same conversion ratios for each class as listed in the liquidation paragraph above except Series G, which will convert at $4.04 per share, and Series I which will convert at $1.00 per share, subject to conversion price adjustments upon certain events. The conversion price of the shares is reset if there is subsequent financing at a lower price than the current conversion price, which is measured and recognized if the contingency occurs. Series H Preferred Stock may not be converted into shares of Common Stock except as noted below.

In addition, each share of Series A through I Preferred Stock automatically converts into shares of Common Stock at the Conversion Price stated above upon the earlier of (i) an underwritten public offering in which the per share public offering price is greater than $10.10 (as adjusted for stock dividends, combinations, splits or the like with respect to such shares) and the proceeds to the Company equal or exceed forty million dollars ($40,000,000) net of underwriter discounts, commissions, concessions and expenses; or (ii) the written consent of the holders of not less than 66 2/3% of the then outstanding shares of Preferred Stock, voting together as a single class.  The initial conversion price for the Series H Preferred Stock shall be $4.04 per share.

d.    **Redemption:**

The Preferred Stock is not redeemable by the Company or the holder.

e.    **Voting:**

The holder of each share Voting Preferred Stock shall have the right to one vote for each share of Common Stock into which such Preferred Stock could then be converted, and with respect to such vote, such holder shall have full voting rights and powers equal to the voting rights and powers of the holders of Common Stock, and shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Company, and shall be entitled to vote, together with holders of Common Stock, with respect to any question upon which holders of Common Stock have the right to vote.  Except as required by law, the Series H Preferred Stock shall have no voting rights.

Additionally as long as at least 3,000,000 shares of Voting Preferred Stock are outstanding, the holders of Voting Preferred Stock, voting together as a single class, shall be entitled to elect three members of the Board of Directors.  The holders of the Common Stock and Voting Preferred Stock, voting together as a single class on an as-converted basis, shall be entitled to elect all remaining members of the Board of Directors.

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE G - STOCK-BASED COMPENSATION

**[1]   Stock options:**

In 2011, the Board of Directors adopted, and the Company's stockholders approved, a new stock option plan (the "Plan") pursuant to which 4,895,209 shares of the Company's Common Stock were reserved for issuance upon the exercise of options granted to officers, employees, consultants and directors of the Company.  On November 26, 2014, an additional 1,500,000 shares of the Company's Common Stock were reserved for issuance upon the exercise of options granted to officers, employees, consultants and directors of the Company under the Plan. Options issued under the Plan are classified as either incentive stock options ("ISOs") or nonqualified stock options ("NSOs"). In addition, the Plan provides for the grant of Stock Appreciaiton Rights, Restricted Stock Awards and Restricted Stock Unit Awards.  The Board of Directors grants ISOs and NSOs at an exercise price equal to the fair value of the Company's Common Stock on the date of grant.  For grants of ISOs, if the grantee owns, or is deemed to own, 10% or more of the total voting power of the Company, then the exercise price shall be 110% of the fair market value on the date of grant. The Plan further provides that the maximum period in which stock options may be exercised will be determined by the Board of Directors, provided that no option may be exercisable after ten years from date of grant.

The Company accounts for stock-based compensation in conformity with GAAP for employees and for non-employee consultants.  Accordingly, the measurement of compensation expense for all stock awards granted to employees are at the fair value on the date of grant and recognition of compensation expense is over the related service periods for awards expected to vest.  Compensation expense to non-employees are recognized in the statements of operations based on the value of the vested portion of the issuances as measured at its then current fair value as of each reporting date until vested.

Total stock based compensation expense recognized for the years ended December 31, 2017 and 2016, amounted to approximately $20,000 and $55,000, respectively.

Employees

The fair value of each option grant is estimated on the date of grant using the Black-Scholes option-pricing model with the following assumptions used to compute the fair value of stock option grants:

|  | 2017 | 2016 |
|---|---|---|
| Risk free interest rate | **1.52% - 1.85%** | 0.88% - 1.40% |
| Expected dividend yield | **0%** | 0% |
| Exercise price | **$0.05** | $0.05 - $.35 |
| Expected life of the option in years | **3.58 - 6.08 years** | 2.76 - 6.08 years |
| Expected volatility | **41% - 42%** | 42% - 44% |

The valuation assumptions were determined as follows:

The fair value of the Company's Common Stock was determined by an outside valuation firm.  The Company's shares of stock are not publicly traded, however, to determine the appropriate historical stock price volatility, management has taken an average of several publicly traded medical device companies, which are representative of the Company's size and industry.  The Company has used the historical values of those companies' volatility estimates to estimate its volatility.  Risk-free interest rate:  The Company bases the risk-free rate on the rate payable on the U.S. Treasury securities with an equivalent term to the expected term of the options in effect at the time of the grant.  Expected life:  The expected life of the option

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE G - STOCK-BASED COMPENSATION (CONTINUED)

**[1]   Stock options: (continued)**

Employees (continued)

represents the period of time options are expected to be outstanding.  Dividend yield:  The estimate for dividend yield is 0%, because the Company has not historically paid, and does not intend to pay a dividend in the foreseeable future.

The following table summarizes the activity related to stock option grants to employees for the years ended December 31, 2017 and 2016:

| | Option Shares | Weighted Average Exercise Price Per Option Share Outstanding |
|---|---|---|
| **Balance, December 31, 2015** | 4,715,110 | $           0.75 |
| Granted during the year | 248,750 | 0.10 |
| Expired / Cancelled | (1,143,463) | 0.83 |
| **Balance, December 31, 2016** | 3,820,397 | 0.68 |
| Granted during the year | 219,500 | 0.05 |
| Expired / Cancelled | (713,661) | 1.14 |
| **Balance, December 31, 2017** | **3,326,236** | **$           0.54** |

Information with respect to employee stock options outstanding and exercisable at December 31, 2017 is as follows:

| Exercise Price | Number Outstanding | Weighted Average Remaining Contractual Life (in Years) | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $   .05 | 349,500 | 9.25 | | 86,601 | |
| $   .055 | 80,000 | 4.23 | | 11,666 | |
| $   0.23 | 561,910 | 6.94 | | 437,845 | |
| $0.253 | 260,000 | 1.99 | | 192,916 | |
| $   0.35 | 214,472 | 7.52 | | 203,443 | |
| $   0.38 | 119,172 | 5.85 | | 118,067 | |
| $0.385 | 35,000 | 3.15 | | 35,000 | |
| $   0.50 | 243,182 | 4.98 | | 243,182 | |
| $   0.55 | 50,000 | 0.11 | | 50,000 | |
| $   0.91 | 1,378,000 | 2.05 | | 1,378,000 | |
| $   1.53 | 35,000 | 1.15 | | 35,000 | |
| | 3,326,236 | 4.36 | $0.54 | 2,791,720 | $0.62 |

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE G - STOCK-BASED COMPENSATION (CONTINUED)

**[1]   Stock options: (continued)**

<u>Employees</u> (continued)

At December 31, 2017, total unrecognized compensation cost related to non-vested employee options was approximately $19,000 and is expected to be recognized over the remaining weighted-average service period of 1.63 years.  The weighted average grant date fair value of stock options granted during 2017 and 2016 was $0.02 and $0.03, respectively.  Stock-based compensation for employee stock options was approximately $18,000 and $53,000 for the years ended December 31, 2017 and 2016, respectively, and is recorded in operating expenses in the accompanying statements of operations.

The intrinsic value of the options exercised by employees during 2017 and 2016, and outstanding at December 31, 2017 and 2016 was de minimis.

<u>Non-employees</u>

The following table summarizes the activity related to stock option grants to non-employees for the years ended December 31, 2017 and 2016:

|  | Option Shares | Weighted Average Exercise Price Per Option Share Outstanding | |
|---|---|---|---|
| **Balance, December 31, 2015** | 244,100 | $ | 2.62 |
| Granted during the year | 84,000 | | 0.08 |
| Cancelled during the year | (10,042) | | 1.12 |
| **Balance, December 31, 2016** | 318,058 | | 1.63 |
| Granted during the year | 202,000 | | 0.05 |
| Cancelled during the year | (138,100) | | 3.04 |
| **Balance, December 31, 2017** | **381,958** | **$** | **0.29** |

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**

NOTE G - STOCK-BASED COMPENSATION (CONTINUED)

**[1]   Stock options: (continued)**

Non-employees (continued)

Information with respect to non-employee stock options outstanding and exercisable at December 31, 2017 is as follows:

| Exercise Price | Number Outstanding | Weighted Average Remaining Contractual Life (in Years) | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $0.05 | 277,000 | 9.43 | | 79,207 | |
| $0.35 | 36,958 | 7.91 | | 20,187 | |
| $0.91 | 40,000 | 2.48 | | 42,000 | |
| $1.53 | 23,000 | 2.23 | | 23,000 | |
| $2.16 | 5,000 | 0.23 | | 2,000 | |
| | 381,958 | 8.00 | $0.29 | 161,394 | $0.53 |

At December 31, 2017, total unrecognized compensation cost related to non-vested non-employee options was approximately $5,000 and is expected to be recognized over the remaining weighted-average service period of 1.47 years.  The weighted average grant date fair value of stock options granted during 2017 and 2016 was $0.03.  Stock-based compensation expense related to non-employee stock options was $2,000 for the years ended December 31, 2017 and 2016, respectively.

**[2]   Warrants:**

All outstanding warrants expired unexercised, as of December 31, 2016.

NOTE H - GRANT INCOME

During 2015, the Company was awarded a grant in the amount of $938,939, from the National Institute of Health. The grant was for research expenses related to Acute Ischemia Monitoring Utilizing Subcutaneous Electrodes. The Company received funding of $132,476 related to this grant during the year ended December 31, 2016, which corresponds to the occurrence of the related research costs, and was included in grant income in the statements of operations.   The related expenses were included in research and development in the accompanying statements of operations. The Company did not receive grant funding during 2017.

**ANGEL MEDICAL SYSTEMS, INC.**

**Notes to Financial Statements**
*(See independent accountants' compilation report)*
**December 31, 2017 and 2016**


NOTE I - RELATED PARTY TRANSACTION

St. Jude Medical Cardiac Rhythm Management Division, a Medical Device Manufacturer ("MDM"), is a greater than 10% shareholder of the Company and as of December 31, 2017, MDM held approximately $25,000,000 of convertible promissory notes payable by the Company.  In November 2014, the Company granted the MDM a limited Right of First Refusal (the "Right") on the acquisition of the Company.  This Right will remain in place from the effective date of the parties' agreement (November 26, 2014) through 1 year post FDA approval of the Company's AngelMed Guardian System.  This Right also terminates in the event the Company completes a qualified IPO.


NOTE J - COMMITMENTS

**Operating leases:**

The Company leases equipment and office space under operating lease agreements, expiring at various times through 2018.  The Company entered into a lease for office space effective August 1, 2016, which is automatically extended on a month-to-month basis and may be terminated with 30 days' notice.  The monthly expense is less than $1,000 per month.

Future minimum rental payments under noncancelable operating leases at December 31, 2017 are approximately $4,000 as of Dcember 31, 2017.


NOTE K - EMPLOYEE BENEFIT PLAN

The Company has a retirement savings plan under Section 401(k) of the Internal Revenue Code covering all eligible employees.  Participants may make elective salary deferral contributions between 1% and 16% of their annual compensation up to the maximum under the Internal Revenue Code.  The Company assumes all administrative costs of the plan.  The Company does not make any matching contributions in accordance with the plan documents.


NOTE L - SUBSEQUENT EVENTS

The Company has evaluated subsequent events through May 17, 2018, which is the date these financial statements were available to be issued.  As noted in Note A, on April 9, 2018, the Company received a letter from the FDA stating that its Pre-Market Approval submission had been approved and that the AngelMed Guardian System could be commercialized.  The Company intends to raise additional funds through debt or equity in order to launch a commercial effort and to manage a required post-approval study.

APPENDIX E

TO

DISCLOSURE STATEMENT
OF ANGEL MEDICAL SYSTEMS INC.

UNAUDITED FINANCIAL STATEMENTS Q3 2018

**Angel Medical Systems, Inc.**
**Unaudited Consolidated Income Statement**
*in US Dollars*

| | Unaudited | | | |
| --- | --- | --- | --- | --- |
| | **1Q18** | **2Q18** | **3Q18** | **3Q YTD 2018** |
| **REVENUES** | | | | |
| Product Sales | $ - | $ - | $ - | $ - |
| **Total Revenues** | - | - | - | - |
| **COST OF SALES** | | | | |
| Other | - | - | - | - |
| **Total Cost of Goods Sold** | - | - | - | - |
| **GROSS PROFIT** | - | - | - | - |
| **OPERATING EXPENSES** | | | | |
| General & Administrative | 298,577 | 397,943 | 237,677 | 934,196 |
| Marketing & Sales | (2,835) | 27,602 | 33,084 | 57,851 |
| Research & Development | 32,407 | 67,169 | 115,033 | 214,609 |
| Clinical & Regulatory | 12,431 | 408,862 | 39,026 | 460,319 |
| **Total Operating Expenses** | **340,580** | **901,575** | **424,820** | **1,666,976** |
| **OPERATING INCOME (LOSS)** | **(340,580)** | **(901,575)** | **(424,820)** | **(1,666,976)** |
| **OTHER (INCOME) EXPENSE** | | | | |
| Depreciation | 28,626 | 5,150 | 5,150 | 38,926 |
| Stock Option/Warrant Expense | 5,539 | 5,500 | 5,000 | 16,039 |
| Interest Expense (Income) | 2,020,389 | 2,058,470 | 2,092,452 | 6,171,311 |
| **Total Other (Income) Expense** | **2,054,554** | **2,069,120** | **2,102,602** | **6,226,276** |
| **NET INCOME (LOSS)** | **$ (2,395,134)** | **$ (2,970,696)** | **$ (2,527,422)** | **$ (7,893,252)** |

**Angel Medical Systems, Inc.**
**Unaudited Consolidated Balance Sheet**
*in US Dollars*

| | | Unaudited | | |
|---|---|---|---|---|
| | 12/31/2017 | 3/31/2018 | 6/30/2018 | 9/30/2018 |
| **ASSETS** | | | | |
| Cash and Cash Equivalents | $ 2,912,013 | $ 2,186,862 | $ 1,216,812 | $ 581,222 |
| Prepaid and Other Current Assets | 72,956 | 108,511 | 68,901 | 55,140 |
| Total Current Assets | 2,984,969 | 2,295,373 | 1,285,713 | 636,362 |
| Fixed Assets, net | 44,454 | 25,897 | 20,747 | 15,597 |
| Other Assets | 4,450 | 4,450 | 39,560 | 35,660 |
| **TOTAL ASSETS** | $ 3,033,873 | $ 2,325,720 | $ 1,346,020 | $ 687,619 |
| | | | | |
| **LIABILITIES & EQUITY** | | | | |
| *Liabilities* | | | | |
| Accounts Payable | $ 88,309 | $ 50,006 | $ 19,309 | $ 27,275 |
| Accrued Expenses | 991,372 | 718,569 | 680,230 | 440,275 |
| Employee Related Liabilities | 99,873 | 92,058 | 87,043 | 84,757 |
| Total Current Liabilities | 1,179,554 | 860,634 | 786,582 | 552,307 |
| Other LT Liabilities | - | - | - | - |
| Accrued Interest/Final Fee - Notes | 19,183,576 | 21,199,942 | 23,253,991 | 25,330,611 |
| Convertible Notes | 44,793,161 | 44,777,090 | 44,782,589 | 44,804,265 |
| Total Liabilities | 65,156,292 | 66,837,666 | 68,823,162 | 70,687,183 |
| | | | | |
| *Equity* | | | | |
| Preferred Equity (Rounds A through F) | 10,221 | 10,221 | 10,221 | 10,221 |
| Common Stock | 6,169 | 6,169 | 6,169 | 6,169 |
| APIC | 66,873,104 | 66,878,703 | 66,884,203 | 66,889,203 |
| Retained Earnings | (118,998,183) | (129,011,905) | (129,011,905) | (129,011,905) |
| Net Income | (10,013,730) | (2,395,134) | (5,365,830) | (7,893,252) |
| **TOTAL LIABILITIES AND EQUITY** | $ 3,033,873 | $ 2,325,720 | $ 1,346,020 | $ 687,619 |

**Angel Medical Systems, Inc.**
**Unaudited Consolidated Statement of Cash Flows**
*in US Dollars*

| | | | | Unaudited | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 1Q18 | | 2Q18 | | 3Q18 | | 3Q YTD 2018 |
| **Cash Flows From Operating Activities:** | | | | | | | | |
| Income/(loss) | $ | (2,395,134) | $ | (2,970,696) | $ | (2,527,422) | $ | (7,893,252) |
| Adjustments | | | | | | | | |
| Depreciation & Amortortization | | 28,626 | | 5,150 | | 5,150 | | 38,926 |
| (Increase)/Decrease in Other Assets | | (35,657) | | 4,606 | | 17,661 | | (13,390) |
| (Increase)/Decrease in Receivables | | 106 | | (106) | | (0) | | 0 |
| Increase/(Decrease) in Accounts Payable | | (38,243) | | (30,697) | | 7,966 | | (60,974) |
| Increase/(Decrease) in Accrued Expense | | (272,803) | | (38,339) | | (239,955) | | (551,097) |
| Increase/(Decrease) in Employee Related Liabilities | | (7,811) | | (5,016) | | (2,286) | | (15,113) |
| Accretion of Final Loan Payment | | 864,296 | | 873,900 | | 873,900 | | 2,612,096 |
| Increase/(Decrease) in Accrued Note Interest | | 1,152,070 | | 1,180,149 | | 1,202,720 | | 3,534,939 |
| Amortization of Deferred Finance Costs | | 5,499 | | 5,499 | | 21,676 | | 32,674 |
| Equity Based Compensation | | 5,539 | | 5,500 | | 5,000 | | 16,039 |
| **Net Cash Provided by (Used in) Operating Activities** | | **(693,512)** | | **(970,050)** | | **(635,590)** | | **(2,299,151)** |
| **Cash Flows from Investing Activities:** | | | | | | | | |
| Purchase of Fixed Assets | | (10,070) | | - | | - | | (10,070) |
| **Net Cash Used in Investing Activities** | | **(10,070)** | | **-** | | **-** | | **(10,070)** |
| **Cash Flows from Financing Activities:** | | | | | | | | |
| Financing | | - | | - | | - | | - |
| Debt Issuance Costs paid | | (21,570) | | - | | - | | (21,570) |
| **Net Cash Provided by (Used in) Financing Activities** | | **(21,570)** | | **-** | | **-** | | **(21,570)** |
| Net Increase/(Decrease) in Cash and Cash Equivalents | | **(725,151)** | | **(970,050)** | | **(635,590)** | | **(2,330,791)** |
| Cash and Cash Equivalents at Beginning of Period | | **2,912,013** | | **2,186,862** | | **1,216,812** | | **2,912,013** |
| **Cash and Cash Equivalents at End of Period** | $ | **2,186,862** | $ | **1,216,812** | $ | **581,222** | $ | **581,222** |

APPENDIX F

TO

DISCLOSURE STATEMENT
OF ANGEL MEDICAL SYSTEMS INC.

RIGHTS OFFERING - INDICATION OF INTEREST AND SUMMARY TERMS

**INDICATION OF INTEREST TO**

**PARTICIPATE IN THE SERIES A PREFERRED FINANCING**

**OF**

**ANGEL MEDICAL SYSTEMS, INC.**

**(MUST BE RECEIVED BY NO LATER THAN DECEMBER 31, 2018)**

ANGEL MEDICAL SYSTEMS, INC., a Delaware corporation (the *"Corporation"*), is soliciting indications of interest in connection with the contemplated sale and issuance of the Corporation's to be newly designated shares of Series A Preferred Stock (the *"Series A Financing"*). The Corporation is offering each holder of shares of the Corporation's issued and outstanding capital stock and the Corporation's issued and outstanding promissory notes that were issued by the Corporation in 2012, 2014 and 2016 the opportunity to participate in the Series A Financing. The price and other material terms and conditions of the Series A Preferred Stock are described in the Summary of Terms attached hereto as EXHIBIT A (the *"Series A Term Sheet"*). Capitalized terms used, but not otherwise defined, in this Indication of Interest (this *"Indication"*) shall have the meanings ascribed to such terms in the Series A Term Sheet.

The Series A Financing will be consummated as described in the Series A Term Sheet. The minimum investment amount is $25,000. Please complete this form to indicate your interest, if any, in participating in the Series A Financing.

*THIS IS A SOLICITATION OF INTEREST ONLY AND DOES NOT CONSTITUTE AN OFFER TO SELL SECURITIES. INDICATIONS OF INTEREST ARE CONTINGENT UPON THE CORPORATION'S REVIEW AND APPROVAL OF YOUR RESPONSE, IN ACCORDANCE WITH FEDERAL AND STATE SECURITIES LAWS, AND IN THE SOLE AND ABSOLUTE DISCRETION OF THE CORPORATION.*

| | |
|---|---|
| **SELECT ONLY ONE OF THE FOLLOWING TWO ITEMS AND PLACE A CHECKMARK IN THE CORRESPONDING BOX:** | |
| (a)  I do <u>not</u> wish to participate in the Series A Financing. Please do <u>not</u> send me any additional information regarding participation in the Series A Financing. | ☐ |
| (b)  I wish to participate in the Series A Financing in the aggregate amount of $_____. | ☐ |
| **PLEASE NOTE THAT IN THE EVENT OF AN OVERSUBSCRIPTION, THE SALE OF THE SERIES A PREFERED WILL BE UNDERTAKEN IN AN EQUITABLE MANNER AS DETERMINED BY THE CORPORATION IN ITS SOLE AND ABSOLUTE DISCRETION.** | |

Unlike securities of a publicly-traded company, the Corporation's securities are not, and are not expected to become, a liquid security that can be traded on the open market. Rather, any return on investment, if any, would come through the sale of the Series A Preferred Stock at the time of a sale or change in control of the Corporation in the future. The Corporation reserves the right, in its sole discretion, at any time and from time to time, to extend, suspend, reduce, withdraw or otherwise amend the Series A Financing, by giving oral or written notice to you.

The Corporation will not be making any representation or warranty as to any financial projections or other forward-looking statements regarding the Corporation. Investments should only be made if you, as an investor, can bear the economic risk and possibility of losing the entirety of your investment. YOUR DECISION TO MAKE AN INVESTMENT IN THE CORPORATION AT THIS TIME SHOULD BE MADE SOLELY BY YOU AND ONLY AFTER YOU HAVE REVIEWED AND ANALYZED INFORMATION THAT YOU BELIEVE IS SUFFICIENT TO MAKE SUCH A DECISION. YOU ARE NOT REQUIRED OR OBLIGATED TO MAKE AN INVESTMENT IN ANY WAY.

<span style="color:red">**Investment in the Series A Financing is open only to "accredited" investors. "Accredited" investors are those persons who meet the requirements of Rule 501(a) of Regulation D, as promulgated under the**</span>

**Securities Act of 1933, as amended. For individuals to qualify, they generally must either (a) have a net worth alone or with their spouse of more than $1 million (excluding the value of their primary residence) or (b) individual income exceeding $200,000 in each of the past two calendar years, or joint income with their spouse of greater than $300,000 in each of the past two years, with a reasonable expectation of income at the same level in the current calendar year. To qualify as an "accredited" investor, entity investors generally must either be owned only by individuals who qualify as accredited investors or have not less than $5 million in assets. By indicating an interest to participate in the Series A Financing, you thereby attest and confirm to the Corporation that you are an "accredited" investor.**

YOU ARE URGED TO COMPLETE THIS INDICATION AND RETURN IT BY EMAIL TO DAVID R. FISCHELL AT DRDRF@COMCAST.NET, AS SOON AS POSSIBLE BUT NO LATER THAN **DECEMBER 31, 2018**. IF YOU DO NOT RETURN THIS INDICATION ON OR BEFORE **DECEMBER 31, 2018**, THE CORPORATION WILL ASSUME THAT YOU HAVE NO INTEREST IN PARTICIPATING IN THE SERIES A FINANCING, AND YOU SHALL BE DEEMED TO HAVE IRREVOCABLY WAIVED THE OPPORTUNITY TO PARTICIPATE IN THE SERIES A FINANCING.

**During the next several weeks, the Corporation can reach me as follows:**

Name of contact person: _____     Email: _____

Address: _____     Telephone: _____

_____

---

**STOCKHOLDER:**

Print Name: _____

(Exactly as it would appear on a stock certificate)

Signature: _____

Title (if applicable): _____

## SUMMARY OF TERMS FOR THE SERIES A PREFERRED FINANCING
### OF
## ANGEL MEDICAL SYSTEMS, INC.

### December 23, 2018

This Summary of Terms (this *"Summary of Terms"*) sets forth the principal terms for the sale and issuance of the Series A Convertible Preferred Stock of **ANGEL MEDICAL SYSTEMS, INC.**, a Delaware corporation.

## GENERAL:

| | |
|---|---|
| *Issuer:* | Angel Medical Systems, Inc., a Delaware corporation (the *"Company"*), following confirmation of the Company's plan of reorganization by the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*). |
| *Types of Security:* | Series A Convertible Preferred Stock, $0.001 par value per share (the *"Series A Preferred"*). |
| *Amount of Investment in the Series A Preferred:* | A minimum of $10,000,000 in commitments (including the amount of the DIP Notes) (the *"Minimum Amount"*) and a maximum of $15,000,000 (including the amount of the DIP Notes) (the *"Maximum Amount"*). |
| *Price Per Share:* | The original price per share for the Series A Preferred (the *"Original Purchase Price"*) would be no higher than $1.00 per share. The capitalization of the Company immediately before the Initial Closing and after the Initial Closing, assuming the sale by the Company of the Minimum Amount at the Initial Closing, is set forth on EXHIBIT A attached hereto. |
| *Investors:* | Investors who are reasonably acceptable to the Company and who qualify as "accredited investors" under Regulation D of the Securities Act of 1933, as amended (each, an *"Investor"* and collectively, the *"Investors"*). |
| *Option Pool:* | The Company would adopt an equity incentive plan (the *"Option Plan"*) and reserve a pool of 10% on a fully diluted basis shares of common stock of the Company (the *"Common Stock"*) thereunder prior to the Initial Closing, as set forth on EXHIBIT A attached hereto. |
| *Closings:* | The closing of the sale and issuance of the Series A Preferred would occur as soon as practicable following the Company's |

receipt of confirmation of the Company's plan of reorganization by the Bankruptcy Court (the **"Initial Closing"**). For a period of sixty (60) days following the Initial Closing, the Company could hold one or more additional closings with Investors for the purchase of additional shares of the Series A Preferred, up to the Maximum Amount.

**DIP Funding:**     In connection with the filing of the Company's Chapter 11 case with the United States Bankruptcy Court for the District of Delaware, the Company will issue to certain investors promissory notes in the aggregate amount of up to $2,500,000 (the **"DIP Notes"**). At the Initial Closing, the outstanding principal on the DIP Notes (excluding any accrued and unpaid interest on the DIP Notes and any amounts prepaid by the Company) will automatically convert into shares of the Series A Preferred at a price per share equal to 78% of the Original Purchase Price (i.e. no higher than $0.78 per share).

## TERMS OF THE SERIES A PREFERRED:

**Liquidation Preference:**     Upon the occurrence of any (i) liquidation, dissolution or winding up of the Company, (ii) merger or consolidation (other than one in which shareholders of the Company own a majority by voting power of the outstanding shares of the surviving or acquiring corporation), or (iii) sale, lease, transfer or other disposition of all or substantially all of the assets of the Company (the events described in the foregoing clauses (ii) and (iii) are each referred to herein as a **"Deemed Liquidation Event"**), the holders of the Series A Preferred would receive an amount per share of the Series A Preferred, in preference to the holders of the Common Stock, equal to one times (1x) the Original Purchase Price, plus accrued but unpaid dividends on each share of the Series A Preferred (the **"Series A Liquidation Preference"**).

After payment of the liquidation preference of the Series A Preferred above, the balance of any proceeds shall be distributed to the holders of the Common Stock.

Notwithstanding the foregoing, if the holders of any of the Series A Preferred would receive more in the aggregate in any distribution if their shares were treated on a fully as-converted basis (i.e., no preferential distribution under (ii) above), then such shares of the Series A Preferred shall be treated as

though they had converted into Common Stock immediately prior to the distribution at issue.

**Dividends:**

The Series A Preferred will accrue from the applicable closing an annual 8% cumulative dividend (based upon the Original Purchase Price), compounded annually, which shall be payable (i) upon liquidation, dissolution, winding up or a Deemed Liquidation Event or (ii) in shares of Common Stock at the then-prevailing conversion price (which shall in no event be higher than $1.00 per share) upon the conversion of the Series A Preferred to Common Stock.  After payment of any dividends on the Series A Preferred, the holders of the Series A Preferred also would be entitled to participate pro rata in any dividends paid on the Common Stock on an as-if-converted basis.

**Optional Conversion:**

The Series A Preferred would initially convert on a one-for-one basis into the Common Stock at any time at an Investor's option, subject to adjustments for stock distributions, splits, combinations and similar events and as described below under the caption *"Anti-dilution Provisions."*

**Mandatory Conversion:**

The Series A Preferred would automatically be converted into the Common Stock at the then applicable conversion rate (which shall in no event be lower than a 1:1 Series A Preferred to Common Stock ration)  (i) in the event of a closing of a firmly underwritten public offering of shares of the Common Stock at a price of not less than three times (3x) the Original Purchase Price (subject to adjustments for stock distributions, splits, combinations and similar events) and net proceeds to the Company of not less than $25,000,000 (a *"QPO"*) or (ii) with the consent of the holders of at least a majority of the outstanding Series A Preferred (the *"Requisite Investors"*).

**Anti-dilution Provisions:**

Unless waived by the Requisite Investors, in the event that the Company issues additional equity securities at a purchase price less than the current Series A Preferred conversion price (which shall in no event be higher than $1.00 per share), such conversion price would be adjusted on a broad-based, weighted average basis, provided that no such adjustment would occur with respect to: (i) securities issuable upon conversion of any of the Series A Preferred, or as a dividend or distribution on the Series A Preferred; (ii) securities issued upon the conversion of any debenture, warrant, option or other convertible security outstanding as of the date of the

applicable closing; (iii) shares of the Common Stock issuable upon a stock split, stock dividend or any subdivision of shares of the Common Stock; (iv) shares of the Common Stock issued or issuable to employees or directors of, or consultants to, the Company pursuant to any plan approved by the Company's Board of Directors (the ***"Board"***), including at least one Series A Director (as defined below); (v) shares of the Common Stock issued or issuable to banks, equipment lessors pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Board, including at least one Series A Director; (vi) shares of the Common Stock issued or issuable for consideration, other than cash pursuant to a technology license, business combination, strategic partnership or joint venture transaction approved by the Board, including at least one Series A Director; (vii) shares of the Common Stock; and (viii) shares of the Common Stock issued in connection with a QPO (collectively, ***"Excluded Issuances"***).

*Registration Rights:*

*Registrable Securities:*     All shares of the Common Stock issuable upon conversion of the Series A Preferred and any other shares of the Common Stock held by the holders of the Series A Preferred would be ***"Registrable Securities"***.

*Demand Registration:*     Upon the earlier of (i) three (3) years after the Initial Closing or (ii) six (6) months following an initial public offering of the Company's shares of the Common Stock (***"IPO"***), persons holding not less than an aggregate of fifty percent (50%) of Registrable Securities may demand not more than two registrations by the Company of their shares, but only if the aggregate offering price is at least $10,000,000. A registration would count for this purpose only if (A) not less than seventy-five percent (75%) of all Registrable Securities requested to be registered are included in the registration, or (B) it is closed or withdrawn at the request of the demanding holders (other than as a result of a material adverse change to the Company). Holders of the Registrable Securities would have priority in all registrations over all other shares except for in registrations initiated by the Company, in which case the shares being sold by the Company for its own account would have priority.

*Registration on Form S-3:*     The holders of not less than twenty percent (20%) of the Registrable Securities would have the right to require the Company to register on Form S-3, if available for use by the Company, Registrable Securities for an aggregate offering

price of at least $1,000,000.  There would be no limit on the aggregate number of such Form S-3 registrations, provided that there are no more than two (2) per year.  Form S-3 registration rights would be subject to customary limitations, including provisions giving the Company the right under certain circumstances to defer a registration.

*Piggyback Registration:*    The holders of Registrable Securities would be entitled to ***"piggyback"*** registration rights on all registration statements of the Company, subject to the right, however, of the Company and its underwriters to reduce the number of shares proposed to be registered to a minimum of thirty percent (30%) on a pro rata basis and to complete reduction on an IPO at the underwriter's discretion. In all events, the shares to be registered by holders of Registrable Securities would be reduced only after all other stockholders' shares are reduced.

*Expenses:*    The registration expenses (exclusive of stock transfer taxes, underwriting discounts and commissions) would be borne by the Company.  The Company would also pay the reasonable fees and expenses, not to exceed $25,000, of one special counsel to represent all the participating holders of Registrable Securities.

*Lock-up:*    The Investors would agree in connection with the IPO, if requested by the managing underwriter, not to sell or transfer any shares of the Common Stock of the Company for a period of up to one hundred-eight (180) days following the IPO provided all directors and officers of the Company agree to the same restriction, subject to hardship exemptions agreed to by the underwriters.

*Termination of Registration Rights:*    Registration rights would terminate upon the earlier of: (i) a Deemed Liquidation Event or (ii) when all Registrable Securities of an Investor are eligible to be sold without restriction under Rule 144 within any ninety (90)-day period.

## GOVERNANCE:

**Voting Rights:**    The Series A Preferred would vote together with the Common Stock on an as-converted to Common Stock basis and not as a separate class, except (i) with respect to election of directors as described below, (ii) as provided under the caption ***"Protective Provisions"*** below or (iii) as required by law.

**Protective Provisions:**    The Company would not, without the written consent of the

holders of at least a majority of the Series A Preferred, either directly or by amendment, merger, consolidation or otherwise: (i) liquidate, dissolve or wind-up the affairs of the Company, or effect any Deemed Liquidation Event; (ii) amend, alter, or repeal any provision of the Certificate of Incorporation or Bylaws in a manner adverse to the Series A Preferred; or (iii) create or authorize the creation of or issue any other security convertible into or exercisable for any equity security having rights, preferences or privileges senior to, or on parity with, the Series A Preferred, or increase the authorized number of shares of the Series A Preferred.

The Company would not, without the approval of the Board, including the approval of at least one Series A Director (as defined below), either directly or by amendment, merger, consolidation or otherwise: (i) adopt an annual operating budget (the ***"Budget"***); (ii) create or authorize the creation of any debt in excess of $100,000 individually or $200,000 in the aggregate; (iii) make any capital expenditure in excess of $200,000 individually or $500,000 in the aggregate that was not contemplated by the then-approved Budget; (iv) hire or terminate any senior executive; (v) purchase or redeem or pay any dividend on any capital stock prior to the Series A Preferred, other than stock repurchased from former employees or consultants in connection with the cessation of their employment/services or other than as approved by the Board; (vi) increase or decrease the size of the Board; (vii) make any loan or advance to any person, including any employee or director, except advances and similar expenditures in the ordinary course of business or under the terms of an employee stock or option plan approved by the Board; or (viii) guarantee any indebtedness except for trade accounts of the Company.

***Board of Directors:***    After the Initial Closing, the Board would consist of five (5) individuals.  The holders of the Series A Preferred, voting as a separate class, would be entitled to appoint two (2) members of the Board as designated by the holders of a majority in interest of the Series A Preferred (each a ***"Series A Director"***), who would initially be Victor Whitman and another to be named individual.  The holders of the Common Stock and the Series A Preferred, voting as a single class on an as converted to shares of the Common Stock basis, would be entitled to elect the remaining three (3) members of the Board, (i) one (1) of whom would be the Company's CEO, (ii) one (1) of whom would be mutually acceptable to the

other members of the Board who would initially be Andrew Taylor and (iii) one of (1) of whom is designated by a the holders of the Common Stock and the Series A Preferred, voting as a single class on an as converted to shares of the Common Stock basis.  Such composition of the Board would be prescribed by a voting agreement entered into by and among the Company and the holders of the Company's capital stock.  The Company shall pay all reasonable expenses of the Board members, including costs relating to service on a Board committee.

**ADDITIONAL RIGHTS:**

***Information Rights:***

The Company would deliver to the Investors (unless waived by the holders of at least a majority of the Series A Preferred): (a) within thirty (30) days after the end of each calendar quarter, management-prepared and certified financial statements; and (b) at least thirty (30) days prior to the end of each fiscal year, a comprehensive operating budget forecasting the Company's revenues, expenses and cash position on a month-to-month basis for the upcoming fiscal year, which would be subject to Board approval, including at least one Series A Director.

***Right to Participate Pro Rata in Future Financings:***

The Investors would have a pro rata right, based on their respective percentage equity ownership in the Company (assuming the conversion of all outstanding shares of the Series A Preferred into shares of the Common Stock and the exercise of all warrants and options outstanding under any stock plan of the Company), to participate in subsequent issuances of equity securities of the Company (other than Excluded Issuances and issuances in connection with acquisitions by the Company).

***Rights of Refusal/Co-Sale:***

The Company first and the Investors second would have a right of first refusal with respect to any shares of capital stock of the Company proposed to be sold by any holder of the Common Stock or any other management employee holding Common Stock or rights to acquire Common Stock for more than five percent (5%) of the fully diluted equity of the Company (collectively, the ***"Key Holders"***).  Before any Key Holder could sell such capital stock, such Key Holder would give the Investors an opportunity to participate in such sale on a basis proportionate to the number of shares of capital stock held by such Key Holder and those held by the Investors.

7

| | |
|---|---|
| ***Drag-Along Right:*** | Each holder of shares of capital stock of the Company (including without limitation the Series A Preferred) would be required to enter into an agreement that provides that such holders will vote their capital stock in favor of any sale of the Company (whether structured as a merger, reorganization, asset sale, stock sale, licensing transaction or otherwise), that is approved by a majority of the Board and holders of at least a majority of the Series A Preferred and the Common Stock, voting together as a single class on an as if converted to Common Stock basis. |

**OTHER:**

| | |
|---|---|
| ***Vesting of Stock Awards:*** | Unless otherwise approved by the Board, stock awards under the equity incentive plan would vest as follows: twenty five percent (25%) after one (1) year, with the remainder vesting in equal quarterly installments over the following three (3) years. |
| ***Documentation:*** | The transaction would be documented by counsel to the Company with documents containing the provisions described above and consisting of the following: |

- Amended and Restated Certificate of Incorporation;

- Series A Preferred Stock Purchase Agreement;

- Investor Rights Agreement;

- Right of First Refusal and Co-Sale Agreement; and

- Voting Agreement.

| | |
|---|---|
| ***Conditions to Closing:*** | The Initial Closing would be subject to satisfaction or waiver of the following conditions, among others: (i) satisfactory completion of intellectual property, financial, regulatory and legal due diligence of the Company by the Investors; (ii) qualification of the sale of the Series A Preferred under applicable Blue Sky laws; (iii) filing of the Amended and Restated Certificate of Incorporation establishing the rights and preferences of the Series A Preferred; and (iv) the Company's receipt of confirmation of the Company's plan of reorganization by the Bankruptcy Court. |
| ***Expenses:*** | Each party shall bear its own costs and expenses incurred in connection with transactions contemplated hereby except that the Company shall at the Initial Closing reimburse one |

counsel to the Investors for the reasonable fees and expenses (including, without limitation, legal fees and disbursements) incurred by the Investors in connection with the transactions contemplated hereby (up to the aggregate amount of $40,000).

***Non-Binding Terms:***          This Summary of Terms is not an offer subject to acceptance or a legally binding commitment by the Company, and no obligation will be created by execution of this Summary of Terms unless and until definitive documents have been executed and delivered.

**SIGNATURES ON THE FOLLOWING PAGE**

The undersigned hereby agree to the foregoing terms.  This instrument may be executed and delivered in one or more counterparts and by facsimile or other electronic means of execution and delivery, each of which will constitute an original, and all of which will constitute one and the same instrument.

**THE COMPANY:**                                **INVESTOR INDICATION OF INTEREST:**

                                                **INVESTOR NAME:**

**ANGEL MEDICAL SYSTEMS, INC.**                 **[INSERT NAME]**

By:_____           By:_____
Name: David R. Fischell, Ph.D.        Name:_____
Title: Chief Executive Officer        Title:_____

                                      Amount of Purchase: $_____

                                      Date: December _____, 2018

SIGNATURE PAGE TO
THE SUMMARY OF TERMS OF THE SERIES A PREFERRED FINANCING OF
ANGEL MEDICAL SYSTEMS, INC.

**EXHIBIT A**

**PRO-FORMA CAPITALIZATION***

|  | PRE-CLOSING** | | POST-CLOSING | |
|---|---|---|---|---|
|  | # of Shares | % Fully Diluted | # of Shares | % Fully Diluted |
| Series A Preferred from Senior Notes | 2,661,826** | 30.8% | 2,661,826 | 12..5% |
| Common Stock Outstanding from Junior Notes | 5,970,949** | 69.2% | 5,970,949 | 28% |
| Series A Preferred Outstanding (DIP Notes) | 0 |  | 2,564,103 | 12.% |
| Series A Preferred Outstanding (New Money) | 0 |  | 8,000,000 | 37.5% |
| Unallocated Stock Pool | 0 |  | 2,132,986 | 10% |
| **TOTAL:** | **8,632,775** | **100.00%** | **21,329,864** | **100.00%** |

*These figures represent the conversion of $2,000,000 in principal of the outstanding DIP Notes (excluding interest) and the sale of the Minimum Amount of $10,000,000 (including the DIP Amount) in new money in value of the Series A Preferred.

**Following Conversion of 2012, 2014 and 2016 notes to common/Series A preferred, but before conversion DIP Notes to Series A and before closing of Series A for New Money.

29344433