## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In Re:                             )

                                   )

ANGEL MEDICAL SYSTEMS, INC.,  )        Chapter 11

a Delaware corporation,           )        Case No. 18-12903 (   )

                                   )

        Debtor.[1]              )

                                   )

## MOTION OF THE DEBTOR FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY AND (VI) SCHEDULING A FINAL HEARING

Angel Medical Systems, Inc. (the "**Debtor**"), as debtor and debtor in possession in the above-captioned case (the "**Chapter 11 Case**"), by its undersigned counsel, files this motion (the "**Motion**") requesting the entry of an interim order (the "**Interim Order**"), substantially in the form attached hereto as **Exhibit B**, and a final order (the "**Final Order**"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"): (i) authorizing the Debtor to obtain senior secured postpetition financing in a principal amount not to exceed $2,500,000.00 in the aggregate   (the "**DIP Facility**"), pursuant to the Debtor's sale of certain Senior Secured Super-Priority Convertible Promissory Notes (the "**Notes**") on the terms described herein and in that certain Note Purchase and Secured Debtor-in-

---

[1] The Debtor's address is 40 Christopher Way, Suite 201, Eatontown, NJ 07724.  Its EIN is 52-2360129.

Possession Loan Agreement (the "**Note Purchase Agreement**");[2] (ii) granting the purchasers of the Notes (the "**Purchasers**") allowed superpriority administrative expense claims in the Chapter 11 Case and any Successor Case (as defined below) for any and all obligations of the Debtor owing under the Notes, the Note Purchase Agreement, and the Escrow Agreement (collectively, the "**DIP Documents**") (collectively, and including all obligations of the Debtor as described in the DIP Documents, the "**DIP Obligations**"); (iii) granting the Collateral Agent, for the ratable benefit of the Purchasers, automatically perfected first priority security interests in and liens on all of the Collateral (as defined below), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"); (iv) authorizing the Debtor's use of any prepetition collateral, including the Cash Collateral, and the Debtor providing adequate protection to the Prepetition Lien Holders that may have an interest in such prepetition collateral, including Cash Collateral, for any diminution in value of their interests therein; (v) scheduling a final hearing with respect to the relief requested herein; and (vi) granting related relief. In support of this Motion, the Debtor incorporates the statements contained in the *Declaration of Andrew Taylor in Support of Chapter 11 Petition and First-Day Relief* (the "**First Day Declaration**") filed contemporaneously herewith and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Debtor is a privately held pre-commercial medical device company with approximately fifty issued patents. The Debtor has developed the AngelMed Guardian System (the "**Guardian System**"), which is an implantable cardiac monitoring and alerting system that is designed to warn cardiac patients of potentially life-threatening acute coronary syndromes

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Note Purchase Agreement and/or the Interim Order, as applicable.

("**ACS**"), including heart attacks.  It is well known that getting early treatment for heart attacks is extremely beneficial and potentially life-saving.  In a five year clinical study, the Guardian System demonstrated that the warning provided by it provides a more accurate and earlier indication of ACS than a patient relying on symptoms alone and can materially shorten the time between the commencement of an incident to Emergency Room arrival.

2.     On April 9, 2018, the Food and Drug Administration approved the Debtor's Pre-Market Approval submission and approved the commercialization of the Guardian System.  The FDA approved indication for use ("**IFU**") allows the Guardian System to be prescribed for patients with a prior ACS event at high risk for another one.  More than two million Americans would qualify today based in this IFU.  The FDA in its summary of safety and efficacy states: "An important consideration is that the device fills an unmet medical need by providing more effective diagnosis of a life-threatening condition comparted to relying on patient symptoms alone."

3.     Other than for liquidity constraints arising from the pending debt maturities discussed below, the Debtor believes that it is poised to successfully launch into the commercial stage of its operations in 2019.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**").

5.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    The statutory predicate for the relief requested herein is sections 105(a), 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2.

## BACKGROUND

### A.    General

8.    On the date hereof (the "**Petition Date**"), the Debtor filed its voluntary petition to commence this Chapter 11 Case.  The Debtor is authorized to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee has been appointed in this Chapter 11 Case and no request has been made for the appointment of a trustee or an examiner.

9.    Additional information regarding the Debtor's business, its capital structure, and the circumstances leading to the filing of this Chapter 11 Case is set forth in the First Day Declaration and in the Disclosure Statement to the Plan, which has also been filed on the Petition Date.

### B.    Prepetition Indebtedness

10.    Prior to the Petition Date, the Debtor issued three tranches of secured debt that are described in more detail below.

### 1.    Secured Notes

11.    Pursuant to a Note Purchase and Security Agreement, dated as of December 5, 2012 (as amended), by and among the Debtor, as the borrower, Bioinfo Accelerator Fund, LLC, as agent, and the noteholders party thereto, the Debtor issued certain secured notes (the "**2012 Notes**").  As of the Petition Date, $20,646,000 in aggregate unpaid principal, plus interest, fees and other expenses, is outstanding under the 2012 Notes.

12.    Pursuant to a Note Purchase and Security Agreement, dated as of November 25, 2014 (as amended), by and among the Debtor, as the borrower, Bioinfo Accelerator Fund, LLC,

as agent, and the noteholders party thereto, the Debtor issued an additional series of secured notes (the "**2014 Notes**").  As of the Petition Date, $20,430,000 in aggregate unpaid principal, plus interest, fees and other expenses, is outstanding under the 2014 Notes.

13.     Further, pursuant to a Note Purchase and Security Agreement, dated as of September 20, 2016 (as amended), by and among the Debtor, as the borrower, Bioinfo Accelerator Fund, LLC, as agent, and the noteholders party thereto, the Debtor issued a third series of secured notes (the "**2016 Notes**").  As of the Petition Date, $1,956,442 in aggregate unpaid principal, plus interest, fees and other expenses, is outstanding under the 2016 Notes.

14.     Each of the 2012 Notes, the 2014 Notes and the 2016 Notes is secured by security interests in and liens on substantially all of the assets of the Debtor, *excluding intellectual property* (the "**Pre-Petition Collateral**"). As is common with start-up entities, there is a material overlap in the holders of these pre-petition Notes and the holders of equity interests in the Debtor, including by insiders.

15.     All of the 2012 Notes, the 2014 Notes and the 2016 Notes mature on December 31, 2018 (the "**Maturity Date**").

16.     Under the terms of an Intercreditor Agreement, dated as of September 20, 2016 (the "**2016 Intercreditor Agreement**"), the 2016 Notes are senior in both right of payment and lien priority to the 2012 Notes and the 2014 Notes.  A copy of the 2016 Intercreditor Agreement is attached as an Exhibit to the First Day Declaration.  Under the terms of a further Intercreditor Agreement, dated as of November 25, 2014, the 2012 Notes and the 2014 Notes are of equal rank and priority of payment.

17.      Because the Debtor is in the pre-revenue stage of its life cycle and has not begun to commercialize the Guardian System, *the vast majority of the Debtor's asset value is attributable to its intellectual property, which is unencumbered.*

18.      The Debtor believes that the value of all of its assets (excluding intellectual property) is less than the amount owed under the 2016 Notes.  Therefore, given the 2016 Intercreditor Agreement, the Debtor believes that claims attributable to the 2012 Notes and the 2014 Notes, respectively, are entirely unsecured.

19.      Because the collateral securing the 2016 Notes excludes intellectual property and because the remainder of such collateral is estimated to be of only fractional value in relation to the $1,956,442 in aggregate unpaid principal amount owed to the holders of the 2016 Notes as of the Petition Date, the Debtor believes that claims attributable to the 2016 Notes are substantially undersecured.  The holders of the 2016 Notes, through their agent, are consenting to the DIP Facility and, among other things, the priming of pre-petition liens that were granted and may exist in their favor.  Given this fact, the 2016 Intercreditor Agreement precludes the holders of the 2012 Notes and the 2014 Notes from objecting to the DIP Facility.

**2.      Other Possible Secured Claims**

20.      Financing statements have been filed against the Debtor asserting discrete security interests in various pieces of equipment that comprise a building security system financed by Beneficial Equipment Finance Corporation ("**Beneficial**").  As of the Petition Date, the Debtor believes only approximately $2,000 in aggregate principal liabilities are outstanding and unpaid to Beneficial.  Moreover, the Debtor believes that the obligations owed to Beneficial are actually on account of a true lease and that Beneficial is not a secured creditor.

21.     Certain third parties, including state and local taxing authorities, also might assert or possess statutory liens in certain of the Debtor's property in accordance with applicable state law.

**3.     Unsecured Obligations**

22.     As the Debtor has not yet begun the commercial phase of its enterprise, the Debtor has a relatively small amount of trade debt and operational debt.  The Debtor believes that the amount of trade payables outstanding as of the Petition Date, largely constituting unpaid professional fees, is less than $500,000.

**C.     The Debtor's Immediate Need for Liquidity**

23.     Without the proposed DIP Facility and continued access to cash collateral, the Debtor will have insufficient liquidity to operate its business, and it will be unable to fund ordinary course expenditures or pay expenses necessary to administer the Chapter 11 Case, the most significant of which are payroll expenses and payments to the vendors preparing to manufacture the Guardian System for the Debtor. Simply put, without access to financing, the Debtor will be required to cease operations and liquidate, causing irreparable harm to the Debtor, its estate and all other stakeholders. Further, absent financing, the Debtor will not be able to bring to market a medical device that fills an unmet need for better diagnosis of a life-threatening condition as the knowhow and expertise that resides in the Debtor's people will be lost.  With access to the DIP Facility and the protections afforded by the Bankruptcy Code, the Debtor believes that it will be able to successfully bridge its liquidity needs and maintain its ordinary course business operations through and including the effective date of the Plan.

**D.      The Debtor's Efforts to Obtain Financing**

24.      As set forth in detail in the First Day Declaration, the Debtor has been actively seeking financing from both existing stakeholders and third parties.  In connection therewith, the Debtor solicited more than thirty potential outside sources of capital for combination of debtor-in-possession bridge financing and exit financing. The Debtor was unable to obtain alternative financing terms from other lenders that were more favorable than the proposed DIP Facility. Further, the willingness of the Purchasers to provide the DIP Facility is being provided in the context of a global restructuring plan, whereby the Purchasers will convert the obligations under the DIP Facility into equity in the Reorganized Debtor.

25.      The Debtor, in its business judgment, has determined that the DIP Facility is the Debtor's best available option for financing.  Although insiders (including the Debtor's Chief Financial Officer) are Purchasers under the DIP Facility, MCM Angel Partners, LLC, the Debtor's largest holder of 2016 Notes, is the lead investor in the proposed DIP Facility, and has negotiated the terms of the DIP Facility with the Debtor.  The Debtor believes that the terms of the DIP Facility are fair and reasonable.  In the Debtor's business judgment, approval of the DIP Facility is in the best interests of the Debtor, its estate and its various stakeholders, and the DIP Facility will provide the Debtor with sufficient liquidity during the pendency of the bankruptcy case.

<u>**RELIEF REQUESTED**</u>

26.      For the reasons set forth herein, the Debtor requests authorization from the Court to enter into the DIP Facility pursuant to the terms set forth in this Motion, the Note Purchase Agreement attached hereto as <u>**Exhibit C**</u> and the other DIP Documents, the Interim Order and the Final Order.  Among other things, the Debtor seeks to grant to the Collateral Agent, for the ratable benefit of the Purchasers, first priority security interests in and priming liens on all of the

Collateral, subordinate only to the Carve-Out (defined below), and to obtain authorization for the Debtor to use the borrowings under the DIP Facility and to use Cash Collateral during the period commencing immediately after the entry of the Interim Order, and as provided in the DIP Documents and for the purposes set forth in the Budget.

## MATERIAL TERMS OF THE DIP FACILITY

27.     Bankruptcy Rule 4001(c)(1)(B) requires that a motion for authority to obtain credit list or summarize, and set out the location within the relevant documents, all material provisions of the proposed DIP Documents and form of order, including interest rate, maturity, events of default, liens, borrowing limits and borrowing conditions.   Fed. R. Bankr. P. 4001(c)(1)(B).  The principal terms of the DIP Facility are as follows:[3]

| | |
|---|---|
| ***Borrower/Issuer:*** | ANGEL MEDICAL SYSTEMS, INC., a Delaware corporation and debtor and debtor in possession in the Chapter 11 Case (the **"Company"**). Note Purchase Agreement, §1.1(a). Interim Order at ¶ 2. |
| ***Amount:*** | Up to $2,500,000, provided that the Company's Board of Directors subject to Court approval in the Chapter 11 Case, may approve a higher amount based upon indications of interest.  Note Purchase Agreement, §1.2(c). A principal amount not to exceed $600,000 shall be made available to the Company upon entry of the Interim Order and pending entry of the Final Order. Interim Order at ¶ 2(b). |
| ***Purchasers:*** | Purchasers who are reasonably acceptable to the Company and who qualify as "accredited investors" under Regulation D of the Securities Act of 1933, as amended, who are signatories to and who appear on Exhibit A to the Note Purchase Agreement (each, a **"Purchaser"** and |

---

[3] This summary is qualified, in its entirety, by the provisions of the Note Purchase Agreement, the other DIP Documents and the Interim Order. Unless otherwise defined within this Motion, capitalized terms used within this summary shall have the meanings given to them in the Note Purchase Agreement, the other DIP Documents and/or the Interim Order, as applicable.

collectively, the **"Purchasers"**).  Interim Order at ¶ 2(a).

| | |
|---|---|
| ***Type of Security:*** | Senior Secured Super-Priority Convertible Promissory Notes (*see* <u>Exhibit B</u> to Note Purchase Agreement), bearing interest at a simple interest rate of 12% calculated on the basis of a 360-day year consisting of twelve 30-day months (the **"Notes"**). Note Purchase Agreement, §1.5(d) Interim Order at ¶ 2(a). The default interest rate on the Notes shall be the interest rate then in effect plus four percent (4%) per annum. *Id.* The Notes will be secured by the DIP Liens on the Collateral as summarized below and as provided in the Note Purchase Agreement. Interim Order at ¶ 2(d)-(f). |
| ***Use of Proceeds:*** | To (i) pay fees and expenses related to the sale and issuance of the Notes and the administration of the Chapter 11 Case, (ii) fund working capital and general corporate purposes in the ordinary course of business of the Company, (iii) pay obligations arising from or related to the Carve-Out (as defined below), (iv) pay Professional Fees (as defined below) and (v) be used for such other purposes as are permitted by the DIP Orders (as defined below), and the other DIP Documents, as applicable.  Note Purchase Agreement, §1.4. Interim Order at ¶ 2(h) and ¶ 3. |
| ***Term of Payment:*** | Unless the Notes are converted into shares of the Series A Preferred (as defined below) in the Series A Preferred Financing (as defined below), all obligations of the Company under the Notes and the definitive agreements for the Notes (the "**DIP Obligations**") are to be repaid in full in cash at <u>the earliest of</u> (i) one (1) year following the Petition Date (the "**Stated Maturity Date**"), (ii) the 45th day after the Interim Order Entry Date, if the Final Order Entry Date shall not have occurred by such date, (iii) the closing date of a sale of all or substantially all of the assets of the Company under Section 363 of the Bankruptcy Code and (iv) the acceleration of the Notes, including, without limitation, as a result of the occurrence of an Event of Default under the Notes (any such date, the "**Maturity Date**").  Note Purchase Agreement, §1.5(a). Interim Order at ¶ 10. |
| ***Closing:*** | The first closing of the sale and issuance of the Notes to the Purchasers shall occur within one (1) business day of the later of the following events: (i) the date the Company has received commitments to purchase Notes having an aggregate principal amount equal to not less than $2,000,000 and (ii) the date on which the Bankruptcy Court issues an |

interim order approving the DIP Facility, the sale and issuance of the Notes and all definitive actions contemplated by the Note Purchase Agreement (the ***"Interim Order"***). Note Purchase Agreement, §1.2(b). Interim Order at ¶ 2(a). As used herein, the term **"Interim Order"** means an interim order issued by the United States Bankruptcy Court for the District of Delaware (the "**Court**") in the Chapter 11 Case approving the DIP Facility, including the Debtor's sale and issuance of the Notes and the Debtor's execution, delivery and performance of the DIP Documents. Interim Order at ¶ 2(a). Additional sales and issuances of Notes may occur following entry of a Final Order (defined below) and prior to the Effective Date of the Plan. Note Purchase Agreement, §1.2(c).

| | |
|---|---|
| ***Final Order Entry Date:*** | The date of entry on the docket in the Chapter 11 Case of an order approving the Company's sale and issuance of the Notes on a final basis (such date, the **"Final Order Entry Date"**), which order shall be in form and substance consistent with this Summary of Terms and the DIP Documents (the **"Final Order,"** and together with the Interim Order, collectively, the **"DIP Orders"**). Note Purchase Agreement, §1.5(a). |
| ***Conversion of the Notes:*** | Following the Effective Date of the Plan, which is confirmed by an order of the Court, and upon the closing by the Company on the sale and issuance of shares of the Company's next issuance series of preferred stock (such newly designated shares, the **"Series A Preferred"**) that results in committed gross proceeds to the Company of not less than $10,000,000 (the **"Series A Preferred Financing"**), the outstanding principal of the Notes (no accrued and unpaid interest on the Notes will be included), would automatically convert into shares of the Series A Preferred at a price per share equal to 78% of the per share price such shares of the Series A Preferred are issued in the Series A Preferred Financing. Note Purchase Agreement, <u>Exhibit B</u>, Form of Note, §§3(a) and (b). Interim Order at ¶ 2(a). |
| ***Super Priority Administrative Claims:*** | Subject and subordinate to the Carve-Out (as defined below) in all respects, the DIP Obligations shall constitute allowed superpriority administrative expense claims and shall have priority over all other allowed Chapter 11 and Chapter 7 administrative expense claims, including expenses of a chapter 11 trustee and/or a chapter 7 trustee, under Sections 364(c)(1), 503(b), 507(a)(2) and 507(d) of the Bankruptcy Code. |
| | **"Carve-Out"** means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under |

section 1930(a) of title 28 of the United States Code (without regard to the notice set forth in (ii) below); (ii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court, all unpaid fees (including transaction fees paid upon the closing of the respective transactions but excluding any success fees) and expenses (collectively, the **"Professional Fees"**) accrued or incurred by persons or firms retained by the Debtor pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (the **"Debtor Professionals"**) and any official committee of unsecured creditors (the **"Creditors' Committee"**) appointed in the Chapter 11 Case pursuant to Sections 328 or 1103 of the Bankruptcy Code (the **"Committee Professionals"** and, together with the Debtor Professionals, the **"Professional Persons"**) at any time on or prior to delivery by the Investors of a Carve-Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iii) the Professional Fees in an aggregate amount not to exceed $150,000.00 for amounts incurred after the date of delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court (the amounts set forth in this clause (iii) being the **"Post-Carve-Out Trigger Notice Cap"**).

**"Carve-Out Trigger Notice"** means a written notice delivered by email (or other electronic means) to the Investors, the United States Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an event of default under the Notes, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

No portion of the Carve-Out, any cash collateral or proceeds of the Notes or any other amounts may be used for the payment of the fees and expenses of any person incurred in challenging, or in relation to the challenge of, (i) the Purchasers' or the Collateral Agent's liens or claims, or the initiation or prosecution of any claim or action against any or all of the Purchasers and/or the Collateral Agent, including, without limitation, any claim(s) under Chapter 5 of the Bankruptcy Code, and any other federal, state or foreign law, in respect of the Notes and/or the other DIP Documents or (ii) any claims or causes of actions against any or all of the Purchasers and/or the Collateral Agent, their advisors, professionals, agents and sub-agents, regarding the Notes and/or the other DIP Documents, including formal discovery proceedings in anticipation thereof, and/or any liens of the Collateral Agent, for the ratable benefit of the Purchasers.   Note Purchase Agreement, §1.5(e)(iii). Interim Order at ¶ 2(i) and ¶ 6.

*Note Liens:*          Subject and subordinate only to the Carve-Out in all respects, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code,

the DIP Obligations shall be secured by liens (the **"DIP Liens"**) on substantially all assets and property of the Company whether now owned or hereafter acquired, and all proceeds thereof. Note Purchase Agreement, §1.5(e)(i). Interim Order at ¶ 2(d)-(f).

All of the DIP Liens shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution, delivery, or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements or instruments. Note Purchase Agreement, §1.5(e)(ii). Interim Order at ¶ 4.

***Note Purchase Agreement:***   The sales of the Notes would be made pursuant to the Note Purchase Agreement. Interim Order at ¶ 2(a). The Note Purchase Agreement contains, among other things, customary representations and warranties of the Company, representations and warranties of the Purchasers, covenants of the Company, and restrictions on transfer of the Notes. Note Purchase Agreement, Article 2.

***Information Rights:***   The Company will provide (i) quarterly financial statements and (ii) notice of all meetings of stockholders (or written consent taken in lieu thereof) to all of the Purchasers. The Company will provide annual financial statements to all of the Purchasers. Note Purchase Agreement, §4.1(i). Interim Order at ¶ 2(a).

***Exercise of Remedies:***   Rights under the Notes (including but not limited to demand for payment of the Notes) can be modified or exercised only by the holders of a majority in interest of the principal amount of the Notes thereof on behalf of all other such holders of the Notes. Note Purchase Agreement, §5.7. Interim Order at ¶ 2(a), ¶ 12 and ¶ 13.

## REQUIREMENTS UNDER LOCAL RULE 4001-2

28.    Local Rule 4001-2 requires that certain provisions contained in the DIP Documents be highlighted and that the Debtor provide justification for the inclusion of such highlighted provisions. The Debtor below identifies and discusses certain provisions of the DIP Documents and the Interim Order.

29.    <u>Waiver of Section 506(c) of the Bankruptcy Code</u>: Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under section 506(c) of the Bankruptcy Code. <u>See</u> Del. Bankr. L.R. 4001-

2(a)(i)(C).  The Interim Order provides that the waiver of any rights under section 506(c) of the Bankruptcy Code is subject to entry of the Final Order.  Because this waiver only will be effective upon entry of the Final Order and to the extent provided in the Final Order, parties in interest will receive notice and an opportunity to be heard.  Thus, the waiver will not be "without notice."

30.    <u>Carve-Out</u>: Local Rule 4001-2(a)(i)(F) requires disclosure of *disparate* treatment between the professionals retained by the Debtor and the professionals retained by the unsecured creditors' committee with respect to a professional fee carve out.  <u>See</u> Del. Bankr. L.R. 4001-2(a)(i)(F).  Budgeted professional fees comprise the primary component of the Carve-Out.  The Budget provides for anticipated fees of the Committee's professionals, if any, and the Debtor's professionals without differentiation.  The Debtor submits that the total proposed amount is at a level common in cases of similar size and/or complexity.

31.    <u>Waiver of Section 552(b)(1)</u>: Pursuant to Local Rule 4001-2(a)(i)(H), a movant must identify any provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).  The Interim Order provides that in in light of the agreement by the Purchasers to subordinate their liens and superpriority claims to the Carve-Out, the Purchasers and the Collateral Agent are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply with respect to proceeds, product, offspring or profits of any of the Collateral.  <u>See</u> Interim Order at 15(f).  The Debtor believes that such relief is typically granted and is just and appropriate.

32.    <u>Indemnification</u>: Section 5.2 of the Note Purchase Agreement contains an indemnification by the Debtor in favor of the Collateral Agent, the Purchasers, and their respective affiliates and their respective officers, directors, employees, agents, attorneys and

advisors. Such an indemnification is usual and customary in these types of financing arrangements.

### REQUEST FOR APPROVAL OF THE DIP FINANCING AND RELATED ACTIONS

### I.     Sections 364(c) and (d) of the Bankruptcy Code

33.     As described above, it is essential to the success of the Debtor's Chapter 11 Case that the Debtor immediately obtains access to sufficient postpetition financing and use of cash collateral.  The preservation of estate assets and the Debtor's ability to maximize value for its stakeholders is dependent on expeditiously obtaining such approval.

34.     If a debtor in possession cannot obtain postpetition credit on an unsecured basis, Bankruptcy Code § 364 permits a court to authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination thereof.  <u>See</u> 11 U.S.C. § 364(c).[4]

35.     Furthermore, Bankruptcy Code § 364(d)[5] permits a court to authorize a debtor to obtain postpetition credit secured by a lien that is equal or senior in priority to existing liens on

---

[4] Section 364(c) of the Bankruptcy Code provides as follows:

        (c)      If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

        (1)      with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

        (2)      secured by a lien on property of the estate that is not otherwise subject to a lien; or

        (3)      secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

[5] Section 364(d) of the Bankruptcy Code provides as follows:

        (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

        (A)      the trustee is unable to obtain such credit otherwise; and

        (B)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

        (2)      In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

encumbered property, *i.e.*, a "priming" lien, in circumstances where a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or the existing lienholders otherwise consent to the priming of their liens.

## II.    Approval Under Section 364(c) of the Bankruptcy Code

36.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c); see In re Los Angeles Dodgers LLC, 457 B.R. 308, 318 (Bankr. D. Del. 2011) citing In re Ames Dep't Stores, 115 B.R. 34, 37–38 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

37.    Courts have utilized a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(1)    the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

(2)    the credit transaction is necessary to preserve the assets of the estate; and

(3)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test); In re Los Angeles Dodgers LLC, 457 B.R. at 313 citing In re Ames Dep't Stores, 115 B.R. at 39.

---

11 U.S.C. § 364(d).

**A.     The Debtor Was Unable to Obtain Postpetition Financing On An Unsecured Basis**

38.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code.  Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id.; see also In re Ames Dep't Stores, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

39.     As described above, the Debtor made reasonable efforts to investigate the potential availability of debtor-in-possession financing, in a manner and to an extent reasonable and adequate to satisfy the requirements of Bankruptcy Code § 364(c).  See, e.g., In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (a debtor seeking financing under section 364(c) of the Bankruptcy Code made an acceptable attempt to obtain less onerous financing by speaking to several lenders that denied the loan request); In re Ames Dep't Stores, 115 B.R. at 40.

### B. The DIP Financing is Necessary to Preserve and Maximize the Value of the Property of the Debtor's Estate

40. It is essential that the Debtor immediately obtains approval to enter into the DIP Facility. The financing available pursuant to the DIP Facility is essential to preserve and to maximize the value of the property of the Debtor's estate and to otherwise permit the Debtor to administer the Chapter 11 Case. If the Debtor is without sufficient funds to operate and to administer this Chapter 11 Case, the Debtor will be unable to continue to pursue commercialization of the Guardian System, and will be forced to curtail its operations to the detriment of the Debtor, its estate, its creditors and its other stakeholders.

### C. The Terms of the DIP Facility are Fair, Reasonable and Appropriate Given the Circumstances

41. The terms and conditions of the DIP Facility should be evaluated by the Court based on the Debtor's financial circumstances and alternatives. See, e.g., In re W. Pac. Airlines, Inc., 223 B.R. 567, 572 (Bankr. D. Colo. 1997); In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003).

42. The terms of the DIP Facility are fair and reasonable under the circumstances and considering the lack of viable alternatives in light of the Debtor's reasonable prior efforts. The DIP Facility provides sufficient liquidity to the Debtor in its efforts to bridge to the confirmation and effective date of the Plan and to thereafter utilize the contemplated exit financing to pursue commercialization of the Guardian System, which is essential to maximizing the value of the Debtor's estate for the benefit of the Debtor's creditors and other stakeholders. The Debtor was unable to procure a commitment from any party for a postpetition loan on terms that were superior to those of the DIP Facility or financially viable to the Debtor. In the Debtor's business judgment, the DIP Facility is the best means of satisfying the Debtor's immediate liquidity needs and providing a forward path to its successful exit from the Chapter 11 Case.

43. The DIP Facility does not prejudice the Debtor's estate or other parties in interest by limiting or restricting the services of case professionals. See In re Tenney Vill. Co., 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989) (denying approval of a financing facility that, among other things, did not provide a carve-out for professional fees). The proposed DIP Facility and the proposed Interim Order provide generally that the security interests and superpriority administrative expense claims granted to the Purchasers and the Collateral Agent are subject to the Carve-Out, which provides for payment of (a) all unpaid fees of the Clerk of the Court and the Office of the United States Trustee and (b) fees and expenses for any professional retained pursuant to sections 327, 328 or 1103 of the Bankruptcy Code of the debtors and any statutory committee of unsecured creditors, as provided therein and subject to the Post-Carve-Out Trigger Notice. Such "carve-outs" are reasonable and necessary to ensure that debtors and creditors' committees receive adequate assistance of counsel and other case professionals. In re Ames Dep't Stores, 115 B.R. at 40.

44. For these reasons, in the Debtor's business judgment, the terms of the DIP Facility are fair and reasonable in light of the circumstances of this Chapter 11 Case.

### D. The DIP Facility is in the Best Interests of the Debtor's Estate and Its Creditors

45. The Debtor believes that the Court's approval of the DIP Facility is in the best interests of the Debtor's estate and its creditors. As stated above, without immediate access to the cash collateral and the funds available under the DIP Facility, the Debtor will face an immediate liquidity crisis.

### III. Approval Under Section 364(d) of the Bankruptcy Code

46. To obtain postpetition credit under Bankruptcy Code § 364(d)(1), there must be a finding, after notice and hearing, that the debtor is "unable to obtain such credit otherwise." See

Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.), 300 B.R. 861, 863, 865 (Bankr. W.D. Pa. 2003) (the debtor met its burden by "contact[ing] numerous lenders", but was unable to obtain credit without a priming lien); In re 495 Cent. Park, 136 B.R. at 630-31 (the debtor is required to make an effort to obtain credit without the requirement of a priming lien, but is not required to seek credit from every possible lender); In re Dunes Casino Hotel, 69 B.R. 784, 796 (Bankr. D.N.J. 1986) (the debtor satisfied Bankruptcy Code § 364(d)(1) where the debtor was unsuccessful in its efforts to borrow funds on an unsecured basis or secured by junior liens).

47.    As described above, the Debtor made reasonable efforts to investigate the possibility of obtaining postpetition financing on terms more favorable to the Debtor than the DIP Facility, but none was available to the Debtor.  Therefore, the requirements of Bankruptcy Code § 364(d)(1)(B) have been satisfied and the DIP Facility should be approved.  The agent for the holders of the 2016 Notes, among other things, has consented to the form of adequate protection being provided to the holders of the 2016 Notes, the 2014 Notes and the 2012 Notes.

### IV.    The Business Judgment Standard

### A.    Entry into the Note Purchase Agreement is an Exercise of the Debtor's Sound Business Judgment

48.    As described above and in the First Day Declaration, after reasonable and appropriate efforts, the Debtor has concluded that the DIP Facility is the best and only viable option available under the circumstances.

49.    Bankruptcy courts typically defer to a debtor's business judgment, unless such decision is arbitrary and capricious.  See Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (the proposed facilities were approved because they "reflect[ed] sound and prudent business judgment on the part of

TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); see also In re CB Holding Corp., 447 B.R. 222, 227 (Bankr. D. Del. 2010); In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("[c]ourts have generally deferred to a debtor's business judgment in granting section 364 financing"); cf. In re Filene's Basement, LLC, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (stating "[t]ransactions under § 363 must be based upon the sound business judgment of the debtor or trustee.").

50.     The Debtor has exercised sound business judgment in determining that obtaining postpetition financing is necessary and that the DIP Facility is fair and reasonable in the circumstances. Given the Debtor's circumstances and the fact that the Debtor has been unable to obtain postpetition financing from any other potential source on terms superior to the DIP Facility, the Debtor's decision to enter into the DIP Facility represents a sound exercise of the Debtor's business judgment.  Therefore, the Court should grant the Debtor authority to enter into, and to perform in accordance with, the Note Purchase Agreement and the other DIP Documents and to obtain the DIP Facility from the Purchasers on the terms described above, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.

## CASH COLLATERAL, PRIMING, AND ADEQUATE PROTECTION

51.     As described above, the Debtor believes that the holders of the 2012 Notes and the 2014 Notes are unsecured creditors and that the holders of the 2016 Notes are substantially undersecured.  Moreover, the holders of the 2016 Notes have consented to the DIP Facility, including, without limitation, the priming of their pre-petition liens in the Pre-Petition Collateral and the form of adequate protection to be provided on account of the Pre-Petition Collateral.

52.     In the event and to the extent that the Debtor has obligations to any party that remain outstanding that are subject to valid, perfected and non-avoidable prepetition liens on the

Debtor's property, these prepetition lienholders are adequately protected. They will receive protection against any diminution in the value of such prepetition lienholder's interest caused by the imposition of the automatic stay by having continuing, valid, binding, enforceable, and perfected postpetition security interests in and replacement liens on the Pre-Petition Collateral that are junior and subordinate, in all respects, to the DIP Liens and the Carve-Out.

53.     The principal purpose of adequate protection is to safeguard the interests of the secured creditor in the collateral against diminution in the value of that interest postpetition. *See* In re 495 Cent. Park, 136 B.R. at 631 (stating that the goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the chapter 11); In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

54.     Bankruptcy Code § 361 provides three non-exclusive means by which adequate protection may be provided to a secured creditor:

> (1)     requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2)     providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3)     granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

Id.

55.     Adequate protection is determined on a case-by-case basis. MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987) ("the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial

'case-by-case' basis.") (citations omitted); <u>In re 495 Cent. Park</u>, 136 B.R. at 631 ("although section 361 presents some specific illustrations of adequate protection, the statute is not exclusive" and "suggests a broad and flexible definition"); <u>See</u> <u>also</u> 3 COLLIER ON BANKRUPTCY ¶ 363.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (stating that section 361 provides examples of adequate protection, but that "[t]hese examples are not intended to be limiting, and the circumstances of the case will dictate the necessary relief to be given").

56.    In this Chapter 11 Case, the Debtor will provide any prepetition lienholders with adequate protection liens which will be subject to the Carve-Out and will otherwise be junior and subordinate, in all respects, to the DIP Liens.  The Debtor submits that, under the circumstances, the foregoing will suffice as adequate protection and the prepetition lienholders are adequately protected with regard to the Debtor's proposed use of cash collateral.

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

57.    The Debtor seeks a modification of the automatic stay imposed by operation of section 362 of the Bankruptcy Code to the extent contemplated by the provisions of the Note Purchase Agreement as described above.

58.    Such stay modification provisions are customary features of postpetition financing facilities and, in the Debtor's business judgment, are reasonable under the circumstances.    Accordingly, the Debtor respectfully requests that this Court modify the automatic stay to the extent contemplated by the DIP Facility and the proposed Interim Order.

## GOOD FAITH FINDING

59.    The terms and conditions of the DIP Facility and the use of cash collateral are fair and reasonable and were negotiated by the parties in good faith and at arms' length.  Therefore, the Purchasers and the Collateral Agent should receive the benefits of section 364(e) of the Bankruptcy Code to the extent that any or all of the provisions of the DIP Facility and the DIP

Documents, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## REQUEST FOR INTERIM HEARING AND AUTHORITY TO MAKE INTERIM BORROWINGS PURSUANT TO THE DIP FACILITY

60.     Pursuant to Bankruptcy Rule 4001(b), the Debtor requests that the Court conduct an interim hearing and authorize the Debtor's entry into and use of the DIP Facility and cash collateral in order to (a) maintain and finance the operations of the Debtor while it pursues confirmation of the Plan, and (b) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest.

61.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Fed. R. Bankr. P. 4001(c).  However, this Court may conduct a preliminary hearing on the Motion and authorize the Debtor to obtaining financing to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate subject to a finding of satisfaction of the business judgment standard.  See, e.g., In re Simasko, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); see also In re Ames Dep't Stores, 115 B.R. at 38.  After this initial fourteen (14)-day period, a debtor is not so limited in its borrowing requests and, with court approval, is entitled to borrow those amounts that it believes prudent in the operation of its business.  See, e.g., In re Simasko, 47 B.R. at 449; In re Ames Dep't Stores, 115 B.R. at 36.

62.     Pursuant to Bankruptcy Rule 4001(c), the Debtor respectfully requests that the Court conduct a preliminary hearing on the Motion and authorize the Debtor, from and after the entry of the Interim Order pending the Final Hearing, to make interim borrowings in a principal amount not to exceed $600,000, pursuant to the terms governing the DIP Facility, and to utilize cash collateral.

## **SCHEDULING FINAL HEARING**

63.     The Debtor respectfully requests that the Court schedule the Final Hearing for a date 14 days after entry of the Interim Order, and set a deadline to object to entry of the Final Order as set forth in the proposed Interim Order.

## **NOTICE**

64.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtor's twenty (20) largest unsecured creditors (excluding insiders); (v) the Securities and Exchange Commission; (vi) the Collateral Agent; (vii) the Agent for the holders of each of the 2016 Notes, the 2014 Notes, and the 2012 Notes and (viii) all parties that have filed a financing statement asserting a lien in any of the Debtor's assets.   Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013(m).   In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court (a) enter an Interim Order substantially in the form attached hereto as Exhibit B; (b) set a date for a hearing to consider entry of the Final Order, and (c) grant such other and further relief as the Court deems just and proper.

*[Remainder of page left intentionally blank]*

Dated:  December 31, 2018          **MORRIS JAMES LLP**

/s/ Jeffrey R. Waxman
Jeffrey R. Waxman (Bar No. 4159)
Eric J. Monzo (Bar No. 5214)
500 Delaware Avenue
Suite 1500
Wilmington, DE 19801-1494
Telephone:  (302) 888-5842
Facsimile:  (302) 504-3942
E-mail: jwaxman@morrisjames.com
E-mail: emonzo@morrisjames.com

      -and-

HONIGMAN MILLER SCHWARTZ AND COHN
LLP
Joseph R. Sgroi, Esquire
Glenn S. Walter, Esquire
2290 First National Building
660 Woodward Avenue
Detroit, Michigan  48226-3506
Telephone:  (313) 465-7000
Facsimile:  (313) 465-7713
E-mail: jsgroi@honigman.com
E-mail: gwalter@honigman.com

Proposed Counsel to the Debtor